# Exhibit 98

# AGREEMENT AND PLAN OF MERGER

among

## QIAGEN NORTH AMERICAN HOLDINGS, INC.,
a California corporation;

## NALEX MERGER SUB, INC.,
a Delaware corporation;

## NEUMODX MOLECULAR, INC.,
a Delaware corporation;

*and*

## SHAREHOLDER REPRESENTATIVE SERVICES LLC,
as the SELLERS' REPRESENTATIVE

Dated as of September <u>13</u>, 2018

Outside Counsel Eyes Only

NMDX0111767

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ...................................................................................**2**
   1.1.   Certain Definitions.................................................................................2
   1.2.   Additional Definitions .........................................................................13

**ARTICLE II DESCRIPTION OF TRANSACTION.** ............................................**15**
   2.1.   Merger of Merger Sub into the Company............................................15
   2.2.   Effect of the Merger ...........................................................................15
   2.3.   Closing; Effective Time ......................................................................15
   2.4.   Certificate of Incorporation and Bylaws; Directors and Officers.........17
   2.5.   Payments; Conversion of Shares .........................................................18
   2.6.   Cancellation of Company Options; Series Q-1 Warrant.......................20
   2.7.   Dissenting Shares ...............................................................................21
   2.8.   Exchange of Certificates and Payment ................................................22
   2.9.   Sellers' Representative.........................................................................23
   2.10.  Determination of Final Adjustments....................................................26

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ...........**27**
   3.1.   Organization and Qualification............................................................27
   3.2.   Subsidiaries ........................................................................................27
   3.3.   Certificate of Incorporation, By-Laws and Corporate Records .............27
   3.4.   Capitalization .....................................................................................27
   3.5.   Authorization; Enforceability..............................................................29
   3.6.   No Violation or Conflict......................................................................29
   3.7.   Compliance with Law .........................................................................30
   3.8.   Governmental Consents and Approvals................................................30
   3.9.   Financial Statements ...........................................................................30
   3.10.  Absence of Undisclosed Liabilities .....................................................31
   3.11.  Conduct in the Ordinary Course; Absence of Changes .........................31
   3.12.  Contracts ............................................................................................33
   3.13.  Governmental Permits ........................................................................36
   3.14.  Taxes..................................................................................................36
   3.15.  Litigation............................................................................................38
   3.16.  Insurance ............................................................................................38
   3.17.  Significant Suppliers...........................................................................38
   3.18.  Real Property ......................................................................................39
   3.19.  Intellectual Property............................................................................40
   3.20.  Personal Property ................................................................................43
   3.21.  Employment Matters; Labor Relations ................................................44
   3.22.  Employee Plans...................................................................................47
   3.23.  Environmental Matters........................................................................49
   3.24.  Brokers...............................................................................................49
   3.25.  Certain Practices .................................................................................49

i

NMDX0111768

| 3.26. | Certain Interests | 50 |
| 3.27. | Bank Accounts | 50 |
| 3.28. | Foreign Corrupt Practices | 50 |
| 3.29. | Voting Required | 51 |
| 3.30. | Disclosure | 51 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB** ........ **51**

| 4.1. | Organization and Qualification | 51 |
| 4.2. | Authorization; Enforceability | 51 |
| 4.3. | No Violation or Conflict | 52 |
| 4.4. | Governmental Consents and Approvals | 52 |
| 4.5. | Accredited Investor Status | 52 |
| 4.6. | Sufficient Funds | 52 |

**ARTICLE V CERTAIN COVENANTS** ........ **52**

| 5.1. | Conduct of Business | 52 |
| 5.2. | Access and Confidentiality | 54 |
| 5.3. | Tax Matters | 56 |
| 5.4. | Insurance | 59 |
| 5.5. | Exclusivity | 59 |
| 5.6. | Third-Party Consents and Governmental Approvals | 60 |
| 5.7. | Further Assurances | 61 |
| 5.8. | Continuing Employee Compensation and Benefit Plans | 61 |
| 5.9. | Retention of Key Employees | 62 |
| 5.10. | Termination of Employee Plans | 62 |
| 5.11. | Public Announcements | 62 |
| 5.12. | Section 280G Stockholder Approval | 62 |
| 5.13. | Stockholders' Approval | 62 |
| 5.14. | Stockholder Notice | 63 |
| 5.15. | Company Cash Position | 63 |
| 5.16. | Determination of Indemnity Escrow | 63 |

**ARTICLE VI CONDITIONS TO CLOSING** ........ **64**

| 6.1. | Conditions Precedent to Obligations of Purchaser and Merger Sub | 64 |
| 6.2. | Conditions to the Company's Obligations at Closing | 67 |

**ARTICLE VII INDEMNIFICATION** ........ **68**

| 7.1. | Survival of Representations, Warranties and Covenants | 68 |
| 7.2. | Investigation | 69 |
| 7.3. | Sellers' Indemnification of Purchaser | 69 |
| 7.4. | Purchaser's Indemnification of the Sellers | 70 |
| 7.5. | Limitations on Indemnification | 70 |
| 7.6. | Assertion of Claims | 71 |
| 7.7. | Materiality Disregarded | 72 |
| 7.8. | Insurance Proceeds | 72 |
| 7.9. | Loss Exclusions | 73 |

Outside Counsel Eyes Only

NMDX0111769

| 7.10. | Exclusive Remedies | 73 |
| 7.11. | Payments | 73 |
| 7.12. | No Double Recovery | 74 |

**ARTICLE VIII MISCELLANEOUS** ...... **74**

| 8.1. | Termination | 74 |
| 8.2. | Notices | 75 |
| 8.3. | Entire Agreement | 77 |
| 8.4. | Binding Effect | 77 |
| 8.5. | Assignment | 77 |
| 8.6. | Modifications and Amendments | 77 |
| 8.7. | Waivers and Consents | 77 |
| 8.8. | No Third Party Beneficiary | 78 |
| 8.9. | Severability | 78 |
| 8.10. | Publicity | 78 |
| 8.11. | Governing Law | 79 |
| 8.12. | Dispute Resolution | 79 |
| 8.13. | Counterparts | 80 |
| 8.14. | Headings | 80 |
| 8.15. | Expenses | 80 |
| 8.16. | Further Assurances | 80 |

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS

| Exhibit A | Form of Surviving Company Certificate of Incorporation |
| Exhibit B | Form of Option Cancellation Agreement |
| Exhibit B-2 | Form of Warrant Cancellation Agreement |
| Exhibit C | Form of Escrow Agreement |
| Exhibit D | Form of Joinder Agreement |
| Schedule I | Assay Availability Dates |
| Schedule II | Instrument Specifications |
| Schedule III | Assay Specifications |
| Schedule IV | COGS Specifications for Assays |

### DISCLOSURE SCHEDULES

| Schedule 3.1 | Organization and Qualification |
| Schedule 3.4(b) | Company Options |
| Schedule 3.4(c) | Convertible Securities |
| Schedule 3.6 | No Violation or Conflict |

iii

Outside Counsel Eyes Only

NMDX0111770

Schedule 3.7          Compliance with Law
Schedule 3.8          Governmental Consents and Approvals
Schedule 3.10         Absence of Undisclosed Liabilities
Schedule 3.11         Conduct in the Ordinary Course; Absence of Changes
Schedule 3.12         Material Contracts
Schedule 3.13         Governmental Permits
Schedule 3.14         Taxes
Schedule 3.15         Litigation
Schedule 3.16         Insurance
Schedule 3.17         Significant Suppliers
Schedule 3.18         Real Property
Schedule 3.19         Intellectual Property
Schedule 3.20         Personal Property
Schedule 3.21         Employment Matters; Labor Relations
Schedule 3.22         Employee Plans
Schedule 3.23         Environmental Matters
Schedule 3.24         Brokers
Schedule 3.26         Certain Interests
Schedule 3.27         Bank Accounts

Outside Counsel Eyes Only

NMDX0111771

## AGREEMENT AND PLAN OF MERGER

**THIS AGREEMENT AND PLAN OF MERGER** (this "Agreement") is made and entered into as of September 13, 2018, by and among QIAGEN NORTH AMERICAN HOLDINGS, INC., a California corporation ("Purchaser"); NALEX MERGER SUB, INC., a Delaware corporation and a wholly owned Subsidiary of Purchaser ("Merger Sub"); NEUMODX MOLECULAR, INC., a Delaware corporation (the "Company"); and SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company, solely in its capacity as Sellers' Representative (as defined in Section 2.9).

### RECITALS

**WHEREAS** Purchaser is currently the holder of all of the shares of Company Series Q Preferred Stock and the holder of certain shares of Company Series Q-1 Preferred Stock (each as defined below);

**WHEREAS**, Purchaser desires to acquire all of the outstanding shares of capital stock of the Company, upon the terms and subject to the conditions set forth herein;

**WHEREAS**, in connection with the transactions contemplated herein, the vesting of all of the outstanding unvested Company Options will have been accelerated, pursuant to the terms of such Company Options, prior to and conditioned upon the Closing, and all vested Company Options as of immediately prior to the Closing will be cashed out and cancelled in accordance with their terms;

**WHEREAS**, Purchaser, Merger Sub and the Company intend to effect a merger of Merger Sub with and into the Company (the "Merger") in accordance with this Agreement and the Delaware General Corporation Law (the "DGCL");

**WHEREAS**, upon the consummation of the Merger, Merger Sub will cease to exist, and the Company will become a wholly owned Subsidiary of Purchaser;

**WHEREAS**, Purchaser shall not receive any consideration under this Agreement or the Merger in respect of the Company Series Q Preferred Stock or Company Series Q-1 Preferred Stock held by Purchaser;

**WHEREAS**, the respective boards of directors of Merger Sub and the Company have approved this Agreement and the Merger; and

**WHEREAS**, following the execution of this Agreement, the stockholders of the Company will execute and deliver consents with respect to the Shares they hold evidencing the adoption of this Agreement by the stockholders of the Company, pursuant to and in accordance with the applicable provisions of the DGCL and the Company's Certificate of Incorporation.

### AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants, representations and warranties herein contained and other good and valuable consideration, the

Outside Counsel Eyes Only

receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1. <u>Certain Definitions</u>

. In addition to terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the respective meanings set forth below:

"<u>Action</u>" means any claim, demand, action, cause of action, right of recovery, right of set-off, suit, arbitration, inquiry, proceeding or investigation (whether civil, criminal, administrative, investigative or informal) commenced, brought or conducted by, or otherwise involving, any Person, Governmental Authority or arbitrator.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, (a) the terms "controls," "controlled by" and "under common control with" means the possession, directly or indirectly or as a trustee or executor, of the power to direct or cause the direction of the affairs of management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person; and (b) any Person that beneficially owns or holds fifty percent (50%) or more of the outstanding voting securities or other securities convertible into voting securities of such Person shall be deemed to be an Affiliate of such Person; and (c) with respect to a specified Person, any other Person of which the specified Person beneficially owns or holds fifty percent (50%) or more of the outstanding voting securities or other securities convertible into voting securities shall be deemed to be an Affiliate of such specified Person.

"<u>Adjusted Closing Date Purchase Price</u>" shall mean (i) the Closing Date Purchase Price **plus** (ii) the Aggregate Option Exercise Price **plus** (iii) the Purchase Price Adjustment **less** (iv) the Indemnity Escrow Amount **less** (v) the Expense Fund.

"<u>Aggregate Option Exercise Price</u>" means the aggregate amount payable to the Company in respect of all In-the-Money Options unexercised immediately prior to the Effective Time if the holders thereof exercised such In-the-Money Options in full for cash as of the Effective Time.

"<u>Ancillary Agreements</u>" means the Escrow Agreement, the Payments Agreement, and the Employment Agreements.

"<u>Board</u>" shall mean the board of directors of the Company or the supervisory board of Purchaser, as applicable.

"<u>Business</u>" means the business being conducted by the Company, involving, among other things, the development of an automated system for molecular diagnostic testing.

2

Outside Counsel Eyes Only

NMDX0111773

"Business Day" means any day other than a Saturday, Sunday or other day on which banks are required or authorized to be closed in the city of Wilmington, DE.

"Cash" means the Company's cash position, which includes cash and cash equivalents.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any regulations promulgated thereunder.

"Closing Date Purchase Price" means two hundred thirty four million dollars ($234,000,000).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985 and any applicable state Law counterpart.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Capital Stock" means the Company Common Stock and the Company Preferred Stock.

"Company Common Stock" means the common stock, $.0001 par value per share, of the Company.

"Company Options" means all of the options (whether vested or unvested), warrants, rights, calls, commitments or agreements of any character to which the Company is party or by which it is bound calling for the issuance of shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for, or representing the right to purchase or otherwise receive, directly or indirectly, any such capital stock of the Company, provided, however, that the Company Options shall not include any shares of Company Series Q Preferred Stock or Company Series Q-1 Preferred Stock held by Purchaser; and provided further that the Company Options shall not include any Series Q-1 Warrant that is cancelled for consideration as set forth in Section 2.6(d).

"Company Preferred Stock" means the Company Series A Preferred Stock, the Company Series B Preferred Stock, the Company Series Q Preferred Stock and the Company Series Q-1 Preferred Stock.

"Company Series A Preferred Stock" means the Series A preferred stock, $.0001 par value per share, of the Company.

"Company Series B Preferred Stock" means the Series B preferred stock, $.0001 par value per share, of the Company.

"Company Series Q Preferred Stock" means the Series Q preferred stock, $.0001 par value per share, of the Company.

"Company Series Q-1 Preferred Stock" means the Series Q-1 preferred stock, $.0001 par value per share, of the Company.

3

NMDX0111774

"Consent" means any consent or approval of, or notice to, any third party required under any Material Contract or Governmental Permit as a result of the transactions contemplated by this Agreement.

"Continuing Employee" means any Company employee that continues to be employed by the Company after the Closing Date.

"Contract" means any contract, agreement, purchase order, invoice, sales order, obligation, undertaking, understanding, license, lease, note, mortgage or other binding commitment, whether written or oral and whether expressed or implied.

"Copyrights" mean all copyrights (registered or otherwise) and registrations and applications for registration thereof, and all rights therein provided by multinational treaties or conventions.

"Court" means any court or arbitration tribunal of the United States, any domestic state, or any foreign country, and any political subdivision thereof.

"Disclosure Schedules" means the schedules dated the date hereof delivered by the Company to Purchaser on the date hereof which are numbered to correspond to the numbered sections contained in Article IV.

"

"Employee Plans" means all "employee benefit plans" of the Company or any ERISA Affiliate (as defined in Section 3(3) of ERISA) and all bonus, stock or other security option, stock or other security purchase, stock or other security appreciation rights, incentive, deferred compensation, retirement or supplemental retirement, severance, golden parachute, vacation, cafeteria, dependent care, medical care, employee assistance program, education or tuition assistance programs, insurance and other similar fringe or employee benefit plans, programs or arrangements, and any current or former employment or executive compensation or severance agreements, written or otherwise, which are or have ever been sponsored, contributed to, or maintained by or entered into for the benefit of, or relating to, the Company or an ERISA Affiliate for the benefit of any current or former employee, officer, director or consultant of the Company or any ERISA Affiliate, or with respect to which the Company or any ERISA Affiliate could have liability, whether or not such plan is terminated.

"Environmental Condition" means a condition relating to, or arising or resulting from a failure to comply with any applicable Environmental Law or Environmental Permit, or any release of a Hazardous Substance into the environment.

"Environmental Law" means any Law or Regulation (including any restriction, condition, standard, requirement or schedule) relating to pollution or protection of human health, natural resources or the environment from Hazardous Substances (including ambient air, surface water, ground water, land surface or subsurface strata), including any law or regulation relating to emissions, discharges, releases or threatened releases of Hazardous Substances, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, possession, disposal, transport or handling of Hazardous Substances. For purposes of clarity, the term Environment

4

Outside Counsel Eyes Only

NMDX0111775

Law shall include, without limitation, CERCLA, the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § § 6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 6901 et seq.; the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. and all analogous state, provincial and foreign Laws.

"Environmental Permits" means any Governmental Permits required under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor Law, and all Regulations issued pursuant thereto.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a controlled group or which is under common control with the Company within the meaning of Section 414 of the Code.

"Escrow Agent" means SunTrust Bank, or such other financial institution to be reasonably agreed to by the parties hereto.

"Escrow Agreement" means the Escrow Agreement to be entered into at or prior to Closing between Purchaser, the Sellers' Representative and the Escrow Agent, in the form attached as Exhibit C.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"FDA" means the United States Food and Drug Administration or any successor agency or authority thereto.

"Final Determined Payment" means the Adjusted Closing Date Purchase Price plus the amount of Purchase Price Adjustment as finally determined pursuant to Section 2.10 of this Agreement (it being understood that the adjustment may be either positive (causing an increase in the Final Determined Payment over the Adjusted Closing Date Purchase Price)) or negative (causing an decrease in the Final Determined Payment over the Adjusted Closing Date Purchase Price)).

"FIRPTA Certificate" means (a) a statement dated not earlier than twenty (20) days prior to the Closing Date in accordance with Treasury Regulation §§ 1.1445-2(c)(3) and 1.897-2(h) certifying that the Company is not, and has not been during the applicable period specified in Code Section 897(c)(1)(A)(ii), a "United States real property holding corporation" for purposes of Sections 897 and 1445 of the Code, and (b) the notification to the U.S. Internal Revenue Service described in Treasury Regulation § 1.897-2(h)(2) regarding delivery of the statement referred to in the preceding clause (a), in each case signed by a responsible corporate officer of the Company.

"Founders" means Jeff Williams and Sundu Brahmasandra.

"Fully Diluted Shares of Company Capital Stock" means the sum, without duplication, of the aggregate number of shares of Company Capital Stock (on an as converted to Company

5

NMDX0111776

Common Stock basis) that are (a) issued and outstanding immediately prior to the Effective Time (other than shares to be cancelled in accordance with Section 2.5(b)(i)) or (b) issuable upon the exercise of each Company Option outstanding immediately prior to the Effective Time; provided that the Series Q-1 Warrant shall be excluded from this calculation to the extent it is subject to the warrant cancellation treatment set forth in Section 2.6(d).

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time consistently applied.

"Governmental Authority" means (a) any nation, state, city, town, village, district or other jurisdiction; (b) any federal, state, local, municipal, foreign or other government; (c) any governmental, regulatory or legislative agency or authority (other than a Court) of the United States, any domestic state, or any foreign country and any political subdivision or agency thereof, including any authority having governmental or quasi-governmental powers (including any administrative agency or commission, branch or department).

"Governmental Permit" means any license, permit, application, consent, certificate, registration, approval and authorization pending before, issued, granted, given or otherwise made available by, or under the authority of, any Governmental Authority.

"Hazardous Substance" means any "hazardous substance," as defined in CERCLA, and any other chemical, compound, product, solid, gas, liquid, pollutant, contaminant, waste or material which is regulated under any Environmental Law, including without limitation, asbestos or any substance containing asbestos, polychlorinated biphenyls, pesticides, medical and infectious waste, radioactive materials, lead-based paint and petroleum (including crude oil or any fraction thereof).

"HSR Act" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the Company or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, including, for the avoidance of doubt, equipment leases; (f) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities; (g) all obligations of such Person to purchase, redeem, retire, decease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (h) all indebtedness of any third party referred to in clauses (a) through (f) above that is (i) guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (A) to pay or purchase such indebtedness or to advance or supply funds for the payment or purchase of such indebtedness, (B) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily

Outside Counsel Eyes Only

NMDX0111777

for the purpose of enabling the debtor to make payment of such indebtedness or to assure the holder of such Indebtedness against loss, (C) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (D) otherwise to assure a creditor against loss or (ii) secured by any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; provided, however, that Indebtedness shall not include the obligations of the Company under the Transaction Documents or Transaction Costs.

"Indemnified Person" means any party entitled to indemnification upon the occurrence of an indemnifiable event pursuant to Article VII which, with respect to Purchaser, means the Purchaser Indemnified Persons and, with respect to the Sellers, means the Securityholder Indemnified Persons.

"Indemnifying Person" means any party obligated to provide indemnification upon the occurrence of an indemnifiable event pursuant to Article VII.

"Indemnity Escrow Amount" shall be an amount not less than ███████ and not more than ███████ determined in accordance with Section 5.16.

"Intellectual Property" means all (a) Trade Secrets, (b) Patents, (c) Trademarks, (d) Copyrights, (e) copies and tangible embodiments of all the foregoing, in whatever form or medium, (f) rights to obtain and rights to apply for Patents, and to register Trademarks and Copyrights and (g) rights under the License Agreements and under any licenses, registered user agreements, technology or materials, transfer agreements, and other agreements or instruments with respect to items in (a) through (f) above.

"In-the-Money Option" means a Company Option for which the Option Per Share Consideration is greater than zero.

"Inventory" means all inventory, including, without limitation, merchandise, raw materials, work-in-process, finished goods, replacement parts, and packaging, related to the Business, and maintained, held or stored by or for the Company at any location and any prepaid deposits for any of the same.

"IRS" shall mean the United States Internal Revenue Service.

"Key Employees" means the Founders and the Management Employees.

"Knowledge" means (a) with respect to an individual, the actual knowledge of such individual and the knowledge that such individual would be reasonably expected to obtain after conducting a reasonable and diligent investigation or inquiry; and (b) with respect to the Company, the actual knowledge of Jeffrey S. Williams, Sundu Brahmasandra and Jamie Olson, and the knowledge that each such Person would be reasonably expected to obtain after conducting a reasonable and diligent investigation or inquiry.

7

NMDX0111778

"Law" means (a) all laws, statutes, ordinances, Regulations, decisions and Orders of any Governmental Authority and (b) all decisions and Orders of Courts having the effect of law in each applicable jurisdiction.

"Leased Real Property" means the real property leased by the Company as tenant, together with, to the extent leased by the Company, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including, without limitation, those arising under any Law (including, without limitation, any Environmental Law), Action or Order, liabilities for Taxes and liabilities arising under any Contract.

"Licensed Intellectual Property" means all Intellectual Property licensed or sublicensed by the Company from a third party.

"Lien" means any claim, mortgage, pledge, security interest, attachment, encumbrance, lien (statutory or otherwise), option, conditional sale agreement, right of first refusal, first offer, termination, participation or purchase, and any other restriction or charge of any kind (including any restriction on voting, transfer, receipt of income and any agreement to grant any of the foregoing).

"Litigation" means any suit, action, arbitration, cause of action, claim, complaint, criminal prosecution, investigation, inquiry, demand letter, governmental or other administrative proceeding, whether at law or at equity, before or by any Court, Governmental Authority, arbitrator or other tribunal.

"Losses" means any and all losses, claims, shortages, damages, liabilities, expenses (including reasonable attorneys', accountants' fees and costs incurred in connection with any appeal), assessments, Taxes (including interest or penalties thereon), or diminution of value sustained, suffered or incurred by any Indemnified Person arising from or in connection with any matter that is the subject of indemnification under Sections 7.3 or 7.4 hereof.

"Management Employees" means those employees as designated and agreed upon by the Company and Purchaser, from time to time. As of the date of this Agreement, the Management Employees are Jamie Olson, Betty Wu and Michelle Mastronardi.

"Material Adverse Effect" means, an event, violation, inaccuracy, circumstance or other matter that has, or would reasonably be expected to have, a material adverse effect on the business, condition, capitalization, assets, liabilities or operations of the Company taken as a whole; provided, however, that none of the following shall be deemed, in and of itself, to have a Material Adverse Effect on the Company:  (A) an event, violation, inaccuracy, circumstance or that results from (1) conditions affecting the U.S. economy as a whole or any foreign economy in any location where such entity has material operations or sales, or (2) conditions affecting the in vitro diagnostic industry so long as such conditions do not affect the Company in a disproportionate manner as compared with companies of a similar size or (B) changes resulting from the announcement of the

8

NMDX0111779

execution hereof and the transactions contemplated by this Agreement. For the avoidance of doubt, each of the following shall constitute a "Material Adverse Effect": (i) the cessation of employment by the Company of any Key Employee; (ii) any challenge to material Intellectual Property of the Company by a third party Action or notice received from a third party indicating potential infringement of third party Intellectual Property by commercial use of the Company's technology and/or products; and (iii) an increase in the manufacturing costs of the Company's instruments and/or consumables by more than 5% determined in accordance with GAAP.

"Merger Consideration" means: (a) the consideration that a Non-Dissenting Stockholder is entitled to receive in exchange for such Non-Dissenting Stockholder's shares of Company Capital Stock pursuant to Section 2.5 of this Agreement; and (b) the consideration of a holder of an In-the-Money Option is entitled to receive in exchange for such In-the-Money Option pursuant to Section 2.6 of this Agreement.

"Non-Dissenting Stockholder" means each stockholder of the Company that does not perfect such stockholder's appraisal rights under the DGCL and is otherwise entitled to receive consideration pursuant to Section 2.5 of this Agreement.

"Open Source Software" means any Software that is subject to any open source license including the GNU General Public License (GPL), the Lesser GNU Public License (LGPL), any "copyleft" license or any other license that requires as a condition of use, modification or distribution of such Software that such Software or other Software combined or distributed with it be (i) disclosed or distributed in source code form; (ii) licensed for the purpose of making derivative works; (iii) redistributable at no charge; or (iv) licensed subject to a patent non-assert or royalty-free patent license.

"Option Cancellation Agreement" means an agreement between the Company and a holder of Company Options, by which the Company Options are cancelled in exchange for a cash payment, less the aggregate exercise price and applicable withholding, including the execution of the Joinder Agreement whereby the holder of Company Options agrees to become a party to, and be bound by, this Agreement.

"Option Holder Information" means with respect to each Person who is a holder of Company Option: (a) the name of the holder of such Company Option; (b) the total number of shares and class of Company Capital Stock that are subject to such Company Option; (c) the date on which such Company Option was issued and the term of such Company Option; (d) the exercise price per share of Company Common Stock purchasable under such Company Option; (e) the consideration that each such holder is entitled to receive pursuant to Section 2.6; (f) the cash amount to be contributed to the Escrow Amount and the Expense Fund with respect to such Company Option pursuant to 2.5(d); (g) the net cash amount to be paid to each such holder by the Company upon delivery of an Option Cancellation Agreement in accordance with Section 2.6 (after deduction of any amounts to be contributed to the Escrow Amount and the Expense Fund by such holder); and (h) whether any Taxes are to be withheld in accordance with Section 2.8(g) from the consideration that each such holder is entitled to receive pursuant to Section 2.6.

"Option Per Share Consideration" means, with respect to each Company Option: the Per Share Amount **less** the exercise price per share of such Company Option.

Outside Counsel Eyes Only

NMDX0111780

"Other Registration Countries" means countries to be mutually determined by the Company and Purchaser on an assay by assay basis.

"Order" means any judgment, order, writ, injunction, ruling, stipulation, determination, award or decree entered, issued, made or rendered, or any settlement under the jurisdiction of, any Court, Governmental Authority or arbitrator.

"Ordinary Course of Business" means, with respect to the Company, any action that (a) is consistent with the past practices of the Company and is taken in the ordinary course of the normal day-to-day operations of the Company; (b) is not required to be, or customarily presented to be, authorized by the Board of the Company; and (c) is similar in nature and magnitude to actions customarily taken in the ordinary course of business by other Persons that are in the same line of business as the Company.

"Outside Date" means July 31, 2020.

"Owned Intellectual Property" means all Intellectual Property in and to which the Company has, or has a right to hold, all right, title and interest.

"Payoff Letters" means:  (a) one or more payoff letters and other evidence regarding the discharge of Indebtedness of the Company and termination and release of Liens related thereto, each dated no more than ten (10) Business Days prior to the Closing Date, to (i) satisfy such Indebtedness as of the Closing and (ii) terminate and release any Liens related thereto; and (b) an invoice from each advisor or other service provider to the Company, dated no more than ten (10) Business Days prior to the Closing Date, with respect to all unpaid Transaction Cost estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Closing Date.

"Payments Administrator" means Acquiom Financial LLC, a Colorado limited liability company, as set forth in the Payments Agreement.

"Payments Agreement" means the Payments Administration Agreement to be entered into at or prior to Closing by and among Purchaser, the Sellers' Representative and the Payments Administrator, in a form to be reasonably agreed to by the parties thereto.

"Patents" means all national (including the United States) and multinational statutory invention registrations, patents, patent registrations, patent applications (only to the limited extent of any rights therein) (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations with respect thereto), and all inventions disclosed therein (only to the limited extent of any rights therein) and rights with respect thereto provided by multinational treaties or conventions and all improvements to all inventions disclosed in each such registration, patent or application or pursuant to any Law.

"Per Share Amount" shall be determined by dividing: (a) an amount equal to the Adjusted Closing Date Purchase Price **less** the Preferred Liquidation Amount by (b) the aggregate number of Fully Diluted Shares of Company Capital Stock.

"Performance Milestones" shall mean the milestones set forth in Section 6.1(a) hereof.

10

Outside Counsel Eyes Only

NMDX0111781

"Person" means any natural person, corporation, limited liability company, unincorporated organization, partnership, association, joint stock company, joint venture, trust or any other entity.

"Preferred Liquidation Amount" means an amount equal to the aggregate liquidation preference payable in respect of all shares of the Company's Series A Preferred Stock and Series B Preferred Stock and those shares of the Company's Series Q-1 Preferred Stock held by stockholders other than Purchaser outstanding at the Effective Time, determined in accordance with the Certificate of Incorporation of the Company.

"Purchase Price" means the Closing Date Purchase Price plus the Signing Date Payment.

"Purchase Price Adjustment" means Cash as of the Closing Date **less** the amount of any Indebtedness as of the Closing Date, **less** the amount of any Transaction Costs incurred by the Company in connection with the transactions contemplated by this Agreement and not yet paid or payable at Closing, as set forth in the Estimated Closing Statement (it being understood that the adjustment may be either positive (causing an increase in the Per Share Amount) or negative (causing a decrease in the Per Share Amount)).

"Receivables" means any and all accounts receivable, notes, book debts and other amounts due or accruing due to the Company from any third party, arising in connection with the Business, whether or not in the Ordinary Course of Business, together with any unpaid financing charges accrued thereon and the benefit of all security for such accounts, notes and debts.

"Regulation" shall mean any rule, regulation or code of any Governmental Authority.

"Regulatory Approval" means, with respect to any product of the Company, any 510K clearance by the FDA.

"Representatives" means with respect to a Person, such Person's employees, agents, and consultants, the employees, agents and consultants of such Person's Affiliate, and such Person's legal, financial, internal and independent accounting and other advisors and representatives.

"Securities Act" means the Securities Act of 1933, as amended or any successor Law, and all Regulations and rules issued pursuant thereto.

"Seller" means each Person that is a holder of Company Capital Stock immediately prior to the Effective Time.

"Seller Information" means, with respect to each Seller: (i) the name, email address (to the extent available) and address of record of each such holder; (ii) the number of shares of Company Capital Stock of each class and series held by each such holder; (iii) the number of shares of Company Capital Stock held by each such holder, on an as converted to Company Common Stock basis; (iv) the consideration that each such holder is entitled to receive pursuant to Section 2.5; (iv) the cash amount to be contributed to the Escrow Amount and the Expense Fund with respect to the shares of Company Capital Stock held by such holder pursuant to Section 2.5(d); (v) the net cash amount to be paid to each such holder by the Payments Administrator upon surrender of such holder's Company Stock Certificates in accordance with Section 2.8 (after deduction of any amounts to be contributed to the Escrow Amount and the Expense Fund by such holder); and (vi)

11

NMDX0111782

whether any Taxes are to be withheld in accordance with Section 2.8(g) from the consideration that each such holder is entitled to receive pursuant to Section 2.5.

"Series Q-1 Warrant" means collectively those certain warrants to purchase shares of Company Series Q-1 Preferred Stock held by Venture Lending & Leasing VIII, Inc. and Venture Lending & Leasing IX, Inc. or their permitted assigns.

"Share" means each share of Company Capital Stock issued and outstanding immediately prior to the Effective Time or, in the aggregate, the "Shares".

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code; (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise; (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing; (d) the technology supporting any Internet site(s) operated by or on behalf of Company and (e) all documentation, including user manuals and training materials, relating to any of the foregoing.

"Subsidiary" or "Subsidiaries" means, with respect to a Person, any other Person (other than an individual) of which such first Person owns, directly or indirectly, more than fifty percent (50%) of the outstanding voting securities or other securities convertible into voting securities, or otherwise which may effectively be controlled, directly or indirectly, by such first Person.

"Tax" or "Taxes" means any and all federal, state, local or foreign taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed or assessed by any Governmental Authority or other taxing authority or payable pursuant to any tax sharing agreement or any other Contract relating to the sharing of any such tax, fee, levy, duty, tariff or other charge, including, without limitation: (a) taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, disability, social security, workers' compensation, unemployment compensation or net worth; (b) taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added or gains taxes; (c) license, registration and documentation fees; and (d) customs' duties, tariffs, and similar charges, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Return" means any return (including any information return), report or statement, including any schedule or attachment thereto, with respect to Taxes required to be filed or submitted to the IRS or any other Governmental Authority or taxing authority or agency, domestic or foreign, in connection with the determination, assessment, collection or payment of any Tax, or in connection with the administration, implementation of, enforcement of or compliance with, any Law relating to Tax (including consolidated, combined and unitary tax returns).

"Trademarks" means all trademarks, service marks, trade dress, logos, trade names and corporate names, whether or not registered, including all common law rights, and registrations and applications for registration thereof, including, but not limited to, all marks registered in the United

Outside Counsel Eyes Only

NMDX0111783

States Patent and Trademark Office and the Trademark Offices of any other Governmental Authority, and all rights therein provided by multinational treaties or conventions.

"Trade Secrets" means all information (including inventions, technology, know-how, trade secrets, confidential information, customer lists, Software, technical information, data and plans, manufacturing and production processes and techniques, research and development information, drawings, specifications, proposals, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and other information) which is maintained as confidential by the holder thereof, that is not generally known to the other Persons who are not subject to an obligation of non-disclosure, and that has actual or potential commercial value from not being generally known to other Persons (whether or not patentable, whether or not reduced to practice and whether or not made the subject of a pending Patent application or applications).

"Transaction Costs" means (a) the attorneys' fees and expenses incurred by the Company in connection with the transactions contemplated by this Agreement; (b) any and all finder's fees and expenses incurred by the Company in connection with the transaction contemplated by this Agreement; (c) the payment under the Warrant Cancellation Agreement; and (d) any other fees and expenses incurred by the Sellers' Representative in the performance of its duties hereunder and to the extent that any such fees and expenses are required to be paid to the Sellers' Representative upon Closing as required by this Agreement or any of the Transaction Documents.

"Transaction Documents" means this Agreement, the Ancillary Agreements, the Schedules and Exhibits hereto and thereto (including, for the avoidance of doubt, the Disclosure Schedules) and all other agreements, documents, certificates and instruments executed in connection with this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

"Warrant Cancellation Agreement" means an agreement between the Company and the holders of the Series Q-1 Warrant, by which the Series Q-1 Warrant is cancelled in exchange for a cash payment.

1.2.    Additional Definitions

. In addition, each of the following definitions shall have the respective meanings set forth in the section of the Agreement indicated below:

| Definition | Section |
|---|---|
| AAA | 8.12 |
| Advisory Committee | 2.9(c) |
| Cash Balance Notice | 5.15 |
| Cash Flow Event | 5.15 |
| Certificate of Merger | 2.3(a) |
| Closing Date | 2.3(a) |

Outside Counsel Eyes Only                                                                 NMDX0111784

| Definition | Section |
|---|---|
| COBRA Coverage | 3.22(d) |
| Company Closing Certificate | 6.1(i) |
| Company Secretary's Certificate | 6.1(i) |
| Company Tax Returns | 3.14 |
| Confidential Information | 5.2(c) |
| Contest | 5.3(e) |
| Deficiencies | 6.1(b) |
| Dissenting Shares | 2.7(a) |
| Effective Time | 2.3(a) |
| Employment Agreement | 2.3(b) |
| Escrow Fund | 2.5(d) |
| Escrow Period | 7.11(b) |
| Estimated Closing Statement | 2.3(c) |
| Excluded Claims | 7.5 |
| Expense Fund | 2.9(f) |
| Final Milestone Achievement Notice | 6.1(b) |
| Final Milestone Date | 6.1(a) |
| Financial Statements | 3.9 |
| Fundamental Representation | 7.1(a) |
| HIPAA | 3.22(a) |
| HSR Approval Date | 6.1(c) |
| HSR Filing | 5.6(c) |
| Independent Accounting Firm | 2.10(b) |
| Leases | 3.18(e) |
| Letter of Transmittal | 2.8(b) |
| Material Contract(s) | 3.12(a) |
| Milestone Achievement Notice | 6.1(b) |
| Milestone Results Notice | 6.1(b) |
| Milestone Review Notice | 6.1(b) |
| N288 | 6.1(a) |
| N96 | 6.1(a) |
| Purchaser Closing Certificate | 6.2(f) |
| Purchaser Indemnified Persons | 7.3(a) |
| Purchaser Secretary's Certificate | 6.2(f) |
| Post-Closing Tax Period | 5.3(d) |
| Pre-Closing Tax Period | 5.3(b) |
| Predecessor | 3.1 |
| Prior Service | 5.8 |
| Recent Balance Sheet | 3.9 |
| Recent Balance Sheet Date | 3.9 |
| Representative Losses | 2.9(d) |
| Required Assays | 6.1(a) |
| Required Merger Stockholder Vote | 3.30 |
| Requisite Holders | 2.9(c) |
| Second Cash Balance Notice | 5.15 |

Outside Counsel Eyes Only

NMDX0111785

| Definition | Section |
|---|---|
| Second Request | 5.6(c) |
| Securityholder | 2.9 |
| Securityholder Indemnified Persons | 7.4 |
| Signing Date Payment | 2.5(a) |
| Straddle Period | 5.3(c) |
| Straddle Portion | 5.3(c) |
| Surviving Company | 2.1 |
| Surviving Company's Plans | 5.8 |
| Tangible Personal Property | 3.20(a) |
| Term | 5.1(a) |
| Third Party Claim | 7.6 |

## ARTICLE II
## DESCRIPTION OF TRANSACTION.

2.1.  <u>Merger of Merger Sub into the Company</u>

. Upon the terms and subject to the conditions set forth in this Agreement and in accordance with the relevant provisions of the DGCL, at the Effective Time (as defined in Section 2.3(a)), Merger Sub shall be merged with and into the Company, and the separate existence of Merger Sub shall cease. The Company will continue as the surviving corporation in the Merger (the "<u>Surviving Company</u>") and a wholly owned Subsidiary of Purchaser.

2.2.  <u>Effect of the Merger</u>

. The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL.

2.3.  <u>Closing; Effective Time</u>

.

(a)    The consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA at 10:00 a.m. (Eastern time) on a date to be mutually agreed to by Purchaser and the Company, which date shall be no earlier than May 1, 2019 (unless agreed to in writing by the Company and Purchaser) and shall be no later than the fifth (5th) Business Day after the satisfaction or waiver of the last to be satisfied or waived of the conditions set forth in Sections 6 and 7 (other than those conditions which are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or at such other time and/or date as Purchaser and the Company may jointly designate in writing. The date on which the Closing actually takes place is referred to in this Agreement as the "<u>Closing Date</u>." Contemporaneously with or as promptly as practicable after the Closing, the parties hereto shall cause a certificate of merger (the "<u>Certificate of Merger</u>") conforming to the requirements of the DGCL to be executed and filed with the Secretary of State of the State of Delaware and shall make all other filings or recordings required under the DGCL in connection with the consummation of the Merger. The Merger shall

Outside Counsel Eyes Only

NMDX0111786

become effective as of the time that the Certificate of Merger is filed with and accepted by the Secretary of State of the State of Delaware or at such later date or time as may be agreed by the Company and Purchaser in writing and specified in the Certificate of Merger in accordance with the DGCL (the effective time of the Merger being hereinafter referred to as the "Effective Time").

(b)     At or prior to the Closing, the Company shall deliver the following agreements and documents to Purchaser:

(i)     evidence in form and substance reasonably satisfactory to Purchaser that (A) this Agreement has been duly adopted and approved by the Required Merger Stockholder Vote, and such adoption and approval has not been withdrawn, rescinded or otherwise revoked and (B) the number of shares of Company Capital Stock that constitute (or that are eligible to become as a result of such holder's delivery of a written demand for appraisal in accordance with Section 262 of the DGCL) Dissenting Shares shall be less than five percent (5%) of the Shares;

(ii)     Joinder Agreements in the form attached hereto as Exhibit D duly executed by Sellers holding together at least ninety-five percent (95%) of the Shares;

(iii)     a certificate of the Merger Consideration payable to each Person hereunder, duly executed on behalf of the Company by the Chief Executive Officer;

(iv)     the Certificate of Merger, duly executed by the Company;

(v)     the Company Closing Certificate;

(vi)     the Company Secretary's Certificate

(vii)     the Payoff Letters, in form and substance reasonably satisfactory to Purchaser;

(viii)     a FIRPTA Certificate, in form and substance reasonably satisfactory to Purchaser;

(ix)     evidence reasonably satisfactory to Purchaser that all security interests and other Liens in any assets of the Company have been released prior to, or shall be released simultaneously with, the Closing;

(x)     evidence reasonably satisfactory to Purchasers that Purchaser or the Company has obtained all consents and approvals of third parties set forth in Section 3.6 of the Disclosure Schedules as applicable to the Closing;

(xi)     the Key Employees shall have entered into employment agreements in a form reasonably acceptable to Purchaser (the "Employment Agreements");

Outside Counsel Eyes Only

NMDX0111787

(xii)    written resignations of each director of the Company, and each officer of the Company other than the Key Employees, effective as of the Effective Time, in form and substance reasonably satisfactory to Purchaser;

(xiii)    the Company shall have delivered to Purchaser (A) Option Cancellation Agreements that have been executed by the holders of Company Options evidencing the cancellation and termination of all Company Options for consideration at Closing, (B) evidence of the termination of all rights under any plan, program or arrangement providing for the issuance of grant of any Company Options and (C) the Warrant Cancellation Agreement, to the extent the Series Q-1 Warrant has not been exercised or converted prior to Closing, executed by the holders of the Series Q-1 Warrant;

(xiv)    each of the employees of the Company shall have executed and delivered the Company's form of Assignment of Inventions Agreement;

(xv)    the Company shall have provided Purchaser with evidence reasonably satisfactory to Purchaser as to the termination of each Employee Plan directed by Purchaser to be terminated by operation of Section 5.10;

(xvi)    the Escrow Agreement, duly executed by the Sellers' Representative; and

(xvii)    the Payments Agreement, duly executed by the Sellers' Representative.

(c)    Estimated Closing Statement.  No later than ten (10) Business Days prior to the anticipated Closing Date, as agreed to by the Parties, the Company shall provide to Purchaser (i) an updated Schedule 3.4(d) including any Shares issued upon exercise of Company Options and the cancellation and forfeiture of any Company Options, in each case since the date hereof, and (ii) a statement of the Company's calculation of the Purchase Price Adjustment with sufficient detail to permit Purchaser to validate its components and calculation (the "Estimated Closing Statement").

(d)    At or prior to the Closing, Purchaser shall deliver:

(i)    to the Company, the Purchaser Closing Certificate and the Purchaser Secretary's Certificate;

(ii)    to the Company and the Sellers' Representative, the Escrow Agreement, duly executed by Purchaser and the Escrow Agent; and

(iii)    to the Company and the Sellers' Representative, the Payments Agreement, duly executed by Purchaser, Merger Sub and the Payments Administrator.

2.4.    Certificate of Incorporation and Bylaws; Directors and Officers

17

NMDX0111788

. Unless otherwise determined by Purchaser prior to the Effective Time:

(a)     the Certificate of Incorporation of the Surviving Company shall be amended in its entirety as of the Effective Time as set forth in the form attached hereto as Exhibit A;

(b)     the By-Laws of the Surviving Company shall be amended and restated as of the Effective Time to conform to the Bylaws of Merger Sub as in effect immediately prior to the Effective Time; and

(c)     the directors and officers of the Surviving Company immediately after the Effective Time shall be the directors and officers of the Merger Sub immediately prior to the Effective Time.

2.5.    Payments; Conversion of Shares

.

(a)     Signing Date Payment.  On the date hereof, in connection with the execution of this Agreement and in consideration of the covenants and agreements contained in Section 5.5 hereof, Purchaser shall pay, or cause to be paid, by wire transfer of immediately available funds, to the Company to an account designated by Company in writing, three million dollars ($3,000,000) (the "Signing Date Payment").

(b)     Conversion.  Subject to Sections 2.5(d), 2.5(e), 2.5(f), 2.7, 2.8, 2.9 and 2.10, at the Effective Time, by virtue of the Merger and without any further action on the part of Purchaser, Merger Sub, the Company, any stockholder of the Company or any other Person:

(i)     each share of Company Capital Stock owned by Purchaser, Merger Sub, the Company or any direct or indirect wholly owned Subsidiary of Purchaser, Merger Sub or the Company immediately prior to the Effective Time, including without limitation all shares of the Company Series Q Preferred Stock and those shares of the Company Series Q-1 Preferred Stock held by Purchaser, shall be extinguished and cancelled without payment of any consideration in respect thereof;

(ii)     each share of the common stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted automatically into one share of common stock of the Surviving Company.  From and after the Effective Time, all certificates representing the common stock of Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Company into which they were converted in accordance with the immediately preceding sentence;

(iii)     each share of Company Series A Preferred Stock held by a Non-Dissenting Stockholder shall be converted automatically into the right to receive (following the surrender of the certificates representing such shares of Company Preferred Stock in accordance with Section 2.8) an amount in cash equal to the sum of (A) the liquidation preference of such share of Company Series A Preferred

18

NMDX0111789

Stock **plus** (B) the Per Share Amount **multiplied by** the total number of shares of Company Common Stock issuable upon the conversion of such share of Company Series A Preferred Stock held by such Non-Dissenting Stockholder;

(iv) each share of Company Series B Preferred Stock held by a Non-Dissenting Stockholder shall be converted automatically into the right to receive (following the surrender of the certificates representing such shares of Company Preferred Stock in accordance with Section 2.8) an amount in cash equal to the sum of (A) the liquidation preference of such share of Company Series B Preferred Stock **plus** (B) the Per Share Amount **multiplied by** the total number of shares of Company Common Stock issuable upon the conversion of such share of Company Series B Preferred Stock held by such Non-Dissenting Stockholder;

(v) each share of Company Series Q-1 Preferred Stock held by a Non-Dissenting Stockholder (other than any shares of Company Series Q-1 Preferred Stock held by Purchaser, which shares shall be cancelled pursuant to Section 2.5(b)(i)) shall be converted automatically into the right to receive (following the surrender of the certificates representing such shares of Company Preferred Stock in accordance with Section 2.8) an amount in cash equal to the sum of (A) the liquidation preference of such share of Company Series Q-1 Preferred Stock **plus** (B) the Per Share Amount **multiplied by** the total number of shares of Company Common Stock issuable upon the conversion of such share of Company Series Q-1 Preferred Stock held by such Non-Dissenting Stockholder; and

(vi) each share of Company Common Stock held by a Non-Dissenting Stockholder shall be converted automatically into the right to receive (following the surrender of the certificates representing such shares of Company Common Stock in accordance with Section 2.8) an amount in cash equal to the Per Share Amount.

(c) <u>Rounding</u>. The amount of cash, if any, that each holder is entitled to receive at any particular time for the shares of Company Capital Stock held by such holder or the shares of Company Capital Stock issuable upon the exercise of Company Options held by such holder (as the case may be) shall be rounded to the nearest cent (with $0.005 being rounded upward) and computed after aggregating the cash amounts payable at such time for all shares of Company Capital Stock held by such holder.

(d) <u>Escrow</u>. At the Closing, Purchaser shall pay to the Escrow Agent by wire transfer of immediately available funds in accordance with the wire transfer instructions of the Escrow Agent set forth in the Escrow Agreement or as otherwise delivered in writing to Purchaser and the Sellers' Representative, an amount in cash equal to the Indemnity Escrow Amount to secure the indemnification obligations of the Sellers under Article VII of this Agreement (the "<u>Escrow Fund</u>"). The Escrow Fund shall be held by the Escrow Agent and disbursed by it solely for the purposes and in accordance with the terms of this Agreement and the terms of the Escrow Agreement. With respect to any distribution of any portion of the Escrow Fund to the Sellers and holders of Company Options subject to Option Cancellation Agreements, distribution shall be made in accordance with Schedule 2.5(d), as updated and delivered to Purchaser at Closing. The

Outside Counsel Eyes Only

NMDX0111790

approval and adoption of this Agreement and approval of the Merger by the Sellers pursuant to written consents evidencing the Required Merger Stockholder Vote, the Joinder Agreements, the Letters of Transmittal and the Option Cancellation Agreements, as applicable, shall constitute approval by such Sellers and the irrevocable agreement of such Sellers to be bound by and comply with, all of the arrangements and provisions of this Agreement, including the withholding of the Indemnity Escrow Amount and Expense Fund and the indemnification obligations set forth in Article VII hereof. Notwithstanding the foregoing, to the extent that any distribution of the Escrow Fund to a Seller or holder of Company Options is subject to payroll, income or similar withholding taxes, any such portion shall be delivered to the Company and the Company shall process such distributions in compliance with applicable withholding taxes. Section 2.5(d) sets forth the cash amount to be contributed to the Escrow Fund and the Expense Fund with respect to the shares of Company Capital Stock held by each Seller and holders of Company Options subject to Option Cancellation Agreements.

(e)     Expense Fund.  At the Closing, Purchaser shall pay the Expense Fund to the Sellers' Representative to be held by the Sellers' Representative in accordance with Section 2.9(f).

(f)     Adjustments.  In calculating the consideration payable under this Section 2.5, Purchaser shall be entitled to rely on the representations and warranties contained in Section 3.4, the Company Closing Certificate and the Estimated Closing Statement.

2.6.     Cancellation of Company Options; Series Q-1 Warrant

.

(a)     At the Effective Time, each Company Option shall have all rights thereunder cancelled and each holder of any cancelled In-the-Money Option, in exchange therefor, but only upon delivery to the Company of an Option Cancellation Agreement in the form attached hereto as Exhibit B, effective upon the Closing, shall be entitled to an amount in cash, without interest, equal to (i) the Option Per Share Consideration for such In-The-Money Option **multiplied by** (ii) the number of shares of Company Common Stock subject to such In-the-Money Option, less any applicable withholding Taxes. Each Company Option that is not an In-the-Money Option shall be automatically cancelled for no consideration.

(b)     Prior to the Closing, the Company and its board of directors shall, subject to applicable Law, take all actions (including, if appropriate, amending any Company Option Plan and individual option agreements and obtaining consents from the holders of the Company Options and/or delivering optionee notices thereto) necessary to give effect to the transactions provided for in this Section 2.6 and to ensure that from and after the Effective Time, each holder of an outstanding Company Option shall cease to have any rights with respect thereto, except the right to receive the consideration specified in Section 2.6(a), without interest.

(c)     At least fifteen (15) Business Days prior to the Closing Date, the Company shall deliver to each holder of Company Options an Option Cancellation Agreement. Purchaser shall, subject to Purchaser's receipt of an Option Cancellation Agreement duly completed and validly executed in accordance with the instructions provided therein from each holder of Company Options, cause the Surviving Company to deliver through its payroll system the

20

NMDX0111791

consideration provided for herein to such holder.  No interest shall be paid on any amounts payable upon delivery of any Option Cancellation Agreement.

(d)     At the Effective Time, the Series Q-1 Warrant, to the extent not exercised or converted into shares of Company Series Q-1 Preferred Stock prior to or as of the Effective Time, shall have all rights thereunder cancelled and each holder of any cancelled Series Q-1 Warrant, in exchange therefor, but only upon delivery to the Company of a Warrant Cancellation Agreement in the form attached hereto as Exhibit B-2, effective upon the Closing, shall be entitled to an amount in cash, without interest, equal to (i) two (2) **multiplied by** (ii) the face value of the Series Q-1 Warrant. For the avoidance of doubt, the holder of any cancelled Series Q-1 Warrant shall not share in any further consideration following the closing of the Merger, including but not limited to any distributions from the Indemnity Escrow Amount.

(e)     As noted in Sections 2.5(d) and Section 2.5(e) above, the Escrow Fund and Expense Fund will be withheld from the Merger Consideration otherwise distributable to the Sellers (including the holders of the Company Options subject to the Option Cancellation Agreements). Similar to the release of the Escrow Fund, with respect to any distribution of the Expense Fund to the Sellers and holders of Company Options subject to Option Cancellation Agreements, distribution shall be made in accordance with Schedule 2.5(d).

2.7.     Dissenting Shares

.

(a)     Effect on Dissenting Shares.  Notwithstanding any provisions of this Agreement to the contrary, shares of Company Capital Stock held by a holder who has made and perfected a demand for appraisal of such holder's shares of Company Capital Stock in accordance with Section 262 of the DGCL and as of the Closing has neither effectively withdrawn nor lost such holder's right to such appraisal (the "Dissenting Shares") shall not be converted into the applicable Merger Consideration, but shall be entitled to only such rights as are granted by the DGCL. Purchaser shall be entitled to retain any Merger Consideration not paid on account of such Dissenting Shares pending resolution of the claims of such holders, and the Sellers shall not be entitled to any portion of such retained Merger Consideration.

(b)     Loss of Dissenting Share Status.  Notwithstanding the provisions of Section 2.7(a), if any holder of shares of Company Capital Stock who demands appraisal of such holder's shares under the DGCL shall effectively withdraw or lose (through the failure to perfect or otherwise) such holder's right to appraisal, then as of the Closing or the occurrence of such event, whichever occurs later, such holder's shares of Company Capital Stock shall automatically be converted into the right to receive the applicable Merger Consideration, without interest thereon, promptly following the surrender of the certificate or certificates representing such shares of Company Capital Stock.

(c)     Notice of Dissenting Shares.  The Company shall give Purchaser:  (i) prompt notice of any demands for appraisal of shares of Company Capital Stock received by the Company, withdrawals of any demands, and any other instruments or notices served or otherwise delivered pursuant to the DGCL and received by the Company; and (ii) the opportunity to

Outside Counsel Eyes Only

NMDX0111792

participate in all negotiations and proceedings with respect to any such demands for appraisal or other instruments or notices.  The Company shall not, except with the prior written consent of Purchaser, make any payment with respect to any demands for appraisal of shares of Company Capital Stock or offer to settle any such demands.

2.8.  <u>Exchange of Certificates and Payment</u>

.

(a)  <u>Payments Administrator</u>.  On or prior to the Closing Date, Purchaser shall deposit with the Payments Administrator cash sufficient to pay the cash consideration payable to Sellers pursuant to Sections 2.5(b) (excluding, for the avoidance of doubt, the Indemnity Escrow Amount which shall be deposited with the Escrow Agent, and the Expense Fund, which shall be deposited with the Sellers' Representative).  The cash amount so deposited with the Payments Administrator is referred to as the "<u>Payment Fund</u>."  The Payment Fund shall be held in accordance with the terms of the Payments Agreement.

(b)  <u>Letter of Transmittal</u>.  Promptly, but in any event within three (3) Business Days following the Effective Time, Purchaser shall cause the Payments Administrator to mail (with a copy sent by email, if available) to each Person who is a record holder of Company Capital Stock immediately prior to the Effective Time and who has not previously delivered a Letter of Transmittal to the Payments Administrator:  (i) a letter of transmittal in the form agreed to by Purchaser and Company, which form shall include a release (a "<u>Letter of Transmittal</u>"); and (ii) instructions for use in effecting the exchange of an executed Letter of Transmittal for the Merger Consideration, if any, payable with respect to such shares of Company Capital Stock.  Upon receipt by the Payments Administrator of a duly executed Letter of Transmittal and such other documents as Purchaser or the Payments Administrator may reasonably request, the holder shall, subject to Section 2.8(g), if applicable, be entitled to receive cash in an amount equal to the Merger Consideration, if any, that such holder has the right to receive pursuant to Section 2.5(b).  From and after the Effective Time, any stock certificate which prior to the Effective Time represented shares of Company Capital Stock shall be deemed to represent only the right to receive the Merger Consideration, if any, payable with respect to such shares, and the holder of each such Company Stock Certificate shall cease to have any rights with respect to the shares of Company Capital Stock formerly represented thereby.

(c)  <u>Payments</u>.  (i) Promptly following the Closing Date for each Seller who has delivered a duly executed Letter of Transmittal to the Payments Administrator prior to the Closing Date and (ii) promptly following the delivery of the Letter of Transmittal for each Seller that delivers a duly executed Letter of Transmittal to the Payments Administrator after to the Closing Date, Purchaser shall cause to be paid by the Payments Administrator to each such Seller the consideration specified in Section 2.5(b), without interest.  If payment of Merger Consideration in respect of shares of Company Capital Stock converted pursuant to Section 2.5(b) is to be made to a Person other than the registered holder, it shall be a condition to such payment that the Letter of Transmittal be in proper form for transfer and that the Person requesting such payment shall have paid any transfer and other Taxes required by reason of such payment in a name other than that of the registered holder of the Company Capital Stock or shall have established to the satisfaction of Purchaser that such Tax either has been paid or is not payable.

Outside Counsel Eyes Only

NMDX0111793

(d)     Stock Transfer Books.  As of the Effective Time, the stock transfer books of the Company shall be closed and there shall not be any further registration of transfers of shares of Company Capital Stock thereafter on the records of the Company.

(e)     Undistributed Payment Funds.  Any portion of the Payment Fund that remains undistributed to Sellers as of the date that is one hundred eighty (180) days after the date of this Agreement shall be delivered to Purchaser upon demand, and Sellers who have not theretofore received their Merger Consideration in accordance with Section 2.5 and 2.6 shall thereafter look only to Purchaser for satisfaction of their claims for the Merger Consideration.

(f)     Escheat.  Notwithstanding anything in this Agreement to the contrary, neither Purchaser nor any other Person shall be liable to any Seller or to any other Person for any amount paid to a public official pursuant to applicable abandoned property law, escheat law or similar applicable Law.  Any Merger Consideration or other amounts remaining unclaimed by Sellers five (5) years after the Effective Time for payments to be made in connection with the Closing or such other relevant payment date for further distributions (or such earlier date immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Authority) shall, to the extent permitted by applicable Law, become the property of Purchaser free and clear of any Lien.

(g)     Withholding.  Each of Purchaser, the Company, and the Payments Administrator shall be entitled to withhold from payments contemplated hereby such amounts as are required to be withheld under applicable Tax law.  The withheld amounts will be treated for all purposes of this Agreement as having been paid to the applicable Seller in respect of which such withholdings were made.  Any compensatory amounts payable to current or former employees, directors, consultants or managers of the Company arising from the transactions contemplated by this Agreement (including the cancellation of Company Options held by current or former employees of and service providers to the Company) shall be paid by the Company in accordance with the customary payroll practices of the Company.  To the extent that the parties hereto determine that any payments made under this Agreement are or may be subject to withholding, the parties shall reasonably cooperate prior to withholding to determine (i) whether such payment is subject to withholding and (ii) the amount that will be withheld.

2.9.   Sellers' Representative

.

(a)     Effective as of the Effective Time, each Seller and holder of Company Options (collectively, the "Securityholders"), by virtue of the adoption and approval of this Agreement, the Joinder Agreements, and the Option Cancellation Agreements and without any further action by any of the other Securityholders, the Company or any other party, shall be deemed to have approved the designation of, and hereby designates Shareholder Representative Services LLC as the representative, agent and attorney-in-fact (the "Sellers' Representative") of each such Securityholder for all purposes in connection with this Agreement and the Transaction Documents, with full right, power and authority to take (or refrain from taking) any and all actions on behalf of the Securityholders after the Effective Time as the Sellers' Representative deems necessary or appropriate in connection herewith or therewith.  Without limiting the generality of the foregoing,

23

NMDX0111794

the Sellers' Representative is designated as the sole and exclusive agent, representative and attorney-in-fact for each Securityholder for all purposes related to this Agreement, including, after the Closing, (i) service of process upon Sellers, (ii) executing and delivering to Purchaser or any other Person on behalf of any of or all Sellers any and all instruments, certificates, documents and agreements with respect to the transactions contemplated hereby, including the Escrow Agreement, (iii) receipt of all notices on behalf of Sellers with respect to any matter, suit, claim, action or proceeding arising with respect to the sale of the Shares or any transaction contemplated by this Agreement including the defense, settlement or compromise of any claim, action or proceeding pursuant to Section 5.3 or Article VII of this Agreement, (iv) to execute and deliver on behalf of such Securityholder any amendment or waiver hereto, (v) to take all other actions to be taken by or on behalf of such Seller in connection herewith, including, without limitation, the execution, delivery and performance of the Escrow Agreement, (vi) to do each and every act and exercise any and all rights which such Securityholder or the Securityholders collectively, as applicable, are permitted or required to do or exercise under this Agreement or the agreements ancillary hereto, and (vii) to resolve claims under this Agreement and the Escrow Agreement including, but not limited to claims for indemnification under Article VII of this Agreement.

(b)     The Sellers' Representative hereby accepts its appointment as the Sellers' Representative.  All actions, notices, communications and determinations by or on behalf of Securityholders after the Closing shall be given or made by the Sellers' Representative and all such actions, notices, communications and determinations by the Sellers' Representative shall conclusively be deemed to have been authorized by, and shall be binding upon, any of and all Securityholders.  By giving notice to the Sellers' Representative after the Effective Time in the manner provided by Section 8.2, Purchaser shall be deemed to have given notice to all Sellers. Any action taken by the Sellers' Representative may be considered by Purchaser to be the action of Sellers for whom such action was taken for all purposes of this Agreement and the Escrow Agreement. After the Effective Time, notices or communications from the Sellers' Representative in the manner provided by Section 8.2 shall constitute notice from each of the Sellers.

(c)     If the Sellers' Representative shall resign or be removed by the Sellers, the Sellers shall, by consent of the Advisory Committee (defined below), acting through a majority (at least three out of four) of the Advisory Committee (the "Requisite Holders"), within 10 days after such resignation or removal, appoint a successor to the Sellers' Representative.  Any such successor shall succeed the former Sellers' Representative as the Sellers' Representative hereunder. The Sellers hereby agree that an individual designated by each of Arboretum Ventures III, LP, Baird Venture Partners Management Company IV, LLC (on behalf of the Baird Capital funds), Pfizer Inc., and Jeffrey S. Williams shall collectively serve as the advisory committee charged with directing the actions of the Sellers' Representative (the "Advisory Committee").

(d)     The Sellers' Representative will incur no liability of any kind with respect to any action or omission by the Sellers' Representative in connection with the Sellers' Representative's services pursuant to this Agreement and the Ancillary Agreements, except in the event of liability directly resulting from the Sellers' Representative's gross negligence or willful misconduct. The Sellers' Representative shall not be liable for any action or omission pursuant to the advice of counsel. The Sellers shall, severally and not jointly (on a pro rata basis calculated based on the Merger Consideration received by each such Seller divided by the total Merger Consideration received by all Sellers), indemnify, defend and hold harmless the Sellers'

Outside Counsel Eyes Only

NMDX0111795

Representative from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Sellers' Representative's execution and performance of this Agreement and the agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Sellers' Representative, the Sellers' Representative will reimburse the Sellers the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. If not paid directly to the Sellers' Representative by the Sellers, any such Representative Losses may be recovered by the Sellers' Representative from: (i) the Expense Fund and/or (ii) the amounts in the Escrow Fund at such time as remaining amounts would otherwise be distributable to the Sellers; provided, that while this Section 2.9 allows the Sellers' Representative to be paid from the Expense Fund and the Escrow Fund, this does not relieve the Sellers from their obligation to promptly pay such Representative Losses as they are suffered or incurred, nor does it prevent the Sellers' Representative from seeking any remedies available to it at law or otherwise. In no event will the Sellers' Representative be required to advance its own funds on behalf of the Sellers or otherwise. Any restrictions or limitations on indemnity or liability of the Sellers contained elsewhere in this Agreement are not intended to be applicable to the indemnities provided to the Sellers' Representative in this Section 2.9. The foregoing indemnities will survive the Closing, the resignation or removal of the Sellers' Representative or the termination of this Agreement.

(e)       Except for the payment of the Sellers' Representative's engagement fees and the payment to the Sellers' Representative of the Expense Fund, all fees and expenses incurred by the Sellers' Representative or required to be paid to the Sellers' Representative in the performance of the Sellers' Representative's duties hereunder shall be borne by the Securityholders.

(f)       Upon the Closing, Purchaser will wire One Hundred Thousand Dollars ($100,000.00) (the "Expense Fund") to the Sellers' Representative, which will be used for the purposes of paying directly, or reimbursing the Sellers' Representative for, any third party expenses pursuant to this Agreement and the Ancillary Agreements, including legal fees and other post-Closing expenses incurred on behalf of the Securityholders, as approved by the Advisory Committee. The Securityholders will not receive any interest or earnings on the Expense Fund and irrevocably transfer and assign to the Sellers' Representative any ownership right that they may otherwise have had in any such interest or earnings. The Sellers' Representative will not be liable for any loss of principal of the Expense Fund other than as a result of its gross negligence or willful misconduct. The Sellers' Representative will hold these funds separate from its corporate funds, will not use these funds for its operating expenses or any other corporate purposes and will not voluntarily make these funds available to its creditors in the event of bankruptcy. Contemporaneous with or as soon as practicable following the completion of the Sellers' Representative's duties, the Sellers' Representative will deliver any remaining balance of the Expense Fund to the Payments Administrator or the Company (with respect to those payments subject to withholding) for further distribution to the Sellers and holders of Company Options in a manner consistent with Schedule 2.5(d); subject to Section 2.8(g).

25

2.10.   <u>Determination of Final Adjustments</u>

.

(a)   <u>Right to Dispute</u>.  If Purchaser delivers written notice (the "<u>Disputed Items Notice</u>") to the Sellers' Representative within ninety (90) days after the Closing Date stating that Purchaser objects to any items in the Estimated Closing Statement (other than the Cash as of the Closing Date) (the "<u>Disputed Items</u>"), Purchaser and the Sellers' Representative will attempt to resolve and finally determine and agree upon the Disputed Items as promptly as practicable.  If Purchaser does not deliver a Disputed Item Notice to the Sellers' Representative within ninety (90) days after the Closing Date, the Estimated Closing Statement shall be presumed to be true and correct in all respects and shall be final and binding on the parties.

(b)   <u>Arbitration of Disputes</u>.  If Purchaser and the Sellers' Representative are unable to agree upon the Disputed Items within thirty (30) days after delivery of the Disputed Items Notice, Purchaser and the Sellers' Representative will appoint an independent, nationally-recognized accounting firm reasonably acceptable to each of them (in either case, the "<u>Independent Accounting Firm</u>") to resolve the Disputed Items.  The Independent Accounting Firm shall (i) address only the Disputed Items set forth in the Disputed Items Notice and may not assign a value greater than the greatest value claimed for such item by either party or smaller than the smallest value claimed for such item by either party, and (ii) re-calculate the Purchase Price Adjustment, as modified only by the Independent Accounting Firm's resolution of the Disputed Items. Purchaser and the Sellers' Representative will each have the same opportunity to present its position and submit materials regarding the Disputed Items to the Independent Accounting Firm. The Independent Accounting Firm will make a written determination of each Disputed Item within thirty (30) days after being appointed and such determination shall be final and binding on the parties.  The fees, costs and expenses of the Independent Accounting Firm will be allocated to and borne by Purchaser and the Sellers based on the inverse of the percentage that the Independent Accounting Firm's determination of the Disputed Items bears to the total value of the Disputed Items originally submitted to the Independent Accounting Firm.  For example, should the value of the Disputed Items total $1,000, and should the Independent Accounting Firm award $700 in favor of Purchaser's position, then 70% of the aggregate costs of the Independent Accounting Firm would be borne by the Sellers and 30% would be borne by Purchaser.

(c)   <u>Payment</u>.  At such time as a Disputed Item is finally resolved, if (i) it is determined that the recalculated Purchase Price Adjustment causes an increase to the Adjusted Closing Date Purchase Price, Purchaser shall pay or cause to be paid to the Payments Administrator as directed by the Sellers' Representative (for the benefit of the stockholders and holders of Company Options subject to Option Cancellation Agreements) an aggregate amount equal to the excess, of the Final Determined Payment over the Adjusted Closing Date Purchase Price (provided that in the event the Merger Consideration included any payments in consideration for cancellation of Company Options that were not exercised, Purchaser shall deliver such portion of such excess amount allocable to such payments to the Surviving Company and the Surviving Company shall remit such portion of the excess to such holders, less applicable withholding taxes), or (ii) it is determined that the recalculated Purchase Price Adjustment causes a decrease to the Adjusted Closing Date Purchase Price,  Sellers' Representative shall direct the Escrow Agent to pay to Purchaser an aggregate amount equal to the excess of the Adjusted Closing Date Purchase Price

26

NMDX0111797

over the Final Determined Payment from the Escrow Fund.  With respect to any distribution of any excess amount to the Sellers and holders of Company Options subject to Option Cancellation Agreements, distribution shall be made in accordance with Schedule 2.5(d).

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As of the date hereof, the Company hereby represents and warrants, and on the Closing Date shall be deemed to have represented and warranted, to Purchaser as follows:

### 3.1.  Organization and Qualification

. The Company is (a) a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and (b) duly licensed or qualified to transact business as a foreign corporation and is in good standing in each of the jurisdictions listed on Schedule 3.1 of the Disclosure Schedules, which jurisdictions are the only jurisdictions in which the nature of the Business or the character of the properties owned or leased by the Company requires such license or qualification except where the failure to be so qualified, authorized, registered or licensed has not had and will not have a Material Adverse Effect on the Company.  Schedule 3.1 sets forth a list of (i) any Person that has ever merged with or into any Company, (ii) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity interests has ever been acquired by any Company, (iii) any Person, all or substantially all of whose assets has ever been acquired by any Company and (iv) any prior names of any Company or any Person described in clauses (i) through (iii) (each such Person, a "Predecessor").

### 3.2.  Subsidiaries

. The Company does not (a) own of record or beneficially, directly or indirectly, (i) any shares of capital stock or securities convertible into capital stock of any other corporation or (ii) any participating interest in any partnership, joint venture or other non-corporate business enterprise, (b) control, directly or indirectly, any other Person, or (c) have any Subsidiaries.

### 3.3.  Certificate of Incorporation, By-Laws and Corporate Records

. The Company has previously delivered to Purchaser true, correct and complete copies of each of (a) the Certificate of Incorporation of the Company, as amended and in effect, (b) the By-Laws of the Company, as amended and in effect, and (c) the minute books and stock record books of the Company, which minute books and stock record books are complete and correct and which minute books contain complete and accurate records of all meetings and other corporate actions of the Board of the Company, committees of the Board of the Company, incorporators and shareholders of the Company from the date of its incorporation.  The Company is in compliance with, and not in default under or violation of, its Certificate of Incorporation and By-Laws.

### 3.4.  Capitalization

.

27

NMDX0111798

(a)     Capitalization.  As of the date of this Agreement, the authorized capital stock of the Company, consists of (i) 17,291,227 shares of Common Stock, $.0001 par value per share (the "Common Stock"), 3,432,324 shares of which are issued and outstanding, and (ii) 13,458,334 shares of preferred stock, par value $0.0001 per share, 3,202,869 of which are designated Series A Preferred Stock, all of which are issued and outstanding, 5,936,420 of which are designated Series B Preferred Stock, all of which are issued and outstanding, 2,594,437 of which are designated Series Q Preferred Stock, all of which are issued and outstanding and 1,724,608 of which are designated Series Q-1 Preferred Stock, all of which are issued and outstanding.  Immediately prior to the Closing, except as set forth on Schedule 3.4(a), the authorized capital and issued and outstanding capital shall be the same as set forth in the preceding sentence.  The Common Stock, Series A Preferred Stock, Series B Preferred Stock, Series Q Preferred Stock and Series Q-1 Preferred Stock constitute all of the Shares.  All such Shares are duly authorized, validly issued, fully paid and non-assessable and were issued in full compliance with all Laws and constitute all of the issued and outstanding shares of capital stock of the Company.   The designations, powers, preferences, rights, qualifications, limitations and restrictions in respect of each class and series of authorized capital stock of the Company are as set forth in the Company's Certificate of Incorporation, and all such designations, powers, preferences, rights, qualifications, limitations and restrictions are valid, binding, and enforceable in accordance with all Laws.  There are no shares of capital stock of the Company held in the corporate treasury of the Company or reserved for issuance, except as set forth in 3.4(b) below.  The Company has no obligation (contingent or other) to purchase, redeem or otherwise acquire any of its equity securities or any interest therein or to pay any dividend or make any other distribution in respect thereof.

(b)     Information Regarding Company Options.  Schedule 3.4(b) accurately sets forth the following information with respect to all outstanding Company Options as of the date hereof: the name of the holder of such Company Option, the number of Shares covered by the Company Option, the vesting terms of such Company Option, the exercise price of the Company Option, and the expiration date of such Company Option.  Other than the Shares to be issued upon exercise of the Company Options and as set forth in Section 3.4(a) above, the Company has no shares of capital stock reserved for issuance.  The Company has the right to treat all Company Options as provided in Section 2.6. The Company shall deliver an updated Schedule 3.4(b) at or prior to the Closing.

(c)     Convertible Securities.  Except as provided in this Agreement and the other Transaction Documents, and except for the Company Options, and as set forth in Schedule 3.4(c) of the Disclosure Schedules, the Company has no (i) outstanding options, warrants, convertible debt, rights or securities convertible or exchangeable for any shares of its capital stock or containing any profit participation features, or rights, calls or convertible securities, stock appreciation rights (phantom or otherwise), joint venture, partnership or other commitments of any nature relating to the issuance, sale of transfer of any shares of the capital stock or other securities of the Company, (ii) commitment, agreement, arrangement, understanding or undertaking of any kind (contingent or otherwise) to which the Company is a party or by which it is bound obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or other voting securities of the Company or obligating the Company to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking; (iii) outstanding contractual obligation of the Company to repurchase,

28

Outside Counsel Eyes Only

redeem or otherwise acquire any shares of capital stock (or options to acquire any such shares); (iv) voting trust, proxy or other agreement, commitment or understanding of any character to which the Company is a party or by which the Company is bound with respect to the voting of any shares of capital stock of the Company; or (v) agreement, arrangement or commitment of any character (contingent or otherwise) pursuant to which any person is or may be entitled or to cause the Company or any successor corporation (including Purchaser) to file a registration statement under the Securities Act or which otherwise relate to the registration of any securities of the Company or such successor corporation.

(d)     Merger Consideration.   Schedule 3.4(d) accurately sets forth the Seller Information and the Option Holder Information, which Schedule shall be updated immediately prior to the Closing.  The allocation of Merger Consideration among the holders of shares of Company Capital Stock in the manner contemplated by Section 2.5(b) is in all respects consistent with, and determined in accordance with, the applicable provisions of the DGCL, the Certificate of Incorporation of the Company and every Contract binding on the Company.

3.5.     Authorization; Enforceability

. The Company has the corporate power and authority to (a) own, hold, lease and operate its properties and assets and to carry on the Business as currently conducted and to perform all of its obligations under the Material Contracts and (b) execute, deliver and perform all of the Transaction Documents to which the Company is a party.  The execution, delivery and performance of this Agreement and the other Transaction Documents to which the Company is a party and the consummation of the transactions contemplated herein and therein have been duly authorized and approved by the Company, and no other no other action on the part of the Company is necessary in order to give effect thereto.  This Agreement, and each of the other Transaction Documents to be executed and delivered by the Company, have been duly executed and delivered by, and constitute the legal, valid and binding obligations of, the Company, enforceable against the Company in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding may be brought.

3.6.     No Violation or Conflict

. Except as set forth on Schedule 3.6 of the Disclosure Schedules, the filing of the Certificate of Merger with the Secretary of State of the State of Delaware and the HSR Filing, none of (a) the execution and delivery by the Company of this Agreement and the other Transaction Documents to be executed and delivered by the Company, (b) the consummation by the Company of the transactions contemplated by this Agreement and the other Transaction Documents, or (c) the performance of this Agreement and the other Transaction Documents to be executed and delivered by the Company, will (i) conflict with or violate the Certificate of Incorporation or By-Laws of the Company or any resolutions adopted by the Board or shareholders of the Company; (ii) conflict with or violate any Law, Order or Governmental Permit applicable to the Company or to which the Company, or any of the Company's assets, may be subject; (iii) require any consent, approval, authorization or Governmental Permit of, or filing with, or notification to, any Governmental Authority or other Person; (iv) result in any breach or violation of, or constitute a

29

NMDX0111800

default (or an event that with notice and/or lapse of time would become a default) under, or impair the Company's rights or alter the rights or obligations of any third party under, or give rise to any right of termination, amendment, acceleration or cancellation of, any Material Contract or other instrument or obligation to which the Company is a party or by which the Company or its assets are bound or affected; (v) result in the imposition or creation of any Lien on the Shares or on any of the properties or assets of the Company; or (vi) cause the Company to become subject to, or become liable for, the payment of any Tax.

3.7.   Compliance with Law

. Except as set forth on Schedule 3.7 of the Disclosure Schedules, the Company is in material compliance with, and is not in default under, or in violation of, any Law or Order applicable to the Company or to the conduct of the Business or the ownership or use of any of the Company's assets or properties. The Company (a) is not subject to any Orders and (b) has not received, at any time, any notice or other communication (whether written or oral) from any Governmental Authority or other Person regarding any actual, alleged, or potential breach or violation of, or non-compliance with, any Order or Law to which the Company or the Business is or has at any time been subject.

3.8.   Governmental Consents and Approvals

. Except for approval under the HSR Act and except as set forth on Schedule 3.8 of the Disclosure Schedules, the execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to be executed and delivered by the Company do not and will not require any consent, approval, authorization, Governmental Permit or other order of, action by, filing with or notification to, any Governmental Authority.

3.9.   Financial Statements

. The Company has, or with respect to future periods will have prior to the Closing Date, delivered to Purchaser (i) the unaudited balance sheet (the "Recent Balance Sheet") as of March 31, 2018 (the "Recent Balance Sheet Date") and the related statements of income and cash flow for the three (3) month period ended March 31, 2018, (ii) the unaudited balance sheet for the year to date ending as of the last day of the month most recently completed prior to the Closing Date (other than any month ending within thirty days prior thereto) and the related statements of income and cash flow for the year-to-date period then ended, (iii) the unaudited balance sheet of the Company as at December 31, 2017 and the related statements of income and cash flow and notes thereto for the fiscal year ended December 31, 2017, (iv) the unaudited balance sheet of the Company for each year completed following the date hereof and prior to the Closing Date (other than any year ending within sixty days prior thereto) and related statements of income and cash flow and notes for each such year; and (v) the unaudited balance sheet of the Company for each month and quarter completed following the date hereof and prior to the Closing Date (other than any quarter ending within sixty days prior thereto) and related statements of income and cash flow and notes for each such month and quarter (all of the foregoing collectively the "Financial Statements"). The Financial Statements (a) are accurate and complete in all material respects; (b) are consistent with the books and records of the Company; and (c) present fairly, in all material respects, the financial position of the Company as of the respective dates thereof and the results of

Outside Counsel Eyes Only

NMDX0111801

operations for the periods covered thereby. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered (except that the financial statements do not contain footnotes and, with respect to any interim Financial Statements, are subject to normal and recurring year-end audit adjustments, none of which would, individually or in the aggregate, have a Material Adverse Effect on the Company).

3.10.   Absence of Undisclosed Liabilities

. The Company has no Liabilities, and has no Knowledge of any reasonable basis for the assertion of any Liabilities, against the Company with respect to the Business, other than Liabilities (a) reflected or reserved against on the Recent Balance Sheet, (b) disclosed on Schedule 3.10 of the Disclosure Schedules, (c) for performance under the terms of executory contracts entered into in the Ordinary Course of Business, and (d) incurred in the Ordinary Course of Business since the Recent Balance Sheet Date which have not had, and would not reasonably be expected to have, a Material Adverse Effect on the Company.

3.11.   Conduct in the Ordinary Course; Absence of Changes

. Since the Recent Balance Sheet Date, the Company has conducted the Business in the Ordinary Course of Business, and, except as contemplated in the Transaction Documents and except as disclosed on Schedule 3.11 of the Disclosure Schedules, since the Recent Balance Sheet Date, the Company has not:

(a)   permitted or allowed any of the assets of the Company to be subjected to any Lien, other than Liens that will be released at or prior to the Closing;

(b)   except in the Ordinary Course of Business, discharged or otherwise obtained the release of any Lien or paid or otherwise discharged any Liability;

(c)   written off, written down or written up (or failed to write off, write down or write up in accordance with GAAP consistent with past practice) the value of any Inventory or Receivables or revalued any assets of the Company, other than in the Ordinary Course of Business and in accordance with GAAP;

(d)   made any change in any method of accounting or accounting practice or policy other than such changes required by GAAP and disclosed on Schedule 3.11 of the Disclosure Schedules;

(e)   amended, terminated, cancelled or compromised any material claim of the Company or waived any other rights of substantial value to the Company;

(f)   sold, transferred, leased, subleased, licensed or otherwise disposed of any of the assets of the Company, other than the sale of Inventory in the Ordinary Course of Business;

(g)   failed to pay any creditor any amount owed when due;

Outside Counsel Eyes Only

NMDX0111802

(h)     made any material change in the Business or the operations of the Business, except as contemplated by this Agreement or the Ancillary Agreements, or suffered any Material Adverse Effect;

(i)     taken any of the following actions: (i) entered into, adopted or amended any Employee Plan; (ii) made any grant of any severance or termination pay to any director, officer, employee or individual providing services to the Company; (iii) entered into any employment, deferred compensation, change in control or other similar agreement (or any amendment to any such existing agreement) with any director, officer, employee or individual providing services to the Company; (iv) increased or promised to increase any benefits payable under any existing severance or termination pay policies or employment agreements; or (v) increased or promised to increase any compensation, bonus or other benefits payable to directors, officers, employees or individuals providing services to the Company, in each case other than in the Ordinary Course of Business;

(j)     made any loan, advance or capital contribution to, or investment in, or guaranteed any Indebtedness of or otherwise incurred any Indebtedness on behalf of, any Person, other than loans or advances to employees of the Company made in the Ordinary Course of Business;

(k)     borrowed any amount or incurred or become subject to any Liabilities, except Liabilities incurred in the Ordinary Course of Business;

(l)     instituted or settled any Litigation;

(m)     disclosed any proprietary or confidential information of the Company to any Person not associated with the Company, unless such Person, prior to such disclosure, executed and delivered a non-disclosure agreement in favor of the Company;

(n)     made any single capital expenditure or commitment not contemplated by the Company's budget approved by the Board of the Company in excess of $100,000, or aggregate capital expenditures or commitments not contemplated the Company's budget approved by the Board of the Company in excess of $250,000;

(o)     entered into any joint venture, partnership or similar arrangement;

(p)     made or changed any Tax election, changed an annual accounting period, adopted or changed any accounting method, filed any amended Tax Returns, entered into any closing agreement, settled or consented to any claims with respect to Taxes, surrendered any right to claim a refund of Taxes, settled or compromised any Tax liability or consented to any extension or waiver of the limitation period applicable to any claims with respect to Taxes;

(q)     entered into any agreement, arrangement or transaction with any of its directors, officers, employees or shareholders (or with any relative, beneficiary, spouse or Affiliate of any such Person);

Outside Counsel Eyes Only

NMDX0111803

(r)     terminated, discontinued, closed or disposed of any business operations, or laid off any employees or implemented any early retirement, separation or program providing early retirement benefits or announced or planned any such action or program for the future;

(s)     granted any assignment, license, transfer or termination of any Intellectual Property or permitted to lapse or abandoned any Intellectual Property (or any registration or grant with respect thereto or any application relating thereto), in which the Company has any right, title, interest or license;

(t)     allowed any Governmental Permit or Environmental Permit that was issued or relates to the Company or otherwise relates to the Business to lapse or terminate, or failed to renew any insurance policy or Governmental Permit or Environmental Permit that is scheduled to terminate or expire within thirty (30) days;

(u)     failed to maintain the property and equipment used in the Business in good repair and operating condition, ordinary wear and tear excepted;

(v)     suffered any casualty loss or damage with respect to any of the assets of the Company (whether or not covered by insurance) which in the aggregate have a replacement cost of more than $100,000, whether or not such losses or damage shall have been covered by insurance;

(w)     amended, modified or consented to the termination of any Material Contract or the Company's rights thereunder other than in the Ordinary Course of Business;

(x)     amended or restated its Certificate of Incorporation or By-Laws;

(y)     changed the amount of the Company's authorized or issued capital stock; granted any stock option or right to purchase shares of the capital stock of the Company or issued any security convertible into such capital stock; or granted any registration rights, or disclosed or paid any dividend, in respect of any shares of the capital stock of the Company;

(z)     taken, or failed to take, any action which could reasonably be expected to prevent, hinder or materially delay the ability of the Company or the Sellers to consummate the transactions contemplated by this Agreement; or agreed, whether in writing or otherwise, to take any of the actions specified in this Section 3.11 or entered into any commitment to effect any of the actions specified in this Section 3.11, except as expressly contemplated by this Agreement and the Ancillary Agreements.

3.12.   <u>Contracts</u>

.

(a)     <u>Schedule 3.12(a)</u> contains a complete and accurate list, to the extent currently in effect (each of such Contracts, a "<u>Material Contract</u>" and, collectively, the "<u>Material Contracts</u>"):

Outside Counsel Eyes Only

NMDX0111804

(i)     each Contract with any supplier or for the furnishing of services to the Company or otherwise related to the Business (A) under the terms of which the Company:  (1) is obligated to pay or otherwise give consideration of more than $50,000 in the aggregate during the current calendar year; (2) is obligated to pay or otherwise give consideration of more than $100,000 in the aggregate over the remaining term of such Contract; or (3) cannot terminate without penalty or payment on less than 30 days' notice; or (B) not entered into in the Ordinary Course of Business;

(ii)     all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which the Company is a party;

(iii)     all Contracts with any independent contractor, consultant, director, officer or employee of the Company, to which the Company is a party, and which is not cancelable without penalty or further payment on less than thirty (30) days' notice;

(iv)     all Contracts relating to Indebtedness of the Company, including, without limitation, any Contracts relating to the guarantee, support, indemnification, assumption, endorsement of, or any other similar commitment with respect to, the Liabilities or Indebtedness of any other Person (not including the Transaction documents);

(v)     all Contracts with any Governmental Authority to which the Company is a party;

(vi)     all Contracts that limit the ability of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time;

(vii)     all Contracts involving the Company relating to confidentiality, secrecy or non-disclosure (whether the Company is an obligor or beneficiary thereunder) under which the obligations of the parties have not expired, other than such Contracts entered into in the Ordinary Course of Business;

(viii)     all Contracts between the Company and any Affiliate of the Company;

(ix)     all Contracts of the Company involving capital expenditures in excess of $150,000;

(x)     all Contracts pursuant to which the Company is a lessor of any machinery, equipment, motor vehicle, office equipment, furniture or fixtures, other personal property under which the Company is obligated to make payments in excess of $50,000, in the aggregate, in any given calendar year;

Outside Counsel Eyes Only

NMDX0111805

(xi)    all Contracts of the Company which relate, in whole or in part, to any Intellectual Property, except for off-the-shelf, click-through or similar non-customized software applications programs having an acquisition price of less than $50,000, in the aggregate;

(xii)   all Contracts of the Company which expire after more than one (1) year;

(xiii)  all Contracts of the Company which relate to any partnership, joint venture or other similar arrangement;

(xiv)   all Contracts of the Company relating to the acquisition or disposition of any business, a material amount of equity or assets of any other Person or any real property (whether by merger, sale of stock or other equity interest, sale of assets or otherwise) (not including this Agreement and the other Transaction Documents);

(xv)    all Contracts pertaining to collective bargaining agreements and any other Contract between the Company and any labor union;

(xvi)   all Contracts involving the providing of benefits under any Employee Plan; and

(xvii)  all other Contracts, whether or not made in the Ordinary Course of Business, which (A) are material to the Company or the conduct of the Business, or (B) the absence of which would have, or would reasonably be expected to have, a Material Adverse Effect.

(b)     The Company has delivered or made available to Purchaser true, correct and complete copies of all Material Contracts that are in writing, and <u>Schedule 3.12(b)</u> of the Disclosure Schedules contains an accurate summary of all Material Contracts that are not in writing.

(c)     All of the Material Contracts are in full force and effect and are valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject only to bankruptcy, insolvency or similar laws affecting the rights of creditors generally and to general equitable principles. The Company has not received any notice that it is in breach of or in default under any of the Material Contracts, and no event has occurred which, with the passage of time or the giving of notice or both, would constitute a material breach or default by the Company thereunder. To the Knowledge of the Company, none of the other parties to any of the Material Contracts is in default thereunder, nor to the Knowledge of the Company has an event occurred which, with the passage of time or the giving of notice or both would constitute a default by such other party thereunder. The Company has not received any notice of the pending or threatened cancellation, revocation or termination of any of the Material Contracts, nor, the Knowledge of the Company, are there any facts or circumstances that could reasonably be expected to lead to any such cancellation, revocation or termination.

Outside Counsel Eyes Only

NMDX0111806

(d)     Except as set forth on Schedule 3.12(d) of the Disclosure Schedules, the continuation, validity and effectiveness of the Material Contracts under the current terms thereof will not be affected, and no payment will be required to be made or Consent will be required to be issued or obtained, as a result of the execution of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated herein and therein.

3.13.   Governmental Permits

(a)     Schedule 3.13 contains a complete and accurate list of all Governmental Permits that are held by the Company (which list includes the Governmental Authority issuing such Governmental Permit). The Company (i) is, and at all times has been, in compliance with all conditions and requirements imposed by the Governmental Permits; and (ii) has not received any written notice of cancellation or termination of any such Governmental Permit, and has no Knowledge that any appropriate Governmental Authority intends to or has valid grounds to cancel or terminate any such Governmental Permits. Except as set forth on Schedule 3.13 of the Disclosure Schedules, (x) each of the Governmental Permits is valid and in full force and effect; (y) none of the Governmental Permits will be terminated or adversely affected as a result of the execution of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated herein and therein, and no payment or Consent will be required with respect to such Governmental Permits, as a result thereof; and (z) the Company owns or has the right to use the Governmental Permits in accordance with the terms thereof.

(b)     The Governmental Permits listed on Schedule 3.13 of the Disclosure Schedules collectively constitute all of the Governmental Permits necessary to permit the Company to lawfully conduct and operate the Business in the manner in which it is currently conducted and operated and to permit the Company to own and use its assets in the manner in which they are currently owned and used.

3.14.   Taxes

(a)     All federal income Tax Returns and all other Tax Returns required to be filed with respect of the Company (collectively, the "Company Tax Returns") have been timely filed pursuant to applicable Law. The Company has paid, or made provision for the payment of, all Taxes that have or may become due pursuant to the Company Tax Returns or otherwise. Except as set forth on Schedule 3.14(a) of the Disclosure Schedules, (i) the Company Tax Returns are true, correct and complete in all material respects; (ii) no material adjustment to the Company Tax Returns has been claimed or raised in writing by any Governmental Authority and, to the Knowledge of the Company, no basis exists for any such adjustment; and (iii) there are no Tax Liens (other than Tax Liens not yet due and payable) on any assets of the Company. There are no pending or, to the Knowledge of the Company, threatened actions or proceedings for the assessment or collection of any Taxes against the Company or (insofar as either relates to the activities or income of the Company or the Business or could result in Liability of the Company on the basis of joint and/or several liability) any corporation that was includible in the filing of a

36

Company Tax Return with the Company on a consolidated or combined basis. The Company has withheld and paid to the proper Governmental Authority all Taxes required by Law to have been withheld and paid, including in connection with any amounts paid or owing to any employee, independent contractor or third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(b)    Except as disclosed on Schedule 3.14(b) of the Disclosure Schedules, there are no outstanding: (i) waivers or agreements extending the statute of limitations for any period with respect to any Tax to which the Company may be subject; (ii) requests for information currently outstanding that could affect the Taxes of the Company; and (iii) proposed reassessments of any assets owned by the Company or other proposals that could increase the amount of any Tax to which the Company would be subject.

(c)    Reserves and allowances required under GAAP have been provided for on the Recent Balance Sheet that are adequate to satisfy all Liabilities for Taxes of the Company as of the Recent Balance Sheet Date and will be adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its Tax Returns (without regard to the materiality thereof).

(d)    The Company (i) is not a party to any Tax indemnification, Tax allocation or Tax sharing agreement or other agreement with respect to Taxes that will require any payment by the Company; (ii) has not been a member of an affiliated group within the meaning of Code Sec. 1504(a) filing a consolidated federal income Tax return; (iii) has no Liability for the Taxes of any Person under Reg. §1.1502-6 (or any similar provision of applicable Law), as a transferee or successor, by contract, or otherwise; (iv) has not been a United States real property holding corporation within the meaning of Code Sec. 897(c)(2) during the applicable period specified in Code Sec. 897(c)(1)(A)(ii); (vi) has disclosed on the federal Company Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Code Sec. 6661; (vii) has not been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Code Sec. 355 within the past five years; (viii) has not incurred a tax liability by virtue of being at any time a member of any partnership or joint venture or the holder of a beneficial interest in any trust for any period for which the statute of limitations for any Tax has not expired; (ix) no unit of the Company is a "dual resident corporation" within the meaning of Code Sec. 1503(d)); (x) there is currently no limitation on the utilization of any net operating losses, capital losses, built-in losses, tax credits, or similar items of the Company under Code Secs. 269, 382, 383, 384, or 1502 (and any comparable provisions of foreign, state, local, or municipal law; and, (xi) the Company has not been required nor will it be required, as a result of events that occur before Closing, to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (*1*) change in method of accounting for a taxable period ending on or prior to the Closing, (*2*) "closing agreement" as described in Code Sec. 7121 (or any corresponding or similar provision of state, local, or foreign income tax law) executed on or prior to the Closing; (*3*)   intercompany transaction or any excess loss account described in Treasury Regulations under Code Sec. 1502 (or any corresponding or similar provision of state, local, or foreign income tax law); (*4*) installment sale or open transaction disposition made on or prior to Closing; or (*5*) prepaid amount received on or prior to Closing.

37

(e)     The Company is not, and has not at any time been, an S corporation as defined in Code Sec. 1361.

(f)     No written claim has ever been made by a Governmental Authority in any jurisdiction where the Company does not file a Tax Returns that the Company is or may be subject to taxation by such jurisdiction.

(g)     The Company has filed all Tax Returns in any jurisdiction with which it is treated as having "nexus" or other similar connection.

3.15.   Litigation

. Except as set forth on Schedule 3.15 of the Disclosure Schedules, (a) there is no Litigation pending or, to the Knowledge of the Company, threatened by or before any Court or Governmental Authority (i) involving or otherwise affecting the Company or the Business or any of the property, assets or rights owned or used by the Company, or (ii) that challenges or calls into question the validity of this Agreement or any of the other Transaction Documents or that may have the effect of preventing or delaying any action taken or to be taken pursuant hereto or thereto nor, to the Knowledge of the Company does there exist any reasonable basis for any Litigation described in (i) and (ii) above; (b) the Company has not received any written complaint from any customer of or supplier to the Company; (c) there is no Action by the Company pending or threatened against any third party and (d) there is no outstanding Order involving or affecting the Company. For the avoidance of doubt, to the extent any Litigation is disclosed on Schedule 3.15 of the Disclosure Schedules, each such disclosure includes the parties thereto, the nature and location of the proceeding, the date commenced, the amount of damages or other relief sought and, if applicable, paid or granted and a statement as to whether the matter is insured and, if so, the insurance policy applicable to such matter.  None of the Litigation matters disclosed on Schedule 3.15 of the Disclosure Schedules, if any, has had, or could reasonably be expected to have, a Material Adverse Effect.

3.16.   Insurance

.

(a)     The Company has delivered to Purchaser true and complete copies of all insurance policies and fidelity bonds covering the assets, business, equipment, properties and operations of the Company or otherwise relating to the Business, a list of which (by type, carrier, policy number, limits, premium and expiration date) is set forth on Schedule 3.16(a) of the Disclosure Schedules.  The Company has paid all premiums due, and has otherwise performed its obligations under, each such policy and bond and all such insurance policies and bonds are in full force and effect and will remain in full force and effect following the Closing.

(b)     Schedule 3.16(b) of the Disclosure Schedules sets forth a summary of the loss experience of the Company under each insurance policy, including a description of each claim under each such insurance policy, the name of the claimant and the date of the claim.

3.17.   Significant Suppliers

Outside Counsel Eyes Only

NMDX0111809

. Schedule 3.17 of the Disclosure Schedules lists the names and addresses of all of the significant suppliers of raw materials, supplies, merchandise and other goods for the Business for each period covered by the Financial Statements and the amount for which each such supplier invoiced the Company during each such period.  Except as disclosed on Schedule 3.17 of the Disclosure Schedules, the Company has not received any written notice indicating, and has no Knowledge, that any such supplier will not sell raw materials, supplies, merchandise and other goods to the Company at any time after the Closing Date on terms and conditions similar to those imposed on current sales to the Business, subject to general and customary price increases.

3.18.   Real Property

.

(a)     The Company does not own, directly or indirectly, any real property.

(b)     Schedule 3.18(b) of the Disclosure Schedules lists (i) the street address of each parcel of Leased Real Property; and (ii) the lease applicable to each parcel of Leased Real Property.

(c)     Except as set forth on Schedule 3.18(c) of the Disclosure Schedules, to the Knowledge of the Company, (i) there is no material violation of any municipal, state or federal Law (including, without limitation, any environmental, building, planning or zoning Law) relating to any of the Leased Real Property; (ii) the Company is in peaceful and undisturbed possession of each parcel of Leased Real Property and there are no contractual or legal restrictions that preclude or restrict the ability to use the premises for the purposes for which they are currently being used; and (iii) all existing water, sewer, steam, gas, electricity, telephone and other utilities required for the use, occupancy and operation of the Leased Real Property are adequate for the conduct of the Business as it has been and currently is conducted.

(d)     Except as set forth on Schedule 3.18(d) of the Disclosure Schedules, the Company has not subleased any parcel or any portion of any parcel of Leased Real Property to any other Person, nor has the Company assigned its interest under any lease or sublease to any third party.

(e)     The Company has delivered to Purchaser correct and complete copies of all leases and subleases listed on Schedule 3.18(b) or Schedule 3.18(d) of the Disclosure Schedules and any and all ancillary documents pertaining thereto (including, but not limited to, all amendments, consents for alterations and documents recording variations and evidence of commencement dates and expiration dates) (the "Leases").  Except as set forth on Schedule 3.18(e), with respect to each such Lease: (i) such Lease is the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and is in full force and effect and represents the entire agreement of the Company and each landlord with respect to such property;  (ii) such Lease will not cease to be legal, valid, binding, enforceable and in full force and effect on terms identical to those currently in effect as a result of the consummation of the transactions contemplated by this Agreement, nor will the consummation of the transactions contemplated by this Agreement constitute a breach or default under such Lease or otherwise give the landlord a right to terminate such Lease; (iii) with respect to each such Lease (A) the Company

Outside Counsel Eyes Only

NMDX0111810

has not received any written notice of cancellation or termination under such Lease and no lessor has any right of termination or cancellation under such Lease except in connection with the default of the Company thereunder or the expiration of the Lease, (B) the Company has not received any written notice of a breach or default under such Lease, which breach or default has not been cured and (C) the Company has not granted to any other Person any rights, adverse or otherwise, under such Lease; (iv) neither the Company, nor, to the Knowledge of the Company, any other party to such Lease, is in breach or default in any material respect, and no event has occurred that, with notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration under such Lease; and (v) the rental payments set forth in each Lease is the actual rental being paid, and there are no separate agreements or understandings with respect to the same.

(f)      There are no present, pending or, to the Knowledge of the Company, threatened special assessments, tax takings, condemnation proceedings or eminent domain proceedings of any kind pending or threatened against any of the Leased Real Property.

(g)      All the Leased Real Property is occupied under a valid and current certificate of occupancy or similar permit, the transactions contemplated by this Agreement will not require the issuance of any new or amended certificate of occupancy and there are no facts that would prevent the Leased Real Property from being occupied after the Closing in the same manner as immediately prior to the Closing.

(h)      The Company has the full right to exercise any renewal options contained in the Leases pertaining to the Leased Real Property on the terms and conditions contained therein and upon due exercise would be entitled to enjoy the use of each Leased Real Property for the full term of such renewal options.

(i)      The Company has received no written notice of a change, and has no Knowledge that any change is contemplated, with respect to the zoning of the Leased Real Property, or the availability of utility services to the Leased Real Property, that would materially and adversely affect the operations or use of the Leased Real Property.

(j)      To the Knowledge of the Company, all of the mechanical systems in the buildings upon the Leased Real Property, including the water, sewer, plumbing, heating, ventilation, electrical, air conditioning and sprinkler systems, if any, are in good working order, ordinary wear and tear excepted, and the roof is in good condition and free from leakage.

3.19.   <u>Intellectual Property</u>

(a)      <u>Schedule 3.19(a)</u> of the Disclosure Schedules sets forth a complete and accurate list of all active registrations and presently pending applications for registrations of Patents, Trademarks, domain name registrations and Copyrights included in the Owned Intellectual Property and /or Licensed Intellectual Property, indicating for each item, to the extent applicable, the jurisdiction of registration (or application), registration number (or application number) and date issued (or date filed).

Outside Counsel Eyes Only                                                      NMDX0111811

(b)     The Company is the owner of all right, title and interest in and to each of the Patents included in the Owned Intellectual Property, free and clear of all Liens.  All Patents listed on Schedule 3.19(a) of the Disclosure Schedules (i) are in compliance with all legal requirements required to maintain such Patents in full force and effect (including the payment of filing, examination and annuity and maintenance fees and proof of working or use), and (ii) are not subject to any maintenance fees or Taxes or actions falling due within ninety (90) days after the Closing Date except as set forth on Schedule 3.19(b) of the Disclosure Schedules.  No such Patent is involved in any interference, reissue, re-examination or opposition proceeding and no such action has been threatened with respect to any such Patent.

(c)     The Company is the owner of all right, title and interest in and to each of the Trademarks included in the Owned Intellectual Property, free and clear of all Liens.  All Trademarks listed on Schedule 3.19(a) of the Disclosure Schedules that have been registered with the United States Patent and Trademark Office are currently in compliance with all formal legal requirements currently due to maintain the validity of such registrations (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), and are not subject to any maintenance fees or Taxes or actions falling due within ninety (90) days after the Closing Date.  No such Trademark is currently involved in any opposition or cancellation proceeding and no such action has been threatened with respect to any of the Trademarks or any registration applications with respect thereto.  All Trademarks of the Company included on Schedule 3.19(a) of the Disclosure Schedules have been in continuous use by the Company and there are no Trademarks of any third party which interfere with the Trademarks of the Company. The Company has taken commercially reasonable steps to protect the Trademarks of the Company against third party infringement.

(d)     Copyrights included within the Owned Intellectual Property relate to works of authorship (i) created by (A) employees of the Company within the scope of their employment, or (B) independent contractors who have assigned their rights to the Company pursuant to enforceable written agreements, or (ii) acquired from the original author(s) or subsequent assignees.  The works covered by the Copyrights were not copies of nor derived from any work (X) which is not in the public domain, or (Y) for which the Company does not own the Copyrights, and no third party has any claim to authorship or ownership of any part thereof.

(e)     Schedule 3.19(e) of the Disclosure Schedules lists (i) all Software (other than off-the-shelf, click-through or similar non-customized software applications programs having an acquisition price of less than $25,000) which is owned, licensed to or by the Company, leased to or by the Company, or otherwise used by the Company, and identifies which Software is owned, licensed, leased or otherwise used, as the case may be and (ii) lists all Software sold, licensed, leased or otherwise distributed by the Company to any third party, and identifies which Software is sold, licensed, leased, or otherwise distributed as the case may be.  The Software listed on Schedule 3.19(e) of the Disclosure Schedules which the Company owns was either developed (i) by employees of the Company or any of its Subsidiaries within the scope of their employment, or (ii) by independent contractors who have assigned their rights to the Company pursuant to enforceable written agreements.  All Software owned by the Company, and all Software licensed from third parties by the Company, is free from any material defect or programming or documentation error, operates and runs in a reasonable and efficient business manner, conforms in material respects to the specifications thereof, if applicable, and, with respect to the Software

41

NMDX0111812

owned by the Company, the applications can be compiled from their associated source code without undue burden.  On the Closing Date, the Company will furnish Purchaser with the documentation in its possession relating to use, maintenance and operation of the Software.

(f)     The Company has valid registrations for each of the domain names set forth on Schedule 3.19(a) of the Disclosure Schedules.  The Company's registration of each of the domain names is free and clear of any Liens and is in full force and effect.  The Company has paid all fees required to maintain each registration.  None of the Company's registrations or use of the domain names has been disturbed or placed "on hold" and no claim (oral or written) has been asserted against the Company adverse to its rights to such domain names.

(g)     Schedule 3.19(g) of the Disclosure Schedules sets forth a complete and accurate list of all agreements to which the Company is a party or otherwise bound granting any consents, forbearances to sue, right or license to use or practice or similar terms with respect to rights under any Patents, Trademarks or Copyrights (collectively, the "License Agreements"), indicating for each License Agreement the title, the parties, date executed and whether or not it is exclusive. The License Agreements are valid and binding obligations of the Company, enforceable in accordance with their respective terms, and there exists no event or condition that will result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default by the Company under any such License Agreement.   None of the execution, delivery or performance of this Agreement by the Company, the consummation of the Merger, or compliance by the Company with any of the provisions of this Agreement will conflict with or result in any breach of or any payment due (which payment would not otherwise be due) under any provision contained in any of the License Agreements.  No royalties, honoraria or other fees are payable to any third parties for the use of or right to use by the Company of any Licensed Intellectual Property except pursuant to the License Agreements.

(h)     Except as set forth on Schedule 3.19(h) of the Disclosure Schedules, the Owned Intellectual Property and the Licensed Intellectual Property constitute all of the Intellectual Property used in or necessary for the conduct of the Business as currently conducted.   The Company has taken commercially reasonable steps to protect the Owned Intellectual Property and such Licensed Intellectual Property for which the Company has exclusive rights from third party infringement.  To the Knowledge of the Company, no third party is misappropriating, infringing, diluting or violating any Owned Intellectual Property or such Licensed Intellectual Property for which the Company has exclusive rights and no such claims have been brought against any third party by the Company.

(i)     Except as set forth on Schedule 3.19(i) of the Disclosure Schedules, the conduct of the Business as currently conducted and the NeuMoDx N288 and N96 Systems, as in development and, if commercialized, as offered, made, sold or otherwise used, do not infringe upon any Intellectual Property of any third party.  Without limiting the foregoing, no third party has notified the Company alleging that (i) the Company's activities or the conduct of the Business infringes upon, violates or constitutes the unauthorized use of the Intellectual Property of any third party, (ii) the Company infringes any of such third party's Intellectual Property rights in the conduct of the Business or (iii) such third party requires the Company to obtain a license to any of such third party's Intellectual Property.  There is no Litigation pending or, to the Knowledge of the Company, threatened alleging that the Company's conduct of the Business infringes upon,

42

NMDX0111813

violates or constitutes the unauthorized use of the Intellectual Property rights of any third party nor has any third party brought or threatened any Litigation challenging the ownership, use, validity or enforceability of any Owned Intellectual Property or Licensed Intellectual Property.

(j)     Except as set forth on <u>Schedule 3.19(j)</u> of the Disclosure Schedules, none of the execution, delivery or performance of this Agreement by the Company, the consummation of the Merger, or compliance by the Company with any of the provisions of this Agreement will result in the loss or impairment of the Company's or Purchaser's right to own or use any of the Owned Intellectual Property or Licensed Intellectual Property.

(k)     The Company has taken commercially reasonable steps in accordance with normal industry practice to protect the Company's rights in all Trade Secrets of the Company. Without limiting the foregoing, the Company has and enforces a policy of requiring each employee, consultant, contractor and potential business partner or investor to execute proprietary information, confidentiality and assignment agreements substantially consistent with the Company's standard forms thereof (complete and current copies of which will be delivered to Purchaser). There has been no disclosure of any Trade Secrets of the Company, except for any disclosure pursuant to a legally enforceable written confidentiality obligation.

(l)     No third party has claimed that any person employed by or affiliated with the Company or the Business has (i) violated or may be violating any of the terms or conditions of such person's employment, non-competition or non-disclosure agreement with such third party; (ii) disclosed or may be disclosing or utilized or may be utilizing any Trade Secret of such third party; or (iii) interfered or may be interfering in the employment relationship between such third party and any of its present of former employees. To the Knowledge of the Company, no person employed by or affiliated with the Company or the Business has employed or proposes to employ any Trade Secret of former employer and no person employed by or affiliated with the Company or the Business has violated any confidential relationship which such person may have had with any third party, in connection with the development, manufacture or sale of any product or the development or sale of any service of the Company or the Business, and the Company has no reason to believe there will be any such employment or violation. None of the execution of delivery of this Agreement, or the carrying on of the Business or proposed conduct of the Business, will conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any Contract under which any such person is obligated.

(m)     The Company has not used any Open Source Software in a manner that would require the Company to disclose source code for any products, grant rights to redistribute the Company products to any third party, grant patent non-asserts or patent licenses to any third party, or otherwise grant any right not otherwise specifically granted to any third party in the Company's License Agreements.

3.20.   <u>Personal Property</u>

.

(a)     <u>Schedule 3.20</u> of the Disclosure Schedules sets forth a list of the fixed assets owned by or leased to the Company (the "<u>Tangible Personal Property</u>"), and the location thereof.

43

NMDX0111814

Except as shown on <u>Schedule 3.20</u> of the Disclosure Schedules, the Company has good and marketable title, free and clear of all Liens, to all Tangible Personal Property owned by the Company.

(b)　　The Company has delivered to Purchaser correct and complete copies of all leases for Tangible Personal Property and any and all material ancillary documents pertaining thereto (including, but not limited to, all amendments, consents and evidence of commencement dates and expiration dates).  With respect to each such lease:  (i) such lease is the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms and is in full force and effect and represents the entire agreement between the respective lessor and the Company lessee with respect to such property; (ii) except as set forth on <u>Schedule 3.20</u> of the Disclosure Schedules, such lease will not cease to be legal, valid, binding, enforceable and in full force and effect on terms identical to those currently in effect as a result of the consummation of the transactions contemplated by this Agreement, nor will the consummation of the transactions contemplated by this Agreement constitute a breach or default under such lease or otherwise give the lessor a right to terminate such lease; (iii) except as otherwise set forth on <u>Schedule 3.20</u> of the Disclosure Schedules, with respect to each such lease, (A) the Company has not received any written notice of cancellation or termination under such lease and no lessor has any right of termination or cancellation under such lease or sublease except in connection with the default of the Company thereunder or the expiration thereof, (B) the Company has not received any written notice of a breach or default under such lease, which breach or default has not been cured and (C) the Company has not granted to any other Person any rights, adverse or otherwise, under such lease; (iv) neither the Company, nor, to the Knowledge of the Company, any other party to such lease, is in breach or default in any material respect, and no event has occurred that, with notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration under, such lease; and (v) the Company has the full right to exercise any renewal options contained in the leases pertaining to the Tangible Personal Property on the terms and conditions therein and upon due exercise would be entitled to enjoy the use of each item of leased Tangible Personal Property for the full term of such renewal options.

(c)　　All Tangible Personal Property is adequate and usable for the use and purposes for which it is currently used and is in good operating condition, normal wear and tear excepted.

3.21.　<u>Employment Matters; Labor Relations</u>

.

(a)　　<u>Schedule 3.21(a)</u> of the Disclosure Schedules contains a complete and accurate list of the following information for each employee or director of, or consultant to, the Company:  (i) name; (ii) the base salary or hourly wage (or consulting fee), bonus, and contingent compensation applicable for the current fiscal year, (iii) accrued vacation, (iv) date of hire, and (v) job title.

(b)　　<u>Schedule 3.21(b)</u> of the Disclosure Schedules contains a complete and accurate list of all employment, consulting, severance, termination, indemnification or other similar agreements of any nature (whether in writing or not) between the Company and any current

Outside Counsel Eyes Only

NMDX0111815

or former stockholder, officer, director, employee or consultant of or to the Company.  No individual shall accrue or receive additional benefits, service or accelerated rights to payments under any Employee Plan or any of the agreements set forth on <u>Schedule 3.21(b)</u> of the Disclosure Schedules, other than in accordance with the terms of such Employee Plans or agreement.  No individual shall receive any parachute payment, as defined in Section 280G of the Code, or become entitled to severance, termination allowance or similar payments as a result of the Transactions contemplated by this Agreement and the other Transaction Documents.  Except as set forth on <u>Schedule 3.21(b)</u>, (i) there is no written or verbal commitment or agreement to increase wages or modify the terms and conditions of employment or engagement of any employee or independent contractor of the Company, and (ii) no current or former stockholder, officer, director, employee or consultant of or to the Company is employed under a contract which cannot be terminated with less than thirty (30) days' notice and payment of less than $10,000.

(c)     <u>Schedule 3.21(c)</u> of the Disclosure Schedules sets forth a true and complete list of (i) each current or former employee, officer, director or investor of the Company who holds, any option, warrant or other right to purchase shares of capital stock of the Company, together with the number of shares subject to such option, warrant or right, the date of grant or issuance of such option, warrant or right, the extent to which such option, warrant or right is vested and/or exercisable, the exercise price of such option, warrant or right, whether such option is intended to qualify as an incentive stock option within the meaning of Section 422(b) of the Code, and the expiration date of each such option, warrant and right; and (ii) the total number of such options, warrants and rights.  True, complete and correct copies of each agreement (including all amendments and modifications thereto) between the Company and each holder of such options, warrants and rights relating to the same have been furnished to Purchaser.

(d)     Except as set forth on <u>Schedule 3.21(d)</u> of the Disclosure Schedules (i) all directors, officers, management employees and technical and professional employees of the Company are under written obligation to the Company to maintain in confidence all confidential or proprietary information acquired by them in the course of their employment and to assign to the Company all inventions made by them within the scope of their employment during such employment and for a reasonable period thereafter; (ii) to the Knowledge of the Company, no employee or director of the Company is a party to, or otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition or proprietary rights agreement between such employee or director and any other person that in any way adversely affects the performance of his duties as an employee of the Company or the ability of the Company to conduct the Business; and (iii) to the Knowledge of the Company, no employee of the Company intends to terminate his or her employment with the Company.

(e)     The Company is not a party to or bound by any collective bargaining agreement or other labor union contract applicable to any persons employed by the Company, and the Company is not legally obligated to recognize any labor organization as the representative of its employees.  To the Knowledge of the Company, there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit which could affect the Company.  There is no labor strike, slowdown, stoppage, material labor dispute, labor grievance, or claims of unfair labor practices pending or, to the Knowledge of the Company, threatened against the Company, and no labor strike, slowdown, stoppage, organizational effort,

Outside Counsel Eyes Only

NMDX0111816

material labor dispute, labor grievance or claims of unfair labor practices have occurred in the past three (3) years.

(f)     The Company is not a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices. There are no pending or threatened claims or charges (by employees, their representatives or governmental authorities) of unfair labor practices or of employment discrimination or of any other wrongful action with respect to any aspect of employment of any person employed or formerly employed by the Company.  Without limiting the foregoing, there is no charge related to discrimination in employment or employment practices, including, without limitation, age, gender, race, religion or other legally protected category, asserted or pending or, to the Knowledge of the Company, threatened against the Company before the United States Equal Employment Opportunity Commission, or any other Governmental Authority.

(g)     The Company has been and is currently in material compliance with all applicable Laws relating to the employment of labor, including but not limited to those Laws related to wages, hours, minimum wage, overtime pay, employment practices, classification of employment, independent contractor classification, terms and conditions of employment, employment contracts, occupational health and safety, workers' compensation, employee privacy, and the payment and withholding of taxes and other sums as required by the appropriate Governmental Authority.  None of the Company's employment policies or practices is currently being audited or investigated by any Governmental Authority.

(h)     The Company has withheld and paid to the appropriate Governmental Authority, or is holding for payment not yet due to such Governmental Authority, all amounts required to be withheld from employees of the Company, and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.  The Company has paid in full to all their respective employees or adequately accrued for in accordance with GAAP all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of Company employees.  There is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of the Company, threatened before any Governmental Authority with respect to any Persons currently or formerly employed by the Company.

(i)     The Company does not have, nor at the Closing shall the Company have, any obligation under the WARN Act.  Within the past three years, the Company has not implemented any plant closing or layoff of employees that could implicate the WARN Act or any similar or related Law.  Except as set forth on Schedule 3.21(i) of the Disclosure Schedules, the Company has not terminated the employment of or laid off any employee within the 90-day period immediately preceding the Closing Date.

(j)     There are no outstanding inspection orders or pending or, to the Knowledge of the Company, threatened legal proceedings relating to the Company under applicable occupational health and safety Laws, and there have been no fatal or critical accidents within the last three (3) years that would be reasonably likely to lead to legal proceedings against the Company under applicable occupational health and safety Laws.  The Company has complied in all material respects with any orders issued under applicable occupational health and safety Laws,

46

and there are no outstanding appeals of any orders applicable to occupational health and safety Laws relating to the Company.

(k)     Each employee of the Company is authorized to work in the country where he or she performs his or her services for the Company.

3.22.   <u>Employee Plans</u>

.

(a)     <u>Schedule 3.22(a)</u> of the Disclosure Schedules contains a true and complete list of all Employee Plans.  For each Employee Plan, the Company has provided to Purchaser correct and complete copies (where applicable) of the following: (i) all plan documents, summary plan descriptions, summaries of material modifications, summaries of benefits and coverage, amendments and resolutions; (ii) the most recent determination letters received from the IRS; (iii) the three most recent Form 5500 Annual Reports and summary annual reports and non-discriminatory testing documentation; (iv) the most recent audited financial statement and/or actuarial valuation (v) all related agreements, insurance contracts and other agreements which implement each such Employee Plan, (vi) all communications material to any Employee Plan participant or beneficiary; (vii) all correspondence to or from any governmental agency; (viii) all model COBRA forms and related invoices; (ix) all policies pertaining to fiduciary liability insurance covering the fiduciaries of any Employee Plan; (x) all Health Insurance Portability and Accountability Act of 1996, as amended ("<u>HIPAA</u>") privacy notices and all business associate agreements to the extent required under HIPAA; and (xi) any other documents, forms or other instruments reasonably requested by Purchaser.  Except as described on <u>Schedule 3.22(b)</u> of the Disclosure Schedules: (i) there has been no non-exempt "prohibited transaction," as such term is defined in Section 406 of ERISA and Section 4975 of the Code, with respect to any Employee Plan; (ii) there are no claims, assessments, complaints, proceedings, liens or investigations of any kind pending (other than claims for benefits in the Ordinary Course of Business) or, to the Knowledge of the Company, threatened against any Employee Plan or against the assets of any Employee Plan; (iii) all Employee Plans conform to, and in their operation and administration are and have been in all material respects in compliance with, the terms thereof and requirements prescribed by any and all applicable Laws (including without limitation ERISA, the Code, and all applicable requirements for notification, reporting and disclosure to participants or the Department of Labor, IRS or Secretary of the Treasury); (iv) the Company and ERISA Affiliates have performed all obligations required to be performed by them under, are not in default under or violation of, and the Company has no Knowledge of any default or violation by any other party with respect to, any of the Employee Plans; (v) each Employee Plan intended to qualify under Section 401(a) of the Code and each corresponding trust exempt under Section 501 of the Code has received or is the subject of a favorable determination or opinion letter from the IRS, and nothing has occurred which may be expected to cause the loss of such qualification or exemption; (vi) all contributions required to be made to any Employee Plan pursuant to Section 412 of the Code, the terms of the Employee Plan or any collective bargaining agreement, have been made on or before their due dates and a reasonable amount has been timely accrued on the Company's balance sheet; (vii) the transaction contemplated by this Agreement will not, directly or indirectly, result in an increase of benefits, acceleration of vesting or acceleration of timing for payment of any benefit to any participant in or beneficiary of any Employee Plan; (viii) no breach of fiduciary

47

NMDX0111818

duty has occurred with respect to any Employee Plan for which the Company, any ERISA Affiliate or any Employee Plan would be liable; (ix) no material disputes nor any audits by any Governmental Authority are pending or, to the Knowledge of the Company, threatened with respect to any Employee Plan; and (x) each Employee Plan, if any, which is maintained outside of the United States has been operated in all material respects in conformance with the applicable Laws relating to such Employee Plan in the jurisdictions in which such Employee Plan is present or operates and, to the extent relevant, the United States.

(b)     None of the Employee Plans are, and none of the Company nor any ERISA Affiliate has ever contributed to or had any obligation to contribute to or has any liability with respect to: (i) a plan subject to Title IV of ERISA or Section 412 of the Code; (ii) a "multiemployer plan" (within the meaning of Section 3(37) of ERISA or 414(f) of the Code); (iii) a "multiple employer plan" (within the meaning of Section 413(c) of the Code); (iv) any "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code); or (v) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(c)     Each Employee Plan that is a "group health plan" (within the meaning of Code Section 5000(b)(1)) has been operated in compliance with all applicable Laws, and with the group health plan continuation coverage requirements of Section 4980B of the Code and Sections 601 through 608 of ERISA ("COBRA Coverage"), Section 4980D of the Code and Part 7 of ERISA, Title XXII of the Public Health Service Act and the provisions of the Social Security Act, to the extent such requirements are applicable. No Employee Plan or written or oral agreement exists which obligates the Company or any ERISA Affiliate to provide health care coverage, medical, surgical, hospitalization, death or similar benefits (whether or not insured) to any employee, former employee or director of the Company or any ERISA Affiliate following such employee's, former employee's or director's termination of employment with the Company, or any ERISA Affiliate, other than COBRA Coverage. The Company is not subject to an assessable payment under Code Section 4980H. To the extent required under HIPAA and the regulations issued thereunder, the Company has performed all obligations under the medical privacy rules of HIPAA, the electronic data interchange requirements of HIPAA, and the security requirements of HIPAA with respect to each Employee Plan. No Employee Plan, excluding any short-term disability, non-qualified deferred compensation or flexible spending account plan or program, is self-funded, self-insured or funded through the general assets of the Company or an ERISA Affiliate.

(d)     Except as set forth on Schedule 3.22(d) of the Disclosure Schedules, the Company has expressly reserved in itself the right to amend, modify or terminate any Employee Plan, or any portion thereof.

(e)     Each "nonqualified deferred compensation plan" of the Company and any subsidiary of the Company (as defined under Section 409A of the Code) has at all relevant times complied in all material respects with applicable document requirements of, and been operated in material compliance with, Code § 409A. No taxes are due or accrued because of violations of Code § 409A.

(f)     Except as described on Schedule 3.22(f), the Company has not made any plan or commitment to establish any new Employee Plan or to modify any Employee Plan (except

48

NMDX0111819

to the extent required by law or to conform any such Employee Plan to the requirements of any applicable law, in each case as previously disclosed to Purchaser in writing, or as required by this Agreement).

3.23.   Environmental Matters

. Except as disclosed on Schedule 3.23 of the Disclosure Schedules, (a) the Company has obtained and holds all Environmental Permits which are required under any Environmental Laws for the operation of its business as it is currently conducted; (b) the Company is in full compliance with the terms and conditions of all such Environmental Permits; (c) to the Company's Knowledge, the Company is, and at all times has been, in compliance with, and has not been and is not in violation of or liable under, any Environmental Law; (d) there is not and has not been any Environmental Condition resulting from actions or omissions of the Company or any of its agents or employees that will interfere with or prevent continued compliance with the terms of such Environmental Permits or which could give rise to any liability under any Environmental Law; (e) to the Company's Knowledge, there is not and has not been any Environmental Condition resulting from the actions or omissions of the Company or any other party that will interfere with the operation of the Company's business; (f) neither the Company nor any of its agents or employees has processed, distributed, used, treated, stored, disposed, transported, handled, emitted, discharged or released into the environment, any Hazardous Substance in violation of any Environmental Law; neither the Company nor any of its agents or employees has disposed of any Hazardous Substance at any property currently or formerly owned or leased by the Company; (f) the Company has taken all actions necessary under the applicable requirements of any Environmental Law to register any products or materials required to be registered by the Company (or any of its agents) thereunder and such products and materials are listed on Schedule 4.23; and (g) to the Knowledge of the Company no underground storage tanks, polychlorinated biphenyls, asbestos or asbestos-containing materials, lead-based paint, or surface impoundments exist on any property currently owned or leased by the Company. Except as set forth on Schedule 3.23 of the Disclosure Schedules, there is no Action, Order, notice or demand letter pending or, to the Knowledge of the Company, threatened against the Company relating in any way to any Environmental Law or Hazardous Substances. The Company has furnished to Purchaser all environmental reports, audits, permits, licenses and registrations relating to the Company, its operation or facilities.

3.24.   Brokers

. Except as set forth on Schedule 3.24 of the Disclosure Schedules, the Company has not employed any financial advisor, broker or finder, and the Company is not responsible for any broker's, finder's, investment banking or similar fees, commissions or expenses in connection with the transactions contemplated by this Agreement. For purposes of clarity, the Sellers shall be solely responsible for payment of all such fees, commissions and expenses if incurred in connection with the transactions contemplated hereby.

3.25.   Certain Practices

. Neither the Company, nor any of its directors, officers, employees or agents has, directly or indirectly, given or agreed to give any material rebate, gift or similar benefit to any supplier,

49

NMDX0111820

customer, governmental employee or other Person who was, is, or may be in a position to help or hinder the Company or assist the Company in connection with any actual or proposed transaction by the Company.

3.26.   Certain Interests

.

(a)      Except as disclosed on Schedule 3.26(a) of the Disclosure Schedules, no stockholder who owns at least thirty percent (30%) of the Shares, officer or director of the Company, and no relative or spouse (or relative of such spouse) who resides with, or is a dependent of, any such stockholder, officer or director has any direct or indirect financial interest in any competitor, supplier or customer of the Company or any other Person that has had business dealings or had any financial interest in any transaction, with the Company; provided, however, that the ownership of securities representing not more than two percent (2%) of the outstanding voting power of any competitor, supplier or customer, the securities which are listed on any national securities exchange or traded actively in the national over-the-counter market, shall not be deemed to be a "financial interest" so long as the Person owning such securities has no other connection to or relationship with such competitor, supplier or customer;

(b)      Except as disclosed on Schedule 3.26(b) of the Disclosure Schedules, no stockholder of the Company, officer or director of the Company, and no relative or spouse (or relative of such spouse) who resides with, or is a dependent of, any such stockholder, officer or director: (i) owns, directly or indirectly, in whole or in part, or has any other interest in any tangible or intangible property owned or used by the Company in the conduct of the Business or otherwise; or (ii) has outstanding any Indebtedness to the Company.

(c)      Except as disclosed on Schedule 3.26(c) of the Disclosure Schedules, the Company has no Liability or any other obligation of any nature whatsoever to, any officer, director or stockholder of the Company or to any relative or spouse (or relative of such spouse) who resides with, or is a dependent of, any such officer, director or stockholder.

3.27.   Bank Accounts

. Schedule 3.27 of the Disclosure Schedules sets forth a true and complete list of (i) all bank accounts and safe deposit boxes of the Company and all Persons who are signatories thereunder or who have access thereto and (ii) the names of all Persons holding general or special powers of attorney from the Company and a summary of the terms thereof.

3.28.   Foreign Corrupt Practices

. Neither the Company nor any director, officer, agent, employee or other Person acting on behalf of the Company has, in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv)

50

NMDX0111821

made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

3.29.   Voting Required

. Assuming the affirmative vote of the holder of all of the Company Series Q Preferred Stock and the vote of the Purchaser or its permitted assigns with respect to the Series Q-1 Preferred Stock held by the Purchaser as of the date hereof, the affirmative vote of (i) the holders of a majority of the outstanding shares of Company Common Stock and Company Preferred Stock (voting on an as converted to Company Common Stock basis) voting together as a single class, and (ii) the holders of a majority of the Company Preferred Stock voting together as a separate class are the only votes of the holders of any class or series of Company Capital Stock necessary to adopt and approve this Agreement and approve the transactions contemplated by this Agreement (the "Required Merger Stockholder Vote").

3.30.   Disclosure

. No representation or warranty of the Company contained in this Agreement and the other Transaction Documents, and no statement, report or certificate furnished by or on behalf of the Company to Purchaser or its agents pursuant to this Agreement (including the Disclosure Schedules) or any of the other Transaction Documents, (a) contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading or (b) omits to state a material fact necessary in order to provide Purchaser with full and proper information as to the Business, financial condition, assets, results of operations or prospects of the Company and the value of its properties and assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB

As of the date hereof, Purchaser and Merger Sub hereby represents and warrants, and on the Closing Date shall be deemed to have represented and warranted, to the Company as follows:

4.1.   Organization and Qualification

. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California and is duly qualified to transact business as a foreign corporation in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect on Purchaser's ability to purchase the Shares. Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2.   Authorization; Enforceability

. Purchaser and Merger Sub have the corporate power and authority to execute, deliver and perform this Agreement and the other Transaction Documents, as applicable. The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated herein and therein have been duly authorized and approved by the Purchaser and Merger Sub, as applicable, and no other action on the part of Purchaser or Merger Sub is necessary in order to give effect thereto. This Agreement and each of

51

NMDX0111822

the other Transaction Documents to be executed and delivered by Purchaser and/or Merger Sub, as applicable, have been duly executed and delivered by, and constitute the legal, valid and binding obligations of, Purchaser and/or Merger Sub, as applicable, enforceable against Purchaser and/or Merger Sub, as applicable, in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding may be brought.

4.3.    No Violation or Conflict

.  None of (a) the execution and delivery of this Agreement and the other Transaction Documents to be executed and delivered by the Purchaser or the Merger Sub, (b) the consummation by the Purchaser or the Merger Sub by the Purchaser or the Merger Sub of the transactions contemplated by this Agreement and the other Transaction Documents, or (c) the performance of this Agreement and the other Transaction Documents required by this Agreement to be executed and delivered by Purchaser or Merger Sub at the Closing, will (i) conflict with or violate the Certificate of Incorporation or By-Laws of either Purchaser and/or Merger Sub, as applicable, or (ii) conflict with or violate any Law, Order or Permit applicable to Purchaser and/or Merger Sub, as applicable.

4.4.    Governmental Consents and Approvals

.  The execution, delivery and performance of this Agreement and the other Transaction Documents by Purchaser and/or Merger Sub, as applicable, do not and will not require any consent, approval, authorization, Permit or other order of, action by, filing with, or notification to, any Governmental Authority.

4.5.    Accredited Investor Status

.  Purchaser is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D of the Securities Act.

4.6.    Sufficient Funds

.  Purchaser has, and will have for the Closing, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Merger Consideration and consummate the transactions contemplated by this Agreement.

**ARTICLE V**
**CERTAIN COVENANTS**

5.1.    Conduct of Business

.

(a)    From the date of this Agreement until the earlier of the termination of this Agreement or the Closing Date (the "Term"), the Company shall (i) conduct its Business in the Ordinary Course of Business; (ii) use commercially reasonable efforts to keep its material physical

Outside Counsel Eyes Only

NMDX0111823

assets in good working condition, to preserve, maintain the value of, renew, extend, protect the confidential nature of and legal protections applicable to and keep in full force and effect all material Owned Intellectual Property and/or Licensed Intellectual Property and to maintain its business relationships with those having material business dealings with the Company, including the Company's lenders, creditors, lessors, lessees, licensors, licensees, key employees, contractors, distributors, development vendors, clients, customers, suppliers or other Persons; and (iii) comply in all material respects with all applicable Laws and obligations under any Material Contracts of the Company. Without limiting the generality of the foregoing, except as otherwise contemplated by this Agreement or required by Law, or as consented to in writing by Purchaser, which consent shall not be unreasonably withheld, the Company shall not do any of the following during the Term:

(i)     effect any material change to the Company's Certificate of Incorporation, By-Laws or any other organizational documents which would conflict with the terms of this Agreement;

(ii)     acquire, lease, license or dispose of any material properties or assets, except in the Ordinary Course of Business;

(iii)     incur any Indebtedness in excess of $100,000 in the aggregate, except for (X) indebtedness owing to Company's senior secured lender as described on Schedule 5.1 of the Disclosure Schedule, (Y) up to $5,000,000 of additional indebtedness to support the Company's working capital needs, and (Z) equipment leases incurred in the Ordinary Course of Business that have been contemplated in a budget approved by the Board of the Company and provided to Purchaser prior to the date hereof or a new budget approved by the Board, a copy of which shall be provided to Purchaser promptly following such approval;

(iv)     subject any of its properties or assets to any Lien, other than (X) the Lien in favor of Company's senior secured lender as described on Schedule 5.1 of the Disclosure Schedule, (Y) one or more Liens with respect to up to $5,000,000 of permissible additional indebtedness to support the Company's working capital needs or (Z) in connection with any seller financed equipment purchases or leases in the Ordinary Course of Business;

(v)     make any dividend or distribution or, except pursuant to the Company Options, issue, repurchase or redeem any Shares or any options, warrants, convertible or exchangeable securities or other rights to acquire Shares;

(vi)     modify or amend in any material respect or cancel or terminate any Material Contract, other than in the Ordinary Course of Business;

(vii)     make any material change in its Tax or accounting practices, other than any change required by GAAP or any Law, enter into any closing agreement, settle or compromise any proceeding with respect to any Tax claim or assessment relating to the Company, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or

53

assessment relating to the Company, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax;

(viii)   make any material change to any Tax Return, other than any change required by any Law;

(ix)   acquire any business, whether by merger, amalgamation or consolidation, purchase of assets or equity interests or any other manner;

(x)   make any capital expenditures other than (X) as set forth in a budget approved by the Board of the Company and provided to Purchaser prior to the date hereof or a new budget approved by the Board, a copy of which shall be provided to Purchaser promptly following such approval, (Y) capital expenditures of no more than $100,000 at one time or $300,000 on an annual basis, or (Z) as otherwise approved by the Board of the Company, a notice of any such approval shall be promptly provided to Purchaser;

(xi)   make any material increase in the cash compensation of any employee, other than salary raises, payment of bonuses and other changes in compensation in the Ordinary Course of Business;

(xii)   make any material changes to any Employee Plans, other than any changes in the Ordinary Course of Business or required by any Law;

(xiii)   disclose any confidential or proprietary information to any third party, except for disclosures made in the Ordinary Course of Business consistent with past practice under confidentiality and non-disclosure agreements in existence prior to the execution of this Agreement or entered into in the Ordinary Course of Business following the execution of this Agreement;

(xiv)   establish any Subsidiary;

(xv)   commence or settle any material legal proceeding;

(xvi)   accelerate payments from or delay payments to any third party other than in the Ordinary Course of Business consistent with past practice;

(xvii)   unreasonably reject or condition any purchase orders received by the Company that are on commercially reasonable terms that the Company has, or can reasonably acquire, the ability to fulfill; or

(xviii)   commit to do any of the foregoing.

5.2.   Access and Confidentiality

.

54

NMDX0111825

     (a)    During the Term, the Company shall, at mutually agreed dates and times during normal business hours at the Company's facility:  (i) make available for inspection by Purchaser and its Representatives all of its properties, assets, books of accounts, records (including the work papers of their respective independent accountants), Contracts and any other materials reasonably requested by any of them relating to the Company and its existing and prospective Businesses and assets and Liabilities and (ii) make available to Purchaser and its Representatives the appropriate officers, other senior management and Representatives of the Company for interviews to discuss the information furnished to Purchaser and its Representatives and otherwise discuss the Company's existing and prospective Businesses and assets and Liabilities.  Any and all such inspections, interviews and access for investigations shall not unreasonably interfere with the conduct of the Business of the Company.

     (b)    Notwithstanding anything to the contrary in this Agreement, nothing in this Section 5.2 shall require the Company to provide any such access or furnish any such information that in its reasonable judgment would violate any Law or any applicable confidentiality agreement with a third party (provided that the Company shall use its commercially reasonable efforts to obtain the consent of any such third party to the disclosure of such information) or compromise or constitute a waiver of any attorney-client privilege of the Company; provided, however, that if the Company is so restricted, it shall promptly notify Purchaser that information or records are being withheld and provide Purchaser with as much information as reasonably possible with respect to such information or records. Without limiting the generality of the foregoing, neither the Purchaser nor its Representatives shall disclose to any third party any information that is Personal Information unless the individual(s) to whom that Personal Information pertains has consented to that disclosure if required under applicable law.  As used herein, the term "Personal Information" means any information in the possession or control of the Company about an identifiable individual other than the name, title or business address or telephone number of an employee.

     (c)    The following provisions apply to all information provided to or accessed by Purchaser.

       (i)    For purposes of this Agreement, "Confidential Information" shall mean any non-public information of or regarding Company, including trade secrets, patent applications (including drawings and claims), techniques, inventions, ideas, and processes; any data or information relating to any research project, work in process, or future development plans; and any engineering, manufacturing, marketing, servicing, financial or personnel matter or information relating to Company or its suppliers, clients, customers, employees, investors, or business, whether in oral, written, graphic or electronic form.  Confidential Information shall not include information which (a) can be demonstrated (by written instrument predating the disclosure by Company) to have been in Purchaser's possession prior to disclosure by Company, other than any information provided to Purchaser from the Company through any prior confidentiality agreement; (b) which is now or hereafter becomes generally available to the public other than by violating of this Agreement; (c) which is independently developed by Purchaser without reference to information received from Company; or (d) which is subject to disclosure under applicable law or regulation, provided that in the event Confidential Information is

Outside Counsel Eyes Only

NMDX0111826

required to be disclosed, Purchaser shall make reasonable efforts to give prior notification to Company to allow Company to challenge such disclosure.

(ii)     Purchaser shall only use the Confidential Information in connection with this Agreement and for no other purpose.  Purchaser shall keep and hold the Confidential Information in confidence and may not disclose any Confidential Information to anyone except Purchaser's Representatives who need access to such information in connection with evaluating or carrying out the business relationship with Company and who have agreed not to use or disclose the Confidential Information except as permitted under this Agreement.  Purchaser shall take all necessary precautions to prevent unauthorized use or disclosure of the Confidential Information.  Purchaser acknowledges that no license or right is granted by the Company in connection with the Confidential Information.  The obligations under this Section 5.2(c) shall survive the termination of this Agreement indefinitely.

(iii)     In the event of the termination of this Agreement, Purchaser shall destroy or return to the Company, within ten (10) days after such termination, all Confidential Information in its possession or control and all copies thereof, in whatever form, including all analyses, compilations, work product, notes or other information derived from the Confidential Information.

5.3.   <u>Tax Matters</u>

.

(a)     <u>Consistent Tax Reporting</u>.  Purchaser shall file a consolidated federal income tax return that includes the Company for the taxable period of the Surviving Company starting with the next day following the Closing Date.  Accordingly, the taxable year of the Company will close for federal income Tax purposes at the end of the day on the Closing Date.  No election under Code Section 338 (relating to stock purchases treated as asset acquisitions), under Code Section 336(e) (relating to stock sales treated as asset dispositions), or under Treas. Reg. §1.1502-76(b)(2)(ii) (relating to ratable allocation elections) shall be made.  The Company shall not engage in any transactions on the Closing Date outside the ordinary course of business other than the Transactions and any other transaction required by applicable Law.  The parties agree that the Transaction Costs, payments pursuant to Option Cancellation Agreements and other deductions arising from the disposition of Shares acquired by Company Options are properly allocable to the portion of the Closing Date prior to the Closing, and accordingly the "next day rule" of Treas. Reg. §1.1502-76(b)(1)(ii)(B) is inapplicable.  The Sellers, the Company and Purchaser shall (a) treat and report the Transactions in all respects consistently with the provisions of this Agreement for purposes of any federal, state, local or foreign Tax and (b) not take any actions or positions inconsistent with the obligations of the parties set forth herein unless otherwise required by applicable Law.

(b)     <u>Pre-Closing Taxable Periods</u>.  The Surviving Company shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Company for taxable periods ending on or before the Closing Date ("<u>Pre-Closing Tax Periods</u>") that have not been filed prior to the Closing Date; <u>provided</u>, <u>however</u>, that the Company shall provide a draft of any such

Outside Counsel Eyes Only

NMDX0111827

Tax Return to the Sellers' Representative reasonably in advance of (and no later than 20 Business Days prior to) the due date for the filing of any such Tax Return, using the information available to it with respect to the Company for such Pre-Closing Tax Period. The Company shall permit the Sellers' Representative to review and comment on each such Tax Return described in the prior sentence at least twenty (20) Business Days prior to filing and shall consider in good faith such revisions to such Tax Returns as are reasonably requested by the Sellers' Representative. The Surviving Company shall pay any Taxes shown as due on such Tax Returns (other than any such Taxes that were taken into account as a Purchase Price adjustment hereunder) no fewer than five (5) Business Days prior to the due date of payment of such Taxes. Purchaser shall have the right to seek indemnification under this Agreement for any amounts not paid by the Company pursuant to the preceding sentence (other than any such Taxes that were taken into account as a Purchase Price adjustment hereunder). Except as provided below in this Section 5.3, the Surviving Company shall not amend any Tax Return for any Pre-Closing Tax Period without the prior written consent of the Sellers' Representative, which consent shall not be unreasonably withheld or delayed. All Tax Returns to be prepared by or for the Company pursuant to this Section 5.3(b) shall be prepared in a manner consistent with the past practice of the Company, except as otherwise required by Law.

(c)     Straddle Periods.  The Surviving Company shall cause to be prepared and filed any Tax Returns of the Company for taxable periods that include but do not end on the Closing Date (a "Straddle Period").  The Company shall permit the Sellers' Representative to review and comment on each such Tax Return at least twenty (20) Business Days prior to filing and shall consider in good faith such revisions to such Tax Returns as are reasonably requested by the Sellers' Representative.  Purchaser shall have the right to seek indemnification under this Agreement for any Taxes attributable to the portion of such Straddle Period (the "Pre-Closing Straddle Portion") ending on the Closing Date (other than any such Taxes that were taken into account as part of a purchase price adjustment hereunder). In the case of any Straddle Period, the amount of Taxes allocable to the Pre-Closing Straddle Portion shall be deemed to be: (1) in the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period, and (2) in the case of Taxes not described in (1) above (such as franchise Taxes, Taxes that are based upon or related to income or receipts, based upon occupancy or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date.

(d)     Cooperation on Tax Matters.

(i)     Purchaser, the Surviving Company and the Sellers' Representative shall cooperate fully, to the extent reasonably requested one by another, in connection with the filing of Tax Returns pursuant to Sections 5.3(b) and 5.3(c) or otherwise, and any Contest. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such Tax Return filing and/or Contest and making

Outside Counsel Eyes Only                                                          NMDX0111828

employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(ii)     If requested by Purchaser, the Sellers will reasonably cooperate with Purchaser to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed upon the Surviving Company (including with respect to the Transactions).

(iii)    Any Tax refunds that are received by Purchaser or the Surviving Company, and any amounts credited against Tax to which Purchaser or the Surviving Company becomes entitled, that relate to any Pre-Closing Tax Period, shall be for the account of the Sellers, and Purchaser shall pay over to the Payments Administrator for further distribution to the Sellers any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto except to the extent that such refund is attributable to the carryback of a Tax attribute (including a net operating loss, net capital loss, foreign tax credit or research and development credit) arising in a period other than a Pre-Closing Tax Period (a "Post-Closing Tax Period"). Any Tax attribute generated in a Pre-Closing Tax Period shall be carried back, if possible, but only if such carryback produces a tax refund. Any Tax attribute generated in a Pre-Closing Tax Period that is not otherwise utilized through a carryback, shall be carried forward for the sole benefit for Purchaser. Any refund of Taxes or credits against Tax, in each case described in the first sentence of this paragraph, with respect to a Straddle Period shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period in accordance with Section 5.3(c). In addition, to the extent that a claim for refund or proceeding results in a payment or credit against Tax by a Governmental Authority to Purchaser or the Company of any amount described in the first sentence of this paragraph, Purchaser shall pay such amount to the Payments Administrator for further distribution to the Sellers within thirty (30) days after receipt or entitlement thereto.

(e)     Control of Audits. After the Closing Date, except as set forth in the next sentence, the Surviving Company shall control the conduct, through counsel of its own choosing, of any audit, claim for refund, or administrative or judicial proceeding involving any asserted Tax liability or refund with respect to the Surviving Company and its Subsidiaries (each, a "Contest"). In the case of a Contest after the Closing Date that relates to a Pre-Closing Tax Period, the Sellers' Representative (on behalf of the Sellers) shall have the option to control the conduct of such Contest, using counsel reasonably satisfactory to the Purchaser, but Purchaser shall have the right to participate in such Contest at its own expense, and the Sellers' Representative shall not settle, compromise and/or concede any portion of such Contest that could affect the Tax liability of the Surviving Company for any taxable period (as determined in good faith by Purchaser) without the written consent of Purchaser. In the event of any conflict between the provisions of this Section 5.3(e) and the provisions of Article VII, the provisions of this Section 5.3(e) shall control. Purchaser shall control all proceedings with respect to any Contest relating to a taxable period or portion thereof beginning after the Closing Date. Neither Sellers' Representative nor Sellers shall have any right to participate in the conduct of any such proceeding.

Outside Counsel Eyes Only                                                                 NMDX0111829

(f)  <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, real property gains, stamp, registration, and other such Taxes and fees incurred in connection with this Agreement shall be paid one-half by the Purchaser and one-half by the Sellers when due, and the Surviving Company will file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, real property gains, stamp, registration and other Taxes and fees, and, if required by Law, Purchaser will join in the execution of any such Tax Returns and other documentation.

5.4.  <u>Insurance</u>

.  During the Term, the Company shall keep all insurance policies set forth on <u>Schedule 3.16</u> of the Disclosure Schedules, or comparable replacements therefor, in full force and effect; <u>provided</u>, <u>however</u>, that any such insurance policy may be amended or modified or substituted with another insurance policy (including a change in insurance carriers), so long as the coverage and limitations provided by such amended, modified or substituted insurance policy are materially the same as in the respective policy set forth in <u>Schedule 3.16</u> of the Disclosure Schedules.  If requested by the Requisite Holders prior to the Closing, the Company will purchase an extended reporting period endorsement under the Company's existing directors' and officers' liability insurance policies with coverage for six (6) years following the Closing with terms acceptable to the Requisite Holders.  The total cost of any such extended directors' and officers' liability insurance policy shall be treated as a Transaction Cost.

5.5.  <u>Exclusivity</u>

.  During the Term, the Company and its Affiliates will not, directly or indirectly, (a) solicit any competing offers for the acquisition of the Company, or the sale of all or any substantial portion of the assets or business of the Company and the Subsidiaries, whether by merger, amalgamation, sale of assets or securities, or any other form of transaction, (b) negotiate with respect to any unsolicited offer or indication of interest with respect to any such transaction, (c) provide Confidential Information to any potential purchaser in connection with any such transaction, or (d) accept any offer or proposal with respect to such a transaction.  The Company shall promptly notify Purchaser in writing of any proposal or offer relating to such a transaction that is received by the Company or any of its Affiliates.  Notwithstanding the foregoing, the Company shall not be restricted from engaging in discussions or entering into arrangements with third parties for ordinary commercial purposes, including but not limited to arrangements relating to distribution, supply or test menu creation; provided, however, that any such arrangements must (i) be on a non-exclusive basis, (ii) with an initial term ending no later than December 31, 2020 (which may be renewable at the Company's discretion), and (iii) include customary terms that are consistent with industry practice.

The parties hereto agree that irreparable damage would occur in the event that provisions of Section 5.5(a) – (d) are breached.  It is accordingly agreed by the parties that in the event of breach of Section 5.5(a) – (d) by the Company or its Affiliates, the Purchaser shall be entitled to recover the Signing Date Payment in full; provided that Purchaser must first provide written notice of any alleged breach to the Company.  In addition, the Purchaser shall also be entitled to an immediate injunction or injunctions, without the necessity of proving the inadequacy of money damages as remedy and without the necessity of posting any bond or other security, to enforce

Outside Counsel Eyes Only

NMDX0111830

specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, in addition to any other remedy to which Purchaser may be entitled to at law or in equity (including, without limitation, damages above the Signing Date Payment repaid to the Purchaser). Without limiting this Section 5.5, it is understood that any violation of the restrictions set forth in this Section 5.5 by any Person covered by this Section 5.5, whether or not such Person is purporting to act on behalf of the Company, shall be deemed to be a breach of this Section 5.5 by the Company; provided that the Company shall have a ten (10) day opportunity to cure such alleged breach.

5.6.     <u>Third-Party Consents and Governmental Approvals</u>

. During the Term:

(a)     Purchaser and the Company shall cooperate fully and use commercially reasonable efforts to obtain all third-party consents which are listed or required to be listed on <u>Schedule 3.6</u> of the Disclosure Schedules on or prior to the Closing Date.

(b)     Each party (other than the Sellers' Representative) shall use all commercially reasonable efforts to file, as promptly as practicable after the date of this Agreement, all notices, reports and other documents required to be filed by such party with any Governmental Authority with respect to the Transactions and to submit promptly any additional information requested by any such Governmental Authority.

(c)     <u>HSR Filing</u>.

(i)     Without limiting the generality of the foregoing, Purchaser and the Company shall, as soon as practicable after the delivery of the Final Milestone Achievement Notice, but in any event no later than such date set forth in Section 8.1(a)(iv), (A) make or cause to be made any and all required filings under the HSR Act (the "<u>HSR Filing</u>") and (B) make or cause to be made filings under any applicable foreign antitrust Laws.

(ii)     The parties (other than the Sellers' Representative) agree to cooperate and respond as promptly as practicable to any inquiries or requests for additional information received from or investigations initiated by the Federal Trade Commission, Department of Justice or any other Governmental Authority in connection with any such filings. Each of Purchaser and the Company shall give the other party prompt notice of the commencement of any antitrust legal proceeding by or before any Governmental Authority with respect to the Transactions, keep the other party informed as to the status of any such legal proceeding, and promptly inform the other party of any communication to or from any Governmental Authority regarding the Transactions. Purchaser and the Company will consult and cooperate with one another, and will consider in good faith the views of one another, in connection with any analysis, appearance, presentation, memorandum, brief, argument, opinion or proposal made or submitted in connection with any antitrust legal proceeding relating to the Transactions. In addition, except as may be prohibited by any Governmental

60

NMDX0111831

Authority or by any Law and except as may be reasonably required by a party to protect such party's confidential information, in connection with any antitrust legal proceeding relating to the Transactions, each of Purchaser and the Company will permit authorized representatives of the other party to be present at each meeting or conference with a Governmental Authority relating to any such legal proceeding and to have access to and be consulted in advance in connection with any document, opinion or proposal made or submitted to any Governmental Authority in connection with any such legal proceeding.  Purchaser and the Company will use commercially reasonable efforts to remove any and all impediments or delays with Governmental Authorities, legal or otherwise, to the consummation of the Transactions.  Purchaser and the Company shall share equally the payment of all fees, costs and expenses associated with the filings contemplated by this Section.  Notwithstanding anything to the contrary herein, nothing in this Agreement (A) shall require Purchaser to respond to a Request for Additional Information and Documentary Material pursuant to the HSR Act (a "Second Request") or any similar request under any other applicable foreign antitrust Laws, (B) shall require Purchaser to litigate or participate in the litigation of any action or proceeding pursuant to the HSR Act or any other applicable foreign antitrust Law, whether judicial or administrative, brought by any Governmental Authority or appeal any order (1) challenging or seeking to restrain or prohibit the consummation of the transaction or seeking to obtain from Purchaser any damages in relation therewith, or (2) seeking to prohibit or limit in any respect, or place any conditions on, the ownership or operation by Purchaser of all or any portion of Purchaser's business or the Company's business or to require Purchaser to dispose of, license (whether pursuant to an exclusive or nonexclusive license) or hold separate all or any portion of Purchaser's business the Company's business, or (C) shall require Purchaser to, nor shall the Company without the prior written consent of Purchaser, (x) agree or proffer to any of the prohibitions, limitations, conditions or other actions referred to in the preceding clause (B)(2), or (y) enter into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the transaction.

5.7.    Further Assurances

. During the Term, the parties (other than the Sellers' Representative) agree to act in good faith and use all commercially reasonable efforts to satisfy the conditions specified in this Agreement necessary to consummate the Transactions.

5.8.    Continuing Employee Compensation and Benefit Plans

. To the maximum extent permitted by law, Purchaser shall give (or cause to be given) to each Continuing Employee full credit for past service with the Company ("Prior Service") as of and through the Closing Date for purposes of eligibility and vesting (but not benefit accrual) under any of the employee benefit and compensation plans, programs, policies and arrangements (collectively, the "Surviving Company's Plans") for which eligibility or vesting of benefits depends on length of service and in which a Company employee participates following the Closing.  In addition, and without limiting the generality of the foregoing, to the maximum extent

Outside Counsel Eyes Only

NMDX0111832

permitted by law, each Continuing Employee (a) shall be given credit under the Surviving Company's Plans for Prior Service for purposes of eligibility to participate, satisfaction of any waiting periods, and/or evidence of insurability requirements and (b) shall be eligible to receive such periods of vacation leave, sick leave, personal days, holidays and other similar periods of leave as were accrued and available to the employee under the Employee Plans immediately prior to the Closing.

### 5.9.    Retention of Key Employees

. The Company shall use all commercially reasonable efforts to retain the Key Employees during the Term, and use best efforts to cause the Key Employees to accept offer letters of employment and enter into an invention assignment, confidentiality and non-compete agreement, if necessary, each as acceptable to Purchaser prior to the Closing Date.

### 5.10.   Termination of Employee Plans

. If requested by Purchaser, no later than five Business Days prior to the Closing Date, the Company shall terminate any and all Employee Plans intended to include a Code Section 401(k) arrangement identified by Purchaser, effective as of the day immediately preceding the Closing Date. The Company also shall take such other actions in furtherance of terminating such Employee Plans as Purchaser may reasonably require.

### 5.11.   Public Announcements

. During the Term, neither the Company nor Purchaser shall issue or shall cause or permit its Representatives to issue, any press release or make any public statement regarding this Agreement or the Transactions, without such other party's prior written consent unless required by Law.

### 5.12.   Section 280G Stockholder Approval

. Prior to the Closing Date and as promptly as practicable, the Company shall, with respect to such payments or benefits that may, separately or in the aggregate, constitute "parachute payments" within the meaning of Section 280G(b)(2) of the Code and the applicable rulings and regulations thereunder, seek the consent of the requisite number of the stockholders of the Company immediately prior to a "Change of Control" as such term is defined by Section 280G of the Code as a result of the Transactions, including Purchaser, in accordance with the requirements of Section 280G of the Code and the regulations thereunder, such that, after giving effect to such approval by the stockholders, no "excess parachute payment" will be paid or payable to any Person in connection with (including, for the avoidance of doubt but without limitation, in connection with a termination of service upon or following) the transactions described herein.

### 5.13.   Stockholders' Approval

. The Company shall promptly submit this Agreement and the Merger for the approval of its stockholders by written consent and shall use its commercially reasonable efforts to obtain stockholder approval and adoption of this Agreement and the Merger (including the recommendation by the Company, through its Board of Directors, to its stockholders of the

Outside Counsel Eyes Only

NMDX0111833

approval of the Merger and the Agreement) by 5:00 p.m. Eastern time on the seventh calendar day following the date of this Agreement.

5.14.   Stockholder Notice

.  The Company shall distribute to each holder of Shares that has not executed and delivered the Required Merger Stockholder Vote, a notice pursuant to Sections 228 (including notice of the Required Merger Stockholder Vote) and 262 of the DGCL of appraisal rights as required by the DGCL.

5.15.   Company Cash Position

.  The Company shall provide Purchaser with monthly updates of its cash position including a forecast of the expected cash development for the next month. The Company shall further provide the Purchaser with prompt written notice if the Company has cash and cash equivalents in an aggregate amount of less than $6,000,000 at any time (the "Cash Balance Notice"). Following the Purchaser's receipt of a Cash Balance Notice, the Company shall also deliver a second notice (the "Second Cash Balance Notice") to the Purchaser if the Company has cash and cash equivalents in an aggregate amount of less than $5,200,000.  In the event that by the end of four (4) Business Days following the Purchaser's receipt of a Second Cash Balance Notice the aggregate amount of cash and cash equivalents of the Company does not exceed $7,000,000, it shall constitute a "Cash Flow Event." Company shall send its monthly cash updates, any Cash Balance Notice and Second Cash Balance Notice, by email to the addresses specified in Section 8.2.1(a), if not advised differently by the Purchaser and/or Merger Sub.

5.16.   Determination of Indemnity Escrow

.

(a)       During the four-month period immediately following the date hereof, the Company shall conduct and complete a freedom to operate analysis for the European Union, which scope has been defined by the  Purchaser prior to the date of this Agreement, and determination as to whether the tests, services and methods offered or used in the Business, including without limitation the NeuMoDx N288 and N96 Systems, can be practiced without infringing valid Intellectual Property rights of any third party (the "EU IP Analysis"), which cost and expense shall be borne by Company and Purchaser equally.  The Company shall deliver the EU IP Analysis to Purchaser promptly upon its completion.

(b)       Within thirty (30) days of Purchaser's receipt of the EU IP Analysis, representatives of each of the Company and Purchaser shall negotiate in good faith the Indemnity Escrow Amount, which amount shall be not less than ███████ and not more than ███████ based on the outcome of the EU IP Analysis and a similar study already completed for the United States, which has been presented to the Purchaser (the "US IP Analysis," and together with the EU IP Analysis, the "IP Analyses").

(c)       If the Company and the Purchaser are unsuccessful at reaching an agreed upon value for the Indemnity Escrow Amount within sixty (60) days of the Purchaser's receipt of the EU IP Analysis, the Company and Purchaser shall promptly initiate a voluntary binding

63

mediation in accordance with the ICC 2014 Mediation Rules conducted by a mediator with significant experience in the medical diagnostic industry located in the Hague, the Netherlands, which mediator shall be mutually agreeable to both parties.  Should the parties for any reason be unable to agree upon a mediator, they shall request the ICC International Centre for ADR to appoint a capable mediator for them in accordance with applicable ICC rules.  Any mediation herewith will be conducted in the English language.  The cost and expenses of mediation shall be borne by the Company and Purchaser equally.

(d)     If the mediator is unable to assist the parties in reaching a mutually agreed upon settlement within thirty (30) days following the commencement of mediation, the Company and Purchaser hereby agree that the mediator shall render a final binding determination in writing of the Indemnity Escrow Amount based on (i) the potential Losses if the Company is subject to a claim that it has infringed on valid third party Intellectual Property and (ii) the probability of such Losses occurring, in both cases, based on the results of the IP Analyses and any other relevant information presented by the parties, but which amount shall in no event be less than ███████████ or more than ███████████  If either party does not in good faith follow the procedures set forth in this Section 5.16, evidence of such behavior may be presented to the mediator and may be considered in his or her final determination.

(e)     The Company and Purchaser agree that the Indemnity Escrow Amount determined in accordance with this Section 5.16 shall be binding on both parties and shall be the Indemnity Escrow Amount for all purposes under this Agreement.  For the avoidance of doubt, neither the IP Analyses nor any of the contents thereof shall qualify in any respect any representation, warranty or covenant contained herein.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1.    <u>Conditions Precedent to Obligations of Purchaser and Merger Sub</u>

.   The obligations of Purchaser and Merger Sub to consummate the transactions contemplated by this Agreement is expressly subject to the fulfillment of the following conditions:

(a)     <u>Achievement of Performance Milestones</u>.

(i)     Company shall have achieved CE marks for the NeuMoDx 288 Molecular System, including instrument, cartridges, any other consumables and software (collectively, "<u>N288</u>") and the NeuMoDx 96 Molecular System, including instrument, cartridges, any other consumables and software ("<u>N96</u>") and all assays for these systems set forth in <u>Schedule I</u> (the "<u>Required Assays</u>") within the availability dates set forth in <u>Schedule I</u>, all matching such specifications as set forth in <u>Schedule II</u> (for the instruments) and <u>Schedule III</u> and <u>Schedule IV</u> for the Required Assays.

(ii)     Company shall have achieved FDA registration for the N288 and N96 and clearance to market or approval of all Required Assays within the availability dates set forth in <u>Schedule I</u>, all matching such specifications as set forth in <u>Schedules II</u>, <u>III</u>, and <u>IV</u>.

64

NMDX0111835

(iii)     For the avoidance of doubt, for the purposes of subsections (a)(i) and (ii), (A) all Required Assays must be able to be performed on both N288 and N96 and (B) all Required Assays, when performed on either N288 or N96, and the N96 and N288 themselves do not infringe on any third party Intellectual Property.

(iv)     With advice and support from Purchaser, Company shall have registrations filed and products approved in all major countries outside of the United States, including China, Japan and the Other Registration Countries.

(v)     Company shall have manufacturing capacity in place to cover a minimum of six million (6,000,000) reactions per year; provided, the Parties may agree during the Term that additional investment is warranted to increase such capacity with a goal of achieving seven million five hundred thousand (7,500,000) reactions per year.

(vi)     Company shall have completed a design-to-cost study beginning in 2018 with such specifications as set forth in Schedule II

(vii)     Company shall have completed the optimization of assays to improve the "Cost of Goods Sold".

(viii)     The "Cost of Goods Sold" for cartridges sold by the Company shall have achieved the target price and economies of scale at Closing so as to allow the cost per test as set forth in Schedule IV.

(ix)     Company shall have achieved commercial sale (or reagent rental) of at least 12 instruments to end-users in the United States market by June 30, 2019.

(x)     Company shall have achieved commercial sale (or reagent rental) of at least 26 instruments to end-users in the United States market by June 30, 2020 (the "Final Milestone Date").

The Company shall provide the Purchaser with regular update reports on the status of above stated Performance Milestones at the end of each calendar quarter and shall use its reasonable best efforts to achieve all of the Performance Milestones by the Final Milestone Date, but in all events, by the Outside Date.

(b)     Milestone Achievement Notification.

(i)     Within five (5) days following the achievement of any Performance Milestone, the Company shall deliver a notice to the Purchaser stating the same (each, a "Milestone Achievement Notice" and the last of such notices delivered after the completion of all of the Performance Milestones, the "Final Milestone Achievement Notice"), which shall set forth in reasonable detail the facts relating to each such achievement. Notwithstanding the previous sentence, if any of the Performance Milestones have not been achieved as of the Final Milestone Date, the Company shall deliver a notice to the Purchaser not later than the Final Milestone

65

NMDX0111836

Date (the "Milestone Results Notice") setting forth in reasonable detail the Company's actual achievements against each Performance Milestone at such time.

(ii)      Following the receipt of each Milestone Achievement Notice, the Purchaser may deliver written notice (each, an "Milestone Review Notice") to the Company setting forth in reasonable detail its evaluation of the Company's actual achievements against the applicable Performance Milestone and any deficiencies of achievement thereof, if any ("Deficiencies"). If the Purchaser does not deliver a Milestone Review Notice or delivers a Milestone Review Notice stating no Deficiencies within seven (7) Business Days of the delivery of the Final Milestone Achievement Notice, the Purchaser will be deemed to have accepted the Final Milestone Achievement Notice and the Performance Milestones will be deemed to have been achieved or waived by Purchaser.

(iii)      If the Purchaser delivers any Milestone Review Notices setting forth any Deficiencies, the Company shall have, until the Outside Date, the opportunity to deliver an updated Milestone Achievement Notice setting forth in reasonable detail all relevant information necessary to confirm its resolution of or response to the Deficiencies.

(iv)      The process set forth in subsections (b)(ii) and (iii) shall be followed for each Milestone Achievement Notice delivered by the Company until the Purchaser accepts or is deemed to have accepted the Final Milestone Achievement Notice or the Outside Date, whichever occurs first.

(c)      HSR Approval.  The waiting period(s) under the HSR Act applicable to the transactions to be consummated at the Closing Date shall have expired or been terminated (the "HSR Approval Date").

(d)      Accuracy of Representation.  Each of the representation and warranties made by the Company set forth in Article III shall be accurate in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date, other than those representations and warranties that expressly speak only as of a specific date or time, which will be true or correct as of such specified date or time.

(e)      Performance of Covenants.  Each of the covenants and obligations that the Company is required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

(f)      Stockholder Approval.  Purchaser shall have received evidence satisfactory to Purchaser that the Required Merger Stockholder Vote has been obtained within ten days of the date hereof.  The number of shares of Company Capital Stock that constitute (or that are eligible to become as a result of such holder's delivery of a written demand for appraisal in accordance with Section 262 of the DGCL) Dissenting Shares shall be less than five percent (5%) of the Company Capital Stock outstanding immediately prior to the Closing.

(g)      No Litigation.  There shall not be any material litigation or regulatory investigation pending against the Company by any third party not affiliated with Purchaser, or any

66

NMDX0111837

Order of any court or Governmental Authority, in each case seeking to restrain or invalidate the Transactions.

(h)     No Material Adverse Effect; Due Diligence Satisfactory.   Since the date of this Agreement, there have been no changes to the Company that have had, or could reasonably be expected to have, a Material Adverse Effect.   The Purchaser has confirmed that there has not been a Material Adverse Effect and that all conditions set forth in this Section 6.1 (including confirmation of the milestone results set forth in the Milestone Achievement Notices in accordance with Section 6.1(b)) have been satisfied.

(i)     No Intellectual Property Lawsuits.   There shall not be any litigation pending against the Company by any third party not affiliated with Purchaser claiming that the technology underlying N96, N288 and the Required Assays infringes on the rights of any third party that if resolved against the Company, could reasonably be expected to have a Material Adverse Effect.

(j)     Closing Certificates.   Purchaser shall have received:

(i)     a certificate duly executed on behalf of the Company by the chief executive officer of the Company and containing the representation and warranty of the Company that the conditions set forth in Sections 6.1(a), (c), (d) and (e) have been duly satisfied (the "Company Closing Certificate"); and

(ii)     a certificate of the Secretary of the Company, dated as of the Closing Date, in form and substance reasonably satisfactory to Purchaser, certifying and attaching: (A) a certificate of good standing of the Company from the Secretary of State of the State of Delaware as of a date not more than ten (10) Business Days prior to the Closing Date, (B) the Company's Certificate of Incorporation certified by the Secretary of State of the State of Delaware as of a date not more than ten (10) Business Days prior to the Closing Date, (C) the Company's By-Laws, (D) a certificate as to the incumbency of officers of the Company as of the Closing Date, (E) the resolutions adopted by the board of directors of the Company to authorize and adopt this Agreement, and approve the Merger and the other transactions contemplated hereby, and (F) the resolutions adopted by the stockholders evidencing the Required Merger Stockholder Vote (the "Company Secretary's Certificate").

6.2.     Conditions to the Company's Obligations at Closing

.  The obligation of the Company to consummate the Closing is expressly subject to the fulfillment of the following conditions:

(a)     Accuracy of Representation.   Each of the representation and warranties made by Purchaser set forth in Article IV shall be accurate in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date, other than those representations and warranties that expressly speak only as of a specific date or time, which will be true or correct as of such specified date or time.

67

NMDX0111838

(b)     Performance of Covenants.  Each of the covenants and obligations that Purchaser and Merger Sub are required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

(c)     Other Deliveries.  The Company shall have received the items to be delivered pursuant to Section 2.3(d).

(d)     HSR Approval.  The waiting period(s) under the HSR Act applicable to the transactions to be consummated at the Closing Date shall have expired or been terminated.

(e)     Stockholder Approval.  This Agreement shall have been duly adopted and approved by the Required Merger Stockholder Vote.

(f)     Closing Certificates.  The Company shall have received:

(i)     a certificate duly executed on behalf of Purchaser by an officer of Purchaser and containing the representation and warranty of Purchaser that the conditions set forth in Sections 6.2(a) and (b) have been satisfied (the "Purchaser Closing Certificate")

(ii)     a certificate of the Secretary of Purchaser, dated as of the Closing Date, in form and substance reasonably satisfactory to the Company, certifying and attaching:  (A) a certificate of good standing of Purchaser in the State of California as of a date not more than ten (10) Business Days prior to the Closing Date, (B) Purchaser's Certificate of Incorporation certified by the Secretary of State of the State of California as of a date not more than ten (10) Business Days prior to the Closing Date, (C) a certificate of good standing of Merger Sub in the State of Delaware as of a date not more than ten (10) Business Days prior to the Closing Date, (D) Merger Sub's Certificate of Incorporation certified by the Secretary of State of the State of Delaware as of a date not more than ten (10) Business Days prior to the Closing Date, and (E) a certificate as to the incumbency of officers of Purchaser and Merger Sub (the "Purchaser Secretary's Certificate").

**ARTICLE VII**
**INDEMNIFICATION**

7.1.     Survival of Representations, Warranties and Covenants

(a)     The representations and warranties contained in this Agreement and the other Transaction Documents shall survive the Closing effected under this Agreement and continue in full force and effect for a period of eighteen (18) months from the Closing Date except that the representations and warranties set forth in Sections 3.1, 3.2, 3.3, 3.4, and 3.5 (with respect to the Company), and 4.1, 4.2 and 4.6 (with respect to Purchaser and Merger Sub) (each a "Fundamental Representation") shall survive the Closing and continue in full force and effect indefinitely until resolved and satisfied in full.

68

(b)     Notwithstanding anything to the contrary in this Section 7.1, (i) a claim against a Seller or the Purchaser for any breach of a representation or warranty contained in this Agreement or any of the other Transaction Documents involving intentional fraud or intentional fraudulent misrepresentation by such Seller or the Purchaser shall survive indefinitely and may be made at any time following the Closing effected under this Agreement, subject only to applicable limitation periods imposed by Law, and (ii) covenants and agreements of a Seller and the Purchaser contained in this Agreement (and in the corresponding covenants and agreements set forth in any of the Transaction Documents) shall survive the Closing and continue in full force in accordance with their terms.

(c)     Any claims for indemnification asserted in writing as provided for in this Article VII prior to the expiration date, if any, applicable to the representation, warranty or covenant with respect to which such claim for indemnification is made shall survive until finally resolved and satisfied in full.   For convenience of reference, the date upon which any representation or warranty contained herein shall terminate is referred to herein as the "Survival Date."

(d)     No third party other than the Indemnified Persons shall be a third party or other beneficiary of such representations and warranties and no such third party shall have any rights of contribution with respect to such representations or warranties or any matter subject to or resulting in indemnification under this Article VII or otherwise.

7.2.    <u>Investigation</u>

.  The representations, warranties, covenants and agreements set forth in this Agreement and the other Transaction Documents shall not be affected or diminished in any way by any investigation (or failure to investigate) at any time by or on behalf of, or Knowledge acquired by, the party for whose benefit such representations, warranties, covenants and agreements were made.

7.3.    <u>Sellers' Indemnification of Purchaser</u>

.

(a)     From and after the Closing Date (but subject to Section 7.5), the Sellers (and the Option Holders solely to the extent of their contribution to the Escrow Fund) shall, severally, and not jointly, on a pro rata basis according to the Merger Consideration received by each such Seller, hold harmless and indemnify each of Purchaser, Merger Sub, their respective Affiliates and their respective officers, directors and shareholders and their successors and assigns (the "<u>Purchaser Indemnified Persons</u>") from and against, and shall compensate and reimburse the Purchaser Indemnified Persons for any and all Losses arising out of or in any manner incident, relating or attributable to:  (i) any inaccuracy in, or breach of, any representation or warranty of the Company contained in Article III of this Agreement; (ii) any breach of, or failure by any of the Company to perform or observe, or to have performed or observed, in full, any covenant, agreement or condition to be performed or observed by the Company under this Agreement or under any other Transaction Document delivered by the Company pursuant to this Agreement; (iii) any and all liability for Taxes of the Company (or any predecessors) for a Pre-Closing Tax Period and the Pre-Closing Straddle Portion, (iv) any Transaction Costs not included in the

69

NMDX0111840

calculation of the Purchase Price Adjustment on the Estimated Closing Statement and, (v) any Action of Purchaser in relation to any third-party Intellectual Property that Purchaser determines could reasonably be expected to have a Material Adverse Effect, provided, however, that the Sellers' several liability shall not prevent a Purchaser Indemnified Person from recovering its Losses against the full amount available under the Escrow Funds as set forth in Section 7.11.

(b)     From and after the Closing Date (but subject to Section 7.5), each Seller shall, severally, and not jointly, hold harmless and indemnify each of the Purchaser Indemnified Persons from and against, and shall compensate and reimburse the Purchaser Indemnified Persons for any and all Losses arising out of or in any manner incident, relating or attributable to any (i) any inaccuracy in, or breach of, any representation or warranty of such Seller contained in a Letter of Transmittal; (ii) breach of, or failure by such Seller to perform or observe, or to have performed or observed, in full, any covenant, agreement or condition to be performed or observed by such Seller under this Agreement or under any other Transaction Document delivered by the Sellers pursuant to this Agreement, provided, however, that the Sellers' several liability shall not prevent a Purchaser Indemnified Party from recovering its Losses against the full amount available under the Escrow Funds as set forth in Section 7.11.

7.4.     Purchaser's Indemnification of the Sellers

. Purchaser hereby agrees to indemnify and hold harmless the Sellers and the Sellers' respective officers, directors, employees and shareholders and their successors and assigns (collectively, the "Securityholder Indemnified Persons") from, against and with respect to any and all Losses arising out of or in any manner, incident, relating or attributable to:  (a) any inaccuracy in, or breach of, any representation or warranty of Purchaser and/or Merger Sub contained in the Agreement or in any other Transaction Document delivered by Purchaser pursuant to this Agreement; and (b) any breach of, or any failure by Purchaser to perform or observe, in full, any covenant, agreement or condition to be performed by Purchaser under this Agreement or under any other Transaction Document delivered by Purchaser pursuant to this Agreement.

7.5.     Limitations on Indemnification

. Notwithstanding anything to the contrary in Section 7.3 or 7.4, (a) no Indemnifying Person shall have any liability to the corresponding Indemnified Person until the aggregate Losses of such Indemnified Person (or in the case of a Securityholder Indemnified Person, the aggregate Losses of all of the Securityholder Indemnified Persons taken together) exceed $100,000, whereupon the Indemnified Persons shall be entitled to all such Losses; (b) the maximum amount of all Losses for which the Sellers shall be liable pursuant to Section 7.3(a) in the aggregate shall not exceed the Indemnity Escrow Amount, except for Losses arising out of or in any manner incident, relating or attributable to Section 7.3(a)(iii), Section 7.3(a)(iv) or the Fundamental Representations and except in the case of fraud or intentional misrepresentation (collectively, the "Excluded Claims"); (c) the maximum aggregate amount of Losses for which any one Seller will be liable (and required to pay to a Purchaser Indemnified Person) on an individual basis in connection with indemnification claims by the Purchaser Indemnified Persons under this Article VII will not exceed the Merger Consideration actually received by such Seller; and (d) nothing contained in this Article VII shall in any way limit, impair, modify or otherwise affect the rights of the Indemnified Persons (including rights available under the Securities Act or the Exchange

Outside Counsel Eyes Only

NMDX0111841