Original Filing Date: April 15, 2021
Redacted Filing Date: April 22, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BECTON, DICKINSON AND COMPANY,　）
GENEOHM SCIENCES CANADA, INC.　）
and HANDYLAB, INC.,　）
　）
　　　Plaintiffs,　）
　）　C.A. No. 19-1126 (LPS)
　　v.　）
　）　**DEMAND FOR JURY TRIAL**
NEUMODX MOLECULAR, INC., QIAGEN　）
GMBH, QIAGEN NORTH AMERICAN　）　**REDACTED –**
HOLDINGS, INC., SUNDARESH　）　**PUBLIC VERSION**
BRAHMASANDRA, and JEFFREY　）
WILLIAMS,　）
　）
　　　Defendants.　）

### PLAINTIFFS' ANSWER AND/OR REPLY TO DEFENDANTS' COUNTERCLAIMS AND COUNTERCLAIMS-IN-REPLY

Becton, Dickinson and Company, GeneOhm Sciences Canada, Inc. (collectively "BD"), and HandyLab, Inc. ("HandyLab" and collectively with BD, "Plaintiffs"), by and through their attorneys, file this Answer and/or Reply to the Counterclaims of NeuMoDx Molecular, Inc. ("NeuMoDx") and QIAGEN GmbH and QIAGEN North American Holdings, Inc. (collectively "Qiagen" and together with NeuMoDx, "Defendants") (D.I. 201), and Counterclaims-In-Reply, incorporate and reference as though fully set forth herein Plaintiffs' Second Amended and Supplemental Complaint, and hereby allege as follows:

### ANSWER TO DEFENDANTS' COUNTERCLAIMS

1. Plaintiffs admit that NeuMoDx is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1250 Eisenhower Place, Ann Arbor, Michigan 48108-3281.

2. Plaintiffs admit that Qiagen GmbH is a corporation organized and existing

under the laws of Germany, with a principal place of business at Qiagen Strasse 1, 40724 Hilden, Germany.

3.      Plaintiffs admit that Qiagen North American Holdings, Inc. ("Qiagen NA") is a corporation organized and existing under the laws of California, with a principal place of business at 19300 Germantown Road, Germantown, Maryland 20874.

4.      Plaintiffs admit that BD is a corporation organized and existing under the laws of New Jersey, with its principal place of business at 1 Becton Drive, Franklin Lakes, NJ 07417.

5.      Plaintiffs admit that HandyLab is a wholly owned subsidiary of Becton Dickinson and a corporation organized and existing under the laws of Delaware, and HandyLab's officers and directors control, direct, and coordinate the corporation's activities from Franklin Lakes, NJ. To the extent any allegations remain, Plaintiffs deny the remaining allegations set forth of Paragraph 5.

6.      Plaintiffs admit that GeneOhm Sciences Canada, Inc. is a wholly owned subsidiary of Becton Dickinson and a corporation organized and existing under the laws of Canada, with its principal place of business 2555 Boul du Parc-Technologique Québec G1P4S5 Canada.

## JURISDICTION AND VENUE

7.      Paragraph 7 states a legal conclusion and therefore no response is required. Plaintiffs do not dispute subject matter jurisdiction for purposes of this lawsuit only.

8.      Plaintiffs deny engaging in acts giving rise to Defendants' counterclaims in this district.  The remaining allegations in Paragraph 8 state a legal conclusion and therefore no response is required.  Plaintiffs do not dispute personal jurisdiction for purposes of this lawsuit only.

9.      Paragraph 9 states a legal conclusion and therefore no response is required. Plaintiffs do not dispute venue for purposes of this lawsuit only.

████  ████████ – ████████████████

### COUNT I – DECLARATORY JUDGMENT OF NON-INFRINGEMENT

10.     Plaintiffs incorporate and reference their answers to the above and below paragraphs and incorporate them as though fully set forth herein.

11.     Plaintiffs admit they have sued NeuMoDx and Qiagen for infringing U.S. Patent Nos. 8,273,308; 8,703,069; 7,998,708; 8,323,900; 8,415,103; 8,709,787; 10,494,663; 10,364,456; 10,443,088; 10,604,788; 10,625,261; 10,625,262; and 10,632,466 (the "Asserted Patents").  To the extent any allegations remain, Plaintiffs deny the remaining allegations set forth of Paragraph 11.

12.     Denied.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Paragraph 26 contains legal conclusions to which no response is required.  To the extent any allegations remain, Plaintiffs deny the remaining allegations set forth in Paragraph 26.

27.     Denied.

## **COUNT 2 – DECLARATORY JUDGMENT OF INVALIDITY**

28.     Plaintiffs incorporate and reference their answers to the above and below paragraphs and incorporate them as though fully set forth herein.

29.     Plaintiffs admit that they have sued NeuMoDx and Qiagen for infringing one or more claims of the '308, '069, '708, '900, '103, '787, '456, '088, '788, '663, '261, '262 and '466 patents and assert that the patents are valid and enforceable.

30.     Denied.

31.     Denied.

32.     Plaintiffs admit that they have maintained their infringement claims against Defendants.  Plaintiffs deny the remaining allegations in Paragraph 32.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

4

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Paragraph 50 contains legal conclusions to which no response is required.  To the extent any allegations remain, Plaintiffs deny the remaining allegations set forth in Paragraph 50.

51.     Denied.

### COUNT III – BREACH OF CONTRACT

52.     Plaintiffs incorporate and reference their answers to the above and below paragraphs and incorporate them as though fully set forth herein.

53.     Plaintiffs admit that, in late 2011, Brahmasandra contacted an executive at BD regarding a potential "product development and commercialization exercise."   Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 53.

54.     Plaintiffs admit that Brahmasandra contacted an executive at BD and Brahmasandra stated that, based on his contract with Becton Dickinson, he "is expected to stay out of the planning and development of NAT systems for a period of TWO years from Feb 19, 2011." Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 54.

55.     Plaintiffs admit that Brahmasandra contacted an executive at BD and Brahmasandra stated that he "was wondering if you (& BD) would be willing to grant me exception from the non-compete and allow me to start exploring the development of a nucleic acid based system."  Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 55.

56.     Plaintiffs admit that HandyLab and Brahmasandra entered into an "Amendment to Employment Agreement" in February 2012.  To the extent Defendants purportedly quote from the Amendment to Employment Agreement, Plaintiffs respond that the Amendment to Employment

Agreement speaks for itself and no further response is required.  Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 56.

57.     To the extent Defendants purportedly quote from the Amendment to Employment Agreement, Plaintiffs respond that the Amendment to Employment Agreement speaks for itself and no further response is required.  Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 57.

58.     Denied.

59.     To the extent Defendants purportedly quote from the Amendment to Employment Agreement, Plaintiffs respond that the Amendment to Employment Agreement speaks for itself and no further response is required.  Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 59.

60.     Denied.

61.     Because of the lack of specificity and vagueness of the allegations of Paragraph 61, Plaintiffs lack knowledge sufficient to confirm or deny the allegations set forth of Paragraph 61, and therefore deny them.

62.     Plaintiffs admit that their representatives attend industry trade shows, and that at least some of the trade shows Plaintiffs have attended since 2013 have also been attended by representatives of NeuMoDx.  Plaintiffs further admit at least one individual having at least one meeting at an industry trade show with NeuMoDx in 2018.  Plaintiffs deny the remaining allegations in Paragraph 62, and deny meeting "annually" with NeuMoDx at "industry trade shows" after 2013, and further deny that NeuMoDx "provided [Plaintiffs] with demonstrations of the NeuMoDx products and answered questions about the technology" or "shared its technology,

███████ ██████████ – ████████████████████

including confidential aspects of its technology," at any such "meetings."  To the extent any allegations remain, Plaintiffs deny the remaining allegations set forth of Paragraph 62.

63.    Denied.

64.    Denied.

## COUNT IV – DECLARATORY JUDGMENT OF NO TERMINATION OF LICENSE AGREEMENT

65.    Plaintiffs incorporate and reference their answers to the above and below paragraphs and incorporate them as though fully set forth herein.

66.    Plaintiffs admit that Qiagen GmbH and HandyLab entered into a License and Supply Agreement on May 21, 2008, which was later amended on July 1, 2009 (the "HandyLab-Qiagen Agreement").  To the extent Defendants purportedly quote from the HandyLab-Qiagen Agreement, Plaintiffs respond that the Agreement speaks for itself.  Except as specifically admitted, Plaintiffs deny the allegations of Paragraph 66.

67.    Exhibit A speaks for itself and therefore no response to the allegations in Paragraph 67 describing the contents of that document is required.

68.    Plaintiffs admit that they contend that the Asserted Patents are not licensed under the HandyLab-Qiagen Agreement to Defendants.

69.    Exhibits A-C speak for themselves and therefore no responses are required.  The remaining allegations in Paragraph 69 contain legal conclusions to which no response is required.

70.    The HandyLab-Qiagen Agreement speaks for itself and therefore no response to the allegations in Paragraph 70 describing the contents of that document is required.  Plaintiffs deny the content of "Exhibit X" because no such Exhibit was appended to Defendants pleading.  Plaintiffs deny that they did not seek to terminate the HandyLab-Qiagen Agreement under any

██████  ████████ ─ ████████████

other section aside from Section 8.1(i).  The remaining allegations in Paragraph 70 contain legal conclusions to which no response is required.

71.   Denied.

72.   Plaintiffs' letter dated January 7, 2021 speaks for itself and therefore no response to the allegations in Paragraph 72 describing the contents of that document is required.

73.   Denied.

74.   Denied.

75.   Plaintiffs' letter dated January 7, 2021 speaks for itself and therefore no response to the allegations in Paragraph 75 describing the contents of that document is required. Defendants' remaining allegations in Paragraph 75 are legal conclusions to which no response is required but, to the extent a response is required, the remaining allegations are denied.

76.   Denied.

77.   Denied.

## PLAINTIFFS' AFFIRMATIVE DEFENSES TO DEFENDANTS' COUNTERCLAIMS

Plaintiffs repeat and reallege each and every answer and/or allegation above and below (including in Plaintiffs' Counterclaims-in-Reply) as if fully set forth herein.

### FIRST DEFENSE

Defendants' Counterclaims, in whole or in part, fail to state a claim upon which relief can be granted.

### SECOND DEFENSE

Defendants' Counterclaims for patents that have been challenged by Defendants through *inter partes* review and resulted in a final written decision under 35 U.S.C. § 318(a) are barred by estoppel, in whole or in part, under 35 U.S.C. § 315(e)(2).

███   ███████ – ███████████

### THIRD DEFENSE

Defendants' Counterclaims are barred, in whole or in part, by the doctrine of assignor estoppel. For example, Jeffrey Williams, one of the named inventors of U.S. Patent Nos. 7,998,708; 8,323,900; 10,625,261; 10,625,262; and 10,632,466 and Sundaresh Brahmasandra, one of the named inventors of U.S. Patent Nos. 10,364,456; 10,604,788; 10,443,088; and 10,494,663 are currently employed by, and in privity with, Defendants. Therefore, Defendants cannot challenge the validity of at least U.S. Patent Nos. 7,998,708; 8,323,900; 10,625,261; 10,625,262; 10,632,466; 10,364,456; 10,604,788; 10,443,088; and 10,494,663.

### FOURTH DEFENSE

Defendants' Counterclaims are barred, in whole or in part, by laches, delay, waiver, unclean hands, acquiescence and/or estoppel. This includes, but is not limited to, for example, the fact that Defendants did not raise any purported license defense prior to the commencement of this action, including in late 2018 when Qiagen contacted Plaintiffs shortly after executing the merger agreement with NeuMoDx. Additionally, NeuMoDx's principals and relevant employees, including but not limited to Jeffrey Williams and Sundaresh Brahmasandra, affirmed and/or were silent as to the validity and inventorship of HandyLab's patents, including the Asserted Patents, including for example while they were at HandyLab, as part of the sale of HandyLab to BD in 2009, in papers filed with the Patent Office, and thereafter.

### FIFTH DEFENSE

Defendants' Counterclaims are barred, in whole or in part, because *inter alia* Defendants have failed to show and cannot show the elements of a breach of contract claim and/or claim for declaratory judgment of no termination of license agreement; Plaintiffs did not breach any contractual and/or legal duties to Defendants; under Defendants' theories, Defendants breached their contractual and legal duties to Plaintiffs and any contractual and legal rights of or duties to

9

Defendants terminated; Sundaresh Brahmasandra breached his contractual and legal duties to Plaintiffs; Defendants do not have standing to enforce contract(s) upon which their claims are based; and/or the contracts are not breached, void, voidable, unenforceable, invalid and/or no damages can be recovered based on, for example, indefiniteness, lack of mutual assent or meeting of the minds, absence of condition precedent, repudiation, prior material breach, terms of contract, mistake, illegality, bad faith, unclean hands, fraud in the inducement, and/or fraud in the concealment (or silent fraud).

## SIXTH DEFENSE

Defendants' Counterclaims are barred, in whole or in part, for the reasons set forth in connection with Plaintiffs' Counterclaims-in-Reply, which are incorporated by reference.

## SEVENTH DEFENSE

At least one or more Defendants lacks standing to assert one or more of their Counterclaims.

## EIGHTH DEFENSE

Defendants are barred, in whole or in part, from recovering damages or other relief in connection with the Counterclaims.

## PLAINTIFFS' COUNTERCLAIMS-IN-REPLY

### PARTIES

1.      Plaintiffs incorporate by reference paragraphs 1-9 of their Second Amended Complaint (D.I. 169) as though fully set forth herein.  Plaintiffs repeat and reallege each and every answer and/or allegation above and below as if fully set forth herein.

2.      Sundaresh Brahmasandra ("Brahmasandra") is an individual currently residing in the state of Michigan, whose last known address is 2325 Hollow Oak Drive, Ann Arbor, MI 48103.

Brahmasandra co-founded HandyLab in 1999 and was employed by HandyLab until March 2011. Brahmasandra was an officer of HandyLab from its founding through its acquisition by BD in 2009, and also served as a director; Brahmasandra was a senior executive and member of the key managerial personnel after HandyLab's acquisition until March 2011.

3.      Brahmasandra was employed by NeuMoDx (or its predecessor Molecular Systems Corp.) from 2012 to 2021, during which time he held positions as President and Chief Operating Officer ("COO").

4.      Jeffrey Williams ("Williams") is an individual currently residing in the state of Michigan, whose last known address is 861 Maximilian Court, Chelsea, MI 48118.  Williams joined HandyLab in 2004 as the CEO and was employed by HandyLab from 2004 until 2010. Williams was an officer and director of HandyLab from its founding through its acquisition by BD in 2009.  Williams was a senior executive and member of the key managerial personnel after HandyLab's acquisition by BD, until he left the company in 2010.

5.      Williams founded Molecular Systems Corp. (which later became NeuMoDx) in 2012 and was Chief Executive Officer of NeuMoDx (and its predecessor Molecular Systems Corp.) from its founding in 2012 until 2020.

6.      For purposes of Plaintiffs' Counterclaims-In-Reply, NeuMoDx, Brahmasandra, and Williams shall be referred to as "Defendants" below.  Qiagen GmbH shall be referred to as "Qiagen" below.

## JURISDICTION AND VENUE

7.      Plaintiffs incorporate by reference paragraphs 50-66 of their Second Amended Complaint (D.I. 169) as though fully set forth herein.

8. The Court has jurisdiction over Plaintiffs' counterclaims pursuant to the 28 U.S.C. §§ 1331, 1338, and claims under 18 U.S.C. §§ 1836-39, *et seq.*, for misappropriation of trade secrets under the Defend Trade Secrets Act.

9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that do not arise under the Constitution, laws, or treaties of the United States because they involve a common nucleus of operative fact.

10. This Court has personal jurisdiction over Defendants Brahmasandra and Williams at least pursuant to 10 Del. C. § 3114. Brahmasandra and Williams were officers and directors of HandyLab and NeuMoDx, both Delaware corporations. Brahmasandra and Williams entered into business and contractual relationships, including employment agreements, with HandyLab and NeuMoDx, both Delaware corporations. Brahmasandra and Williams misappropriated and improperly acquired, retained, used and/or disclosed Plaintiffs' trade secret and confidential proprietary information and materials in their respective capacities as officers and directors of NeuMoDx, and as current or former officers and directors of HandyLab.

11. Venue remains proper in this District under at least 28 U.S.C. §§ 1400(b), 1391, pendent venue, and Fed. R. Civ. P. 13 because NeuMoDx filed counterclaims in this district. Furthermore, this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, given that Brahmasandra and Williams were officers, directors, and key managerial personnel of HandyLab and NeuMoDx, both Delaware corporations; and Brahmasandra and Williams misappropriated and improperly retained, disclosed, and used Plaintiffs' trade secret and confidential proprietary information and materials, including that of a Delaware corporation, in

their capacities as officers and directors of NeuMoDx and current or former officers, directors, and key managerial personnel of HandyLab.

### BACKGROUND FACTS COMMON TO COUNTERCLAIMS-IN-REPLY

12.     Plaintiffs incorporate by reference paragraphs 1-189 of their Second Amended Complaint (D.I. 169) as though fully set forth herein.

13.     Plaintiffs have learned in discovery that NeuMoDx has covertly misappropriated vast quantities of Plaintiffs' trade secret and confidential proprietary technical and nontechnical information and materials, including hundreds (if not thousands) of (1) research, design, and engineering documents and files for diagnostic instruments and microfluidic cartridges; (2) research, design, and engineering documents and files for diagnostic assays and reagents; and (3) documents and files related to market research, financial information, and competitive strategies. Many of these documents and files were ***clearly marked*** on their face as confidential and proprietary to HandyLab.  NeuMoDx's President and Chief Operating Officer Brahmasandra, NeuMoDx's former CEO Williams, and others freely disseminated Plaintiffs' trade secret and confidential proprietary information and materials to other NeuMoDx employees who were involved in the development of NeuMoDx's competing products and business.  Brahmasandra, Williams, and other NeuMoDx employees encouraged, facilitated, and participated in dissecting and using Plaintiffs' trade secret and confidential proprietary information and materials for NeuMoDx's commercial benefit.

14.     Plaintiffs never authorized NeuMoDx to see, possess, disclose, or use Plaintiffs' trade secret and confidential proprietary information and materials.  Instead, without Plaintiffs' knowledge or consent, at least Brahmasandra retained and/or improperly acquired Plaintiffs' trade secret and confidential proprietary information and materials after his employment at HandyLab ended.  Upon information and belief, Williams did so as well.   William's and Brahmasandra's

retention of and/or improper acquisition of such information and materials and their subsequent disclosure and use of that information and materials with other NeuMoDx employees violated their contractual confidentiality and employment obligations to Plaintiffs to surrender and return all trade secret and confidential proprietary information and materials after their employment ended, and to not use that information or materials for anything other than in performance of their duties while formerly employed by Plaintiffs.

### A.   Brahmasandra's and Williams's Duties to Protect Plaintiffs' Confidential, Proprietary, and Trade Secret Information and Materials

15.   At or around the time of the acquisition of HandyLab by BD, Brahmasandra executed an At-Will Employment Agreement with HandyLab.   Ex. 5.   Brahmasandra's Employment Agreement has an effective date of November 19, 2009.

16.   Pursuant to his Employment Agreement, Brahmasandra was given the title of Vice President, R&D Assay Development.  By virtue of his position as a senior executive, member of the key managerial personnel, and agent, Brahmasandra owed Plaintiffs a fiduciary duty and duty of loyalty.  Brahmasandra's duties and responsibilities also included driving the transfer of technology and knowledge relating to HandyLab assay chemistries to BD associates as well as educating BD associates on HandyLab's existing assay menu and methods, intellectual property, and technologies that were in development.

17.   At or around the time of the acquisition of HandyLab by BD, Williams executed an At-Will Employment Agreement with HandyLab.  Williams's At-Will Employment Agreement has an effective date of November 19, 2009.  Ex. 4.

18.   Pursuant to his Employment Agreement, Williams was given the title of Vice President, HAI and Business Development.  By virtue of his position as a senior executive, member of the key managerial personnel, and agent, Williams owed Plaintiffs a fiduciary duty and duty of

loyalty.  Williams' duties and responsibilities included overseeing the integration of HandyLab into BD, managing business activities toward technical and business milestones, and conducting other strategic and business initiatives.

19.     Williams's and Brahmasandra's At-Will Employment Agreements (the "Agreements") also set forth Williams's and Brahmasandra's obligations concerning trade secrets and confidential proprietary information and materials and other intellectual property.

20.     Upon signing the Agreements, Williams and Brahmasandra agreed that they were prohibited from disclosing or using, other than for performance of their duties and responsibilities in connection with their employment at HandyLab, any of Plaintiffs' trade secrets and confidential proprietary information and materials, including:

> information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of the Company and its Affiliates, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Affiliates, (iv) the identity and special needs of the customers of the Company and its Affiliates and (v) the people and organizations with whom the Company and its Affiliates have business relationships and the nature and substance of those relationships.

21.     In each case, the above confidentiality restriction survived termination of Williams's and Brahmasandra's employment with HandyLab.  The Agreements provided that "[t]he Employee understands that this restriction shall continue to apply after his employment terminates, regardless of the reason for such termination."

22.     The Agreements also provided that, upon termination of their respective employment, Brahmasandra and Williams were each required to surrender to Plaintiffs all trade secrets and confidential proprietary information and materials in their possession or control, including, "[a]ll documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its Affiliates and any copies."

23.     The Agreements also recognized that breach by the Employee of any of the covenants relating to confidentiality would cause irreparable harm to HandyLab, including by so stating, and further stating that "The Employee therefore agrees that [HandyLab], in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Employee of any of said covenants…."

24.     Williams and Brahmasandra also executed other agreements creating similar obligations prior to the acquisition of HandyLab by BD.  For example, Brahmasandra had also executed a Non-Disclosure and Developments Agreement ("NDA") with HandyLab in 2000, which required him to not use HandyLab's trade secrets and confidential proprietary information and materials for any purpose other than performance of his duties at HandyLab, and to return all such information and materials after this employment ended. Ex. 3.  Brahmasandra confirmed that he would "not at any time, whether during or after the termination of the Relationship, reveal to any person or entity any of the trade secret and confidential proprietary information and materials concerning the organization, or finances of the Corporation," and that he would "keep secret all matters entrusted to [him] and [] not use or attempt to use any  such  information in  any manner which may injure or cause loss or may be calculated to injure or cause  loss  whether  directly  or indirectly to the Corporation." *Id*.  Brahmasandra expressly agreed:

> I shall not, after the termination of the Relationship, use or permit to be used any such notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, data, documentation or other materials, it being agreed that all of the foregoing shall be and remain the sole and exclusive property of the Corporation and that immediately upon the termination of the Relationship I shall deliver all of the foregoing, and all copies thereof, to the Corporation, at its main office.

Brahmasandra was further aware that his "obligations under [the NDA] shall survive the termination of [his] employment" at HandyLab, and that "any breach of [the NDA] by me will cause irreparable damage to" HandyLab.

25.    Brahmasandra was employed by Plaintiffs until March 2011.  Williams was employed by Plaintiffs until January 2010.  During Brahmasandra's and Williams's respective periods of employment, Plaintiffs in creating and preparing to launch next generation molecular diagnostics platforms such as the BD MAX™ System—an automated molecular system designed to perform a broad range of molecular tests.

26.    After his employment with Plaintiffs, Williams founded Molecular Systems Corp. in 2011, and solicited Brahmasandra to join him that same year.  Molecular Systems Corp. later changed its name to NeuMoDx.

27.    Unbeknownst to Plaintiffs, on information and belief, Brahmasandra and/or Williams, in breach of the Agreements, retained in their personal possession significant amounts of Plaintiffs' trade secrets and confidential proprietary information and materials that they obtained from Plaintiffs throughout their employment following the termination of their employment, in violation of their employment Agreements and NDAs.

28.    Pursuant to recently-provided discovery in connection with Plaintiffs' claims for patent infringement against Defendants (most of that discovery being provided after the deadline for substantial completion of document productions), Plaintiffs learned that NeuMoDx's agents—including, *e.g.,* Brahmasandra and Williams—misappropriated and improperly retained, disclosed, and used numerous of Plaintiffs' information, documents, and materials containing Plaintiffs' trade secrets and confidential proprietary information and materials.

29.     Brahmasandra, Williams, and NeuMoDx at least misappropriated and improperly retained, disclosed, and used these materials at least in connection with foundational research and development, and product-planning activities, and to obtain a substantial head start in developing diagnostic products that directly compete with Plaintiffs' products.  The retention, disclosure, and use of Plaintiffs' trade secrets and confidential proprietary information and materials by NeuMoDx and its agents—including, *e.g.*, Brahmasandra and Williams—has unjustly enriched Defendants and has caused and will continue to cause substantial economic harm and disadvantage to Plaintiffs.

### B.     Plaintiffs' Trade Secret and Confidential Proprietary Information

30.     One of BD's core business units is the Integrated Diagnostics Solutions business, which is focused on innovation and product development in diagnostic testing systems and solutions.  BD has two industry-leading products in its diagnostics portfolio—BD MAX™ and BD COR™.  They are designed to perform a broad range of diagnostic tests in a rapid and highly automated fashion suitable for hospitals and clinical laboratories that perform medium-to-high volumes of diagnostic tests.  BD MAX™ and BD COR™ are fully integrated and fully automated platforms, incorporating clinical sample preparation, nucleic acid extraction, as well as microfluidic real-time polymerase chain reaction ("PCR") amplification and detection in single diagnostic systems.

31.     Plaintiffs' propriety and confidential information and know-how, including Plaintiffs' trade secrets, are related to the research, development, sale, and business of BD MAX™, BD COR™, and other of Plaintiffs' associated products in interstate and foreign commerce.

32.     As explained above, Defendants misappropriated vast amounts of Plaintiffs' confidential and proprietary technical and nontechnical information and materials, including hundreds (if not thousands) of (1) research, design, and engineering documents and files for

18

████ ████████ – ████████████████

diagnostic instruments and microfluidic cartridges; (2) research, design, and engineering documents and files for diagnostic assays and reagents; and (3) documents and files related to license and supply agreements, market research, financial information, and competitive strategies. Many of these documents and files were ***clearly marked*** on their face as confidential and proprietary to HandyLab.

33.     That confidential and propriety information included at least the following trade secrets that, upon information and belief, NeuMoDx's agents—including, *e.g.,* Brahmasandra and/or Williams—improperly retained from their time of employment with Plaintiffs, disclosed to NeuMoDx, and that NeuMoDx further misappropriated and improperly retained, disclosed, used and continues to use.  Plaintiffs' trade secrets include (based on what has been uncovered thus far in limited discovery) but are not limited to the following non-exclusive and representative trade secrets ("Trade Secrets"):

    a.    <u>Trade secrets relating to the design and manufacture of diagnostic instruments and microfluidic cartridges</u>:

        (i)    engineering drawings for components of the diagnostic instrument and/or microfluidic cartridge (e.g., engineering drawings depicting the cartridge and describing design, engineering, and manufacturing requirements for specific cartridge components, such as ███████████████ ████████████████████████);

        (iii)    fabrication requirements for resistive heaters (e.g., ██████████ ████████████████████ ████████████████████ ████████████████████ ██████████);

██████   ███████████ –███████████████████████

(iv)   lists describing all of the parts, components, and subcomponents in a diagnostic instrument (e.g., spreadsheets listing all parts by part numbers)

b.   <u>Trade secrets relating to design and manufacture of diagnostic assays, including buffers, reagents, and mixtures for use in assays</u>:

(i)   experimental results relating to the research and development of buffers, reagents, and mixtures for use in diagnostic assays (e.g., ████████████ ████████████████████████████████████████████████);

(iii)   design of, methods of manufacturing, and properties of HandyLab's nucleic-acid binding beads (e.g., █████████████████████████████ █████████████████████);

(iv)   formulation and composition of buffers, reagents, and mixtures (e.g., ███████████████████████████████████████████████████ █████████████████);

c.   <u>Trade secrets relating to Plaintiffs' marketing, finances, and competitive strategies</u>:

(i)   lists describing the suppliers, vendors, and manufacturers of components in Plaintiffs' prototypes and products relating to Jaguar and/or BD MAX™;

(ii)   terms of Plaintiffs' confidential agreements with suppliers and/or vendors relating to Jaguar and/or BD MAX™ (e.g., Plaintiffs' agreements that contain pricing terms);

(iii)   confidential market research relating to demand and critical product performance characteristics;

(iv)   analyses of competitors and business strategies for growing market share;

(v)   market research relating to the software features in Plaintiffs' products;

(vi)    Plaintiffs' internal financial documents, including but not limited to financials showing margins, profits, losses, operating expenses, projections, costs of goods sold, and sales by product.

All of Plaintiffs' Trade Secrets are also Plaintiffs' confidential proprietary information.

34.    Plaintiffs' Trade Secrets are valuable because they were developed by Plaintiffs through the significant expenditure of time, money, and other resources, including through the acquisition of HandyLab by BD; and/or through their contribution to the development of diagnostic products including the Jaguar and BD MAX™.  Plaintiffs expended and continue to expend time, money, and resources in maintaining the confidentiality of Plaintiffs' Trade Secrets. Plaintiffs' Trade Secrets are not generally known to the public or to Plaintiffs' competitors, and are not readily ascertainable.  Plaintiffs' Trade Secrets derive independent economic value from not being generally known or readily ascertainable, to Plaintiffs' competitors (including NeuMoDx and Qiagen) who would obtain economic value from the use of Plaintiffs' Trade Secrets.

35.    Plaintiffs' Trade Secrets constitute valuable and confidential information that can be used individually or in combination to design, manufacture, market, and sell competing systems and associated products for diagnostic testing; outline what approaches will (or will not) likely succeed in certain settings; and provide a significant head start to competitors in diagnostic testing.

36.    Many of the files that NeuMoDx's agents—including, *e.g.,* Brahmasandra and/or Williams—misappropriated and improperly acquired and retained from Plaintiffs and that they and other NeuMoDx employees misappropriated and improperly retained, disclosed, and used in developing their competing products are expressly marked as proprietary and/or confidential.  For example, Brahmasandra circulated an engineering drawing of a multi-lane microfluidic cartridge to NeuMoDx employees, which NeuMoDx's employees relied upon in designing NeuMoDx's

own cartridge, and which is clearly marked "PROPRIETARY AND CONFIDENTIAL," "THE SOLE PROPERTY OF HANDYLAB, INC.," and which indicated that "ANY REPRODUCTION IN PART OR AS A WHOLE … IS PROHIBITED."  As another example, while at NeuMoDx, Brahmasandra and Williams exchanged trade secret, proprietary, and confidential market analyses, research, and surveys that were "Prepared Exclusively for HandyLab" or prepared on a "Confidential" basis for HandyLab.

37.    Plaintiffs' competitive position in the field of diagnostic testing relies on the protection of Plaintiffs' confidential and propriety information, including Plaintiffs' Trade Secrets.

**C.     Plaintiffs' Efforts To Protect The Confidentiality Of Plaintiffs' Trade Secrets And Other Confidential Proprietary Information And Material**

38.    Plaintiffs have expended significant amounts of time, money, and other resources to preserve and maintain the secrecy of Plaintiffs' Trade Secrets, including through written agreements, policies, procedures, training programs, and systems that protect this information from disclosure to others and from use by any one for purposes other than Plaintiffs' interest.  As noted, many of the files that NeuMoDx's agents—including, *e.g.,* Brahmasandra and/or Williams— improperly retained from Plaintiffs and that NeuMoDx employees misused are expressly marked as proprietary and/or confidential.

39.    HandyLab has recognized the value of its innovative technology and the importance of protecting its proprietary information since the company's inception.  For example, in January 2000, Brahmasandra's NDA confirmed the importance of not disclosing the trade secret and confidential proprietary information and materials of HandyLab, including in the form of notes, memoranda, reports, lists, records, drawings, sketches, specifications, software, data, documentation, or other materials.  HandyLab took reasonable measures to keep its Trade Secret and confidential proprietary information secret.

40.    HandyLab required its employees, including Williams and Brahmasandra, to comply with the provisions set forth in the HandyLab Employee Handbook.  Ex. 20. The Handbook provided that "[t]he protection of confidential business information and trade secrets is vital to the interests and success of HandyLab," and that employees "may not use this information, repeat it, or share it with any other party for any purpose.  Such confidential information includes, but is not limited to [*e.g.*] … supplier information … financial information … sales and marketing strategies/plans … technical specifications … protocols, processes, compilations of data … technical know-how … procedures … results of testing … software … [etc.]."  The HandyLab Employee Handbook *expressly* states that confidential HandyLab information "encompasses all written materials identified in writing as 'Confidential' or 'Proprietary.'"  Indeed, HandyLab instructed employees that even "[c]asual discussions of information with others outside of the corporation should be carefully avoided," and "[i]nternal discussions should be confined to those fellow employees with a 'need to know', that is, knowledge required by the employee to properly perform job functions."

41.    All employees and contractors of HandyLab were required "to sign a non-disclosure agreement as a condition of employment" pursuant to the HandyLab Employee Handbook.

42.    HandyLab also employed various other physical, technological, and other measures to prevent the inappropriate disclosure of its trade secret and confidential proprietary information and materials.  For example, physical access to HandyLab's offices and facilities was restricted to authorized persons with keycards.  HandyLab's computers were password-protected.  Some

23

HandyLab employees were restricted from accessing certain types of confidential, proprietary, and trade secret information and materials based on the department in which they resided.

43.     As described above, both Brahmasandra and Williams also each signed At-Will Employment Agreements with HandyLab at the time of BD's acquisition acknowledging they would protect HandyLab's trade secret and confidential proprietary information and materials, including by agreeing that the "Employee will comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and shall not disclose … any Confidential Information. … [T]his restriction shall continue to apply after his employment terminates."  Moreover, the At-Will Employment Agreements made clear that "[a]ll documents, records, tapes and other media … relating to the business, whether current, past or future, of the Company or its Affiliates. … shall be the sole and exclusive property of the Company and its Affiliates."  Employees of HandyLab were further required to "safeguard all Documents and [] surrender [Documents] to the Company at the time his employment terminates."

44.     BD also employed, and continues to employ, safeguards to protect its trade secret and confidential proprietary information and materials, including information and materials acquired from its now-subsidiary HandyLab.

45.     BD has policies and procedures concerning information and data security that state, in relevant part, that only the software provided and installed by BD was allowed on employee computers, and that all data and information on the BD Information System Network are proprietary and confidential.

46.     BD employees are reminded of these policies when they sign into the BD system and/or network, for example by messages stating that the network is private and intended for authorized business purposes; actual or attempted unauthorized access, use, or modification of the

network is prohibited; and unauthorized users and/or unauthorized use may be subject to BD disciplinary proceedings and/or criminal and civil penalties in accordance with applicable law, and authorized use is subject to BD policies and procedures.

47.     To the extent that BD trade secret and confidential proprietary information and materials exist in written paper form, such writings are kept in secured areas with limited access. Guests to any of BD's research or manufacturing facilities are not allowed unescorted into these secure areas unless they or their employer had executed appropriate non-disclosure agreements with Plaintiffs.

48.     Further, BD maintains a Trade Secret Policy.  The Policy states, in pertinent part, that trade secrets include "research and development activities and results such as formulas, prototypes, processes, laboratory notebooks, experiments and experimental data, analytical data, calculations, drawings, vendor/supplier information, reports, know-how and negative know-how (*i.e.*, what does not work), new product development, clinical study protocols, results and associated data."  The Trade Secret Policy states that BD associates should treat all non-public information about BD as a BD trade secret unless otherwise instructed.  The Trade Secret Policy also states that "every BD associate with access to BD trade secrets shall comply with this Policy." *See* Ex. 1.

49.     BD maintains a Code of Conduct (the "Code") and requires all associates to participate in annual training pertaining to the Code and certify their understanding of and compliance with the principles of the Code.  Ex. 2.  Complying with the Code is a condition of employment at BD, and "[a]ll directors, officers and employees are responsible for complying with the Code."  The Code prohibits BD employees from using BD Information Technologies (e.g., "computers, networks, cell phones, email, Internet") to engage in unauthorized access to data,

25

download or install software that is not approved by BD, or use file sharing software or external file transmissions, remote access, hosting or storage services that have not been approved by BD. The Code expressly instructs employees that "[y]ou must not share company proprietary information with others, or proprietary information provided to you by others including fellow associates, unless they need to know it for a legitimate business reason. … If you leave BD, you may not take any confidential information from BD and reveal it to your new employer."  To the extent any employee has any questions or concerns about complying with their obligations under the Code, BD maintains a confidential Ethics Helpline for employee to obtain assistance.

50.    Due to their roles and positions at HandyLab, Williams and Brahmasandra had access to Plaintiffs' Trade Secrets and confidential proprietary information and materials, including information relating to design and manufacture of diagnostic instruments and microfluidic cartridges; design and manufacture of diagnostic assays, including buffers, reagents, and mixtures for use in assays; and information relating to marketing, finances, and competitive strategies.  *See also supra* ¶ 32-36.

51.    Upon information and belief, following termination of their employment with Plaintiffs and in violation of the express language of the Agreements, Williams and/or Brahmasandra retained at least hundreds (if not thousands) of Plaintiffs' Trade Secrets and confidential documents including technical documents relating to designs, specifications, manufacturing plans and procedures, experimental and test results; and also financial documents, including lists of assets, sources of supply, and business relationships.

### D.    Brahmasandra's Negotiation Of A Waiver Of Non-Compete Agreement With Plaintiffs

52.    On or about December 2011, after his employment with HandyLab had ended, Brahmasandra contacted Plaintiffs seeking a limited waiver of the non-compete provision of his

At-Will Employment Agreement to allow him to join Molecular Systems Corporation ("MSC") prior to the expiration of that non-compete.

53.     Brahmasandra's message represented that Williams "had ideas on what features need to be implemented" in the nucleic acid testing system contemplated by MSC, but represented that MSC had "no technology yet to implement anything."  Brahmasandra further explained that the "very early venture" would "definitely not result in the development of any competing products for at least 3-4 years from when we do start to work on the product."

54.     Out of respect for their prior working relationships, Plaintiffs granted the request in February 2012, and Brahmasandra joined Molecular Systems Corp. as President shortly thereafter. The letter agreement reflecting the waiver provides that the stated purpose of the agreement was for Plaintiffs to "grant [Brahmasandra] a waiver from the non-compete provisions in the Agreement for the limited purpose of allowing you to pursue this potential opportunity."  Ex. 6 at 1-2.   Nothing in the Amendment to the Employment Agreement modified or waived Brahmasandra's prior and ongoing confidentiality obligations.

55.     Unbeknownst to Plaintiffs, at the very same time that Brahmasandra was negotiating the terms of the waiver, he had *already* breached his At-Will Employment Agreement by improperly retaining hundreds of Plaintiffs' confidential documents following the termination of his employment and, on at least one occasion, having *already* disclosed such documents to individuals outside HandyLab or BD for purposes unrelated to HandyLab's or BD's business, and without a non-disclosure agreement.  *See, e.g.*, Ex. 7.  Brahmasandra failed to disclose to Plaintiffs that he had breached his Employment Agreement, NDA, or fiduciary obligations by doing so.

56.     On information and belief, at the time he was negotiating with Plaintiffs a waiver of the non-compete provisions of his Employment Agreement, Brahmasandra secretly intended to

use confidential documents misappropriated from Plaintiffs to shortcut the research and development time necessary for NeuMoDx (and its predecessor Molecular Systems Corp.) to bring diagnostic testing products to market.  Brahmasandra did not disclose to Plaintiffs his retention of Plaintiffs' Trade Secrets and confidential proprietary information and materials, or his intent to misuse Plaintiffs' Trade Secrets and confidential proprietary information and materials in his capacity as an officer of NeuMoDx (and its predecessor Molecular Systems Corp.).

57.     Plaintiffs did not know, nor could they have known, that Brahmasandra intended to deceive and defraud Plaintiffs and did so.  Plaintiffs negotiated with Brahmasandra in good faith without knowledge that Brahmasandra had already breached his At-Will Employment Agreement, NDA, and fiduciary obligations, was still in possession of hundreds of Plaintiffs' Trade Secrets and confidential proprietary information and materials, and that Brahmasandra intended to misuse such documents in violation of his Agreement in founding a new company and to shortcut the research and development time necessary to bring diagnostic testing products to market.

58.     Neither Brahmasandra nor Williams informed Plaintiffs they had documents reflecting Plaintiffs' Trade Secrets and confidential proprietary information and materials in their possession at any point before or after the non-compete waiver was signed, and in fact actively concealed that information from Plaintiffs while negotiating a waiver of the non-complete.  Neither Brahmasandra nor Williams informed Plaintiffs they intended to share Plaintiffs' Trade Secrets and confidential proprietary information and materials at Molecular System Corp./NeuMoDx or with Molecular Systems Corp./NeuMoDx employees at any point before or after the non-compete waiver was signed.  Neither Brahmasandra nor Williams informed Plaintiffs they intended to misuse Plaintiffs' Trade Secrets and confidential proprietary information and materials at

Molecular System Corp./NeuMoDx at any point before or after the non-compete waiver was signed.

59.     Pursuant to recently-provided discovery in connection with Plaintiffs' claims for patent infringement against Defendants, Plaintiffs learned that NeuMoDx's agents—including, *e.g.,* Brahmasandra and Williams—retained, disclosed, and misused numerous of Plaintiffs' documents and materials containing Plaintiffs' Trade Secrets and confidential proprietary information and materials.

### E.     NeuMoDx And NeuMoDx's Agents, Including Brahmasandra and Williams, Misappropriate Plaintiffs' Confidential Information And Trade Secrets

60.     NeuMoDx, Brahmasandra, and Williams at least misappropriated and improperly retained, disclosed, and used Plaintiffs' Trade Secrets and confidential proprietary information and materials.  Brahmasandra and Williams at least misappropriated Plaintiffs' Trade Secrets and confidential proprietary information and materials by, for example, disclosing or using Plaintiffs' Trade Secrets and confidential proprietary information and materials despite knowing that such information and materials were acquired under circumstances giving rise to a duty by them to maintain the secrecy of the Trade Secrets and confidential proprietary information and materials, and refrain from the use of the Trade Secrets and confidential proprietary information after their employment with HandyLab; and by disclosing or using Plaintiffs' Trade Secrets and confidential proprietary information and materials despite knowing that such information and materials were derived from or through former HandyLab employees who owed a duty to maintain the secrecy of the Trade Secrets and refrain from the use of the information and materials after their employment with HandyLab.   Brahmasandra and Williams improperly acquired, by improperly retaining, hundreds of Plaintiffs' confidential documents (including Trade Secrets) after their employment with HandyLab.

61.     NeuMoDx at least misappropriated Plaintiffs' Trade Secrets and confidential proprietary information and materials by, for example, acquiring, disclosing, or using Plaintiffs' Trade Secrets and confidential proprietary information and materials despite knowing that Plaintiffs' such information and materials were acquired under circumstances giving rise to a duty by former HandyLab employees to maintain the secrecy of that information and materials and refrain from the use of the Trade Secrets and confidential proprietary information and materials after their employment with HandyLab; and by acquiring, disclosing, or using Plaintiffs' Trade Secrets and confidential proprietary information and materials despite knowing that Plaintiffs' Trade Secrets and confidential proprietary information and materials were derived from or through former HandyLab employees who owed a duty to maintain the secrecy of the information and materials and refrain from the use of the Trade Secrets after their employment with HandyLab.

62.     Documents produced in discovery reveal that Brahmasandra, Williams, and others in the course of their day-to-day activities at NeuMoDx, and in their capacities as officers of NeuMoDx, improperly disseminated Plaintiffs' Trade Secrets and confidential proprietary information and materials to NeuMoDx employees and that Plaintiffs' Trade Secrets and confidential proprietary information and materials were misused by NeuMoDx employees in the development of NeuMoDx products.

63.     Documents containing Plaintiffs' Trade Secrets and confidential proprietary information and materials were stored and maintained in central depositories at NeuMoDx and broadly accessible to NeuMoDx employees.  Moreover, at least Brahmasandra maintained copies of documents disclosing Plaintiffs' Trade Secrets and confidential proprietary information and materials on his computer and referred to those documents in the performance of his duties as President of NeuMoDx.

64.     NeuMoDx, by and through its agents including, at a minimum, Brahmasandra and Williams, was aware of, or should have been aware of, Brahmasandra's and Williams's obligations to Plaintiffs, and nevertheless facilitated, encouraged, and condoned the secret retention, misuse, and disclosure of Trade Secrets and confidential and proprietary information and materials. NeuMoDx thus intentionally and improperly interfered with and solicited the breach of Brahmasandra's and William's performance of their obligations under the surviving provisions of their At-Will Employment Agreements with HandyLab, including the provisions relating to the nondisclosure, use, and surrender of HandyLab's trade secrets and confidential information and materials.

65.     NeuMoDx, by and through its agents including, at a minimum, Brahmasandra and Williams, willfully misappropriated Plaintiffs' proprietary, confidential, and trade secret information and materials in order to in order to leverage for NeuMoDx's gain the extensive time and investment that Plaintiffs expended in discovering and developing the HandyLab technology.

66.     On information and belief, NeuMoDx, by and through its agents, misappropriated highly confidential Plaintiffs' Trade Secrets and other confidential proprietary information and materials by improperly acquiring Plaintiff's trade secrets, information and materials and disclosing it indiscriminately to NeuMoDx employees.

67.     On information and belief, NeuMoDx misused and relied on Plaintiffs' Trade Secrets and confidential proprietary information and materials in designing products, developing strategy, and otherwise building its business in a way which would not have been possible but for the misappropriation of Plaintiffs' Trade Secrets and confidential proprietary information and materials.

68.     NeuMoDx, by and through its agents, has co-opted, disclosed, and misused hundreds of documents reflecting or illustrating Plaintiffs' Trade Secrets and confidential proprietary information and materials.   As NeuMoDx's misappropriation is too extensive to describe individually here, and fact discovery is ongoing, Plaintiffs provide the following illustrative examples below.

69.     NeuMoDx, by and through its agents, appropriated and relied on trade secret, confidential proprietary engineering and technical drawings of Plaintiffs' multi-lane microfluidic cartridge.   *See* Ex. 8.   Plaintiffs' engineering drawings and files were misappropriated by at least Brahmasandra pursuant to his employment with Plaintiffs and in direct violation of his contractual obligations to Plaintiffs.   At least Brahmasandra, acting in his capacity as President and COO of NeuMoDx, shared Plaintiffs' trade secret and confidential proprietary engineering drawings internally at NeuMoDx.   For example, on February 7, 2013, Brahmasandra sent Molecular Systems Corp. employee Michael Kusner ("Kusner") an engineering drawing from HandyLab's Jaguar cartridge:



Ex. 9.   Upon information and belief, NeuMoDx employees were instructed to, and did, misuse Plaintiffs' engineering drawings to design NeuMoDx's PCR cartridge.   Indeed, five days after receiving the HandyLab Jaguar engineering drawing from Brahmasandra, Kusner summarized his

████████ ███████████ – ███████████████████████

take-aways from that drawing: ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

Ex. 10.

70.     NeuMoDx, by and through its agents, also misappropriated and relied on Plaintiffs'

documents teaching methods and chemical formulations for ██████████████ For example,

Brahmasandra, acting in his capacity as President and COO of NeuMoDx, shared with employees

at NeuMoDx HandyLab's trade secret and confidential development documents testing █████████

██████████ ██████████████████████████████████





Ex. 11, Ex. 12.  Indeed, NeuMoDx's PCR reagents have since been developed with ███████

███████

71.    NeuMoDx, by and through its agents, also appropriated and relied on actual samples of HandyLab's nucleic-acid binding beads as well as methods of manufacturing them. For example, in 2012, Brahmasandra corresponded with NeuMoDx employee Betty Wu ("Wu") regarding experiments conducted using lots of HandyLab's nucleic-acid binding beads taken from HandyLab (prior to their incorporation into commercially-available mixes), and discussing their possession of the method to make new lots of HandyLab's nucleic-acid binding beads:



Ex. 13, Ex. 14.

72.    NeuMoDx, by and through its agents, also appropriated and relied on Plaintiffs' marketing assessments, strategy reports, and primary research conducted exclusively for and at the

expense of Plaintiffs.  For example, when NeuMoDx's business was still in its nascent phase in March 2013, Brahmasandra and Williams, acting in their respective capacities as officers of Molecular Systems Corp., exchanged emails attaching a set of HandyLab's confidential market research and product planning analyses and reports which they had secretly stolen from Plaintiffs.



Ex. 15.  As shown below, these materials included reports that were clearly marked as having been prepared exclusively for Plaintiffs.



Ex. 16.

73.     NeuMoDx, by and through its agents, appropriated and relied on trade secret, proprietary and confidential lists aggregated by Plaintiffs of the third-party manufacturers, suppliers, and/or vendors of ***each and every component*** of Plaintiffs' products.  *See* Ex. 17 and

18. On information and belief, this information was widely disseminated at NeuMoDx via a shared drive entitled "Shared Resources" such that any NeuMoDx employee could access Plaintiffs' proprietary compilations of vetted manufacturers, suppliers, and other vendors as needed. On information and belief, NeuMoDx employees pursued and obtained contracts with vendors on Plaintiffs' misappropriated lists. *See* Ex. 19.

74. At a minimum, Defendants, recognizing that it would take them too long to develop independently the information that Plaintiffs had painstakingly researched and learned, misused Plaintiffs' Trade Secrets and proprietary and confidential information to obtain a head start for NeuMoDx's business in terms of technology, functionality, sales, and market share.

75. Defendant NeuMoDx knew or should have known of Brahmasandra's and Williams's contractual obligations to Plaintiffs, which included obligations (1) not to use or disclose Plaintiffs' Trade Secrets and confidential proprietary information and materials outside the scope of their employment with Plaintiff, (2) to assign intellectual property, including trade secrets, to Plaintiffs, (3) to return Plaintiffs' Trade Secrets and confidential proprietary information and materials upon the termination of their employment, and (4) to give a duty of loyalty to Plaintiffs as their employee.

76. NeuMoDx's improper access to and use of Plaintiffs' Trade Secrets and confidential proprietary information and materials gave NeuMoDx a substantial head start and advantage in developing its diagnostic testing products. NeuMoDx would not have been able to develop its diagnostic testing products within the same time period but for its misappropriation and use of Plaintiffs' Trade Secrets and confidential proprietary information and materials, aided by Brahmasandra's repeated and pervasive disclosures of Plaintiffs' Trade Secrets and confidential proprietary information and materials.

37

77.     Plaintiffs' Trade Secrets and confidential proprietary information and materials derive significant actual or potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Plaintiffs derive substantial business advantage and significant economic benefit in the development, marketing, and sale of systems and solutions for diagnostic testing from maintaining the confidentiality of the Plaintiffs' Trade Secrets and confidential proprietary information and materials.

78.     Brahmasandra's and Williams's improper acquisition, retention, disclosure, and use of the Plaintiffs' Trade Secrets and confidential proprietary information and materials, and NeuMoDx's improper acquisition, disclosure and use of Plaintiffs' Trade Secrets and confidential proprietary information and materials, have caused and will cause severe competitive harm, substantial economic damages, and disadvantage to Plaintiffs', some of which is not even known or knowable at the present time.

## COUNTERCLAIMS-IN-REPLY

79.     Pursuant to Federal Rule of Civil Procedure 13,  Plaintiffs hereby plead their counterclaims-in-reply against Defendants NeuMoDx, Brahmasandra, and Williams, as set forth herein.

## FIRST COUNTERCLAIM-IN-REPLY
**Misappropriation Under and Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836
(Against NeuMoDx, Brahmasandra, and Williams)**

80.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

81.     Plaintiffs own and possess certain confidential, proprietary, and Trade Secret information, as alleged above.

82.     Plaintiffs have taken reasonable and extensive measures to keep secret its confidential, proprietary, and Trade Secret information, as described above, including but not limited to by restricting physical access to Plaintiffs' facilities with keycard entry, password-protecting computers, restricting access by certain employees to certain materials based on need, and requiring employees to abide by confidentiality rules.  Due to these security measures, Plaintiffs' confidential, proprietary, and Trade Secret information is not available for others in the diagnostic devices industry—or any other industry—to use through any legitimate means.

83.     Plaintiffs' confidential, proprietary, and Trade Secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

84.     Plaintiffs' confidential, proprietary, and Trade Secret information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

85.     At no time did Plaintiffs consent to Defendants' taking, using, retaining, or disclosing Plaintiffs' confidential, proprietary, and Trade Secret information for any purpose.

86.     In violation of Plaintiffs' rights, Defendants misappropriated Plaintiffs' confidential, proprietary and Trade Secret information within the meaning of the DTSA, 18 U.S.C. § 1836, in the improper and unlawful manner as alleged herein, including by acquiring, using and disclosing the confidential, proprietary and trade secret information for their economic benefit. Defendants' ongoing misappropriation of Plaintiffs' confidential, proprietary, and Trade Secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Defendants have attempted and continue to attempt to conceal their misappropriation.

87.     Brahmasandra and Williams misappropriated Plaintiffs' Trade Secrets by, for example, disclosing or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were acquired under circumstances giving rise to a duty by them to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab; and by disclosing or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were derived from or through former HandyLab employees who owed a duty to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab.   Brahmasandra improperly retained hundreds of Plaintiffs' confidential documents (including Trade Secrets) after his employment with HandyLab.   At NeuMoDx, Brahmasandra and Williams misappropriated and improperly retained, disclosed, and used and enabled others at NeuMoDx to disclose and use those documents, in violation of their duties of secrecy to Plaintiffs and their duties to return Plaintiffs' property upon leaving.

88.     NeuMoDx misappropriated Plaintiffs' Trade Secrets by, for example, acquiring, disclosing, or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were acquired under circumstances giving rise to a duty by former HandyLab employees to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab; and by acquiring, disclosing, or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were derived from or through former HandyLab employees who owed a duty to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab.

89.     Specifically, Defendants further misappropriated Plaintiffs' Trade Secrets by using them to develop, manufacture, market, sell, maintain, service, and/or upgrade NeuMoDx's

molecular system products, for Defendants' benefit and to the detriment of Plaintiffs, and such improper use continues to this day.

90.     As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I), in an amount to be proven at trial.  In addition, as a direct and proximate result of Defendants' misappropriation, Defendants have been unjustly enriched as a result of their misappropriation of the Plaintiffs' Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(II) in an amount to be proven at trial.

91.     Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND COUNTERCLAIM-IN-REPLY
**Misappropriation Under and Violation of Michigan Uniform Trade Secrets Act, MCL 445.1901 et seq. (MUTSA) and/or Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 et seq. (DUTSA)**
**(Against NeuMoDx, Brahmasandra, and Williams)**

92.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein. Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

93.     Plaintiffs own and possess certain confidential, proprietary, and Trade Secret information, as alleged above.

94.     Plaintiffs have taken reasonable and extensive measures to keep secret its confidential, proprietary, and trade secret information, as described above, and including but not limited to by restricting physical access to Plaintiffs' facilities with keycard entry, password-

protecting computers, restricting access by certain employees to certain materials based on need, and requiring employees to abide by confidentiality rules.  Due to these security measures, Plaintiffs' confidential, proprietary, and Trade Secret information is not available for others in the diagnostic devices industry—or any other industry—to use through any legitimate means.

95.     Plaintiffs' confidential, proprietary, and Trade Secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

96.     At no time did Plaintiffs consent to Defendants' taking, using, retaining, or disclosing Plaintiffs' confidential, proprietary, and Trade Secret information for any purpose.

97.     In violation of Plaintiffs' rights, Defendants misappropriated Plaintiffs' confidential, proprietary and Trade Secret information, in the improper and unlawful manner as alleged herein, including by acquiring, using and disclosing the confidential, proprietary and Trade Secret information for their economic benefit.  Defendants' ongoing misappropriation of Plaintiffs' confidential, proprietary, and Trade Secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation.

98.     Brahmasandra and Williams misappropriated Plaintiffs' Trade Secrets by, for example, disclosing or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were acquired under circumstances giving rise to a duty by them to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab; and by disclosing or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were derived from or through former HandyLab employees who owed a duty to

maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab. Brahmasandra improperly retained hundreds of Plaintiffs' confidential documents (including Trade Secrets) after his employment with HandyLab. At NeuMoDx, Brahmasandra and Williams disclosed, used, and enabled others at NeuMoDx to use those documents, in violation of their duties of secrecy to Plaintiffs and their duties to return Plaintiffs' property upon leaving.

99.     NeuMoDx misappropriated Plaintiffs' Trade Secrets by, for example, acquiring, disclosing, or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were acquired under circumstances giving rise to a duty by former HandyLab employees to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab; and by acquiring, disclosing, or using Plaintiffs' Trade Secrets despite knowing that Plaintiffs' Trade Secrets were derived from or through former HandyLab employees who owed a duty to maintain the secrecy of the trade secrets and refrain from the use of the trade secrets after their employment with HandyLab.

100.    Specifically, Defendants further misappropriated Plaintiffs' Trade Secrets by using them to develop, manufacture, market, sell, maintain, service, and/or upgrade NeuMoDx's molecular system products, for Defendants' benefit and to the detriment of Plaintiffs, and such improper use continues to this day.

101.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. In addition, as a direct and proximate result of Defendants' misappropriation, Defendants have been unjustly

enriched as a result of their misappropriation of the Plaintiffs' Trade Secrets in an amount to be proven at trial.

102.    Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

### THIRD COUNTERCLAIM-IN-REPLY
**Unfair Competition**
**(Against NeuMoDx)**

103.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

104.    Plaintiffs own and possess certain confidential and proprietary information and material aside from information and material that does not fall within the definition of trade secrets. This confidential and/or propriety information and material is the product of Plaintiffs' skill, financial investment, and labor.

105.    At no time did Plaintiffs consent to Defendants' taking, using, retaining, or disclosing Plaintiffs' confidential and/or proprietary information for any purpose.

106.    Defendants have engaged in unfair competition by misappropriating Plaintiffs' confidential and/or proprietary information and material, in the improper and unlawful manner as alleged herein, including by acquiring, using, and/or disclosing the confidential and/or proprietary information and material for Defendants' unfair advantage and benefit.   Defendants' ongoing misappropriation of Plaintiffs' confidential and/or proprietary information and material was intentional, knowing, willful, malicious, fraudulent, deceitful, and oppressive.   Defendants have

attempted and continue to attempt to conceal their misappropriation from Plaintiffs and the public. Defendants actions misled Plaintiffs and have misled and continue to mislead the public.

107.    As the direct and proximate result of Defendants' conduct, Plaintiffs have suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and damages, in an amount to be proven at trial.

## FOURTH COUNTERCLAIM-IN-REPLY
### CONVERSION
### (Against NeuMoDx)

108.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

109.    Plaintiffs have rightful ownership and right of possession over its confidential and/or proprietary information and material, including its Trade Secrets.

110.    NeuMoDx intentionally and unlawfully exercised dominion over Plaintiffs' confidential and/or proprietary information and material.  NeuMoDx's tortious conduct was not privileged, excused, or authorized.

111.    Plaintiffs were dispossessed of their right to the exclusive legitimate use and possession of their confidential and/or proprietary information and material.

112.    NeuMoDx's tortious conduct constituted the conversion of an identifiable sum of money, the amount of which to be determined at trial.

113.    NeuMoDx's tortious conduct was willful and malicious, warranting an award of punitive damages in addition to the full value of the converted property.

## FIFTH COUNTERCLAIM-IN-REPLY
### TRESPASS TO CHATTELS
### (Against NeuMoDx)

114.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

115.    Plaintiffs have rightful ownership and right of possession over its confidential and/or proprietary information and material, including its Trade Secrets.

116.    NeuMoDx intentionally and substantially interfered with Plaintiffs' right to the exclusive use and possession of its confidential and/or proprietary information and material, including by way of NeuMoDx's ongoing wrongful possession, control, and use of such information and material.

117.    Plaintiffs were deprived of their right to the exclusive legitimate use and possession of its confidential and/or proprietary information and material.

118.    NeuMoDx's tortious conduct with regards to Plaintiffs' confidential and/or proprietary information and material is the proximate cause of damages suffered by Plaintiffs.

119.    NeuMoDx's tortious conduct resulted in injury to Plaintiffs.

120.    Plaintiffs are entitled to damages, the extent of which to be determined at trial.

121.    NeuMoDx's tortious conduct was not privileged or excused.

122.    NeuMoDx's tortious conduct was willful and malicious, warranting an award of punitive damages in addition to actual damages suffered by Plaintiffs.

## SIXTH COUNTERCLAIM-IN-REPLY
### UNJUST ENRICHMENT
### (Against NeuMoDx)

123.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

124.    NeuMoDx has been enriched in the form of highly valuable confidential, proprietary, and Trade Secret information and material of Plaintiffs that was unlawfully misappropriated and improperly retained, acquired, disclosed, and used by NeuMoDx's employees.  This enrichment has occurred at the expense of Plaintiffs, who spent millions of

dollars creating that confidential, proprietary, and Trade Secret information and material to develop, market, and sell products.

125.    NeuMoDx has therefore been unjustly enriched at the expense of Plaintiffs, and Plaintiffs are entitled to restitution in an amount to be established at trial.

## SEVENTH COUNTERCLAIM-IN-REPLY
### BREAD OF CONTRACT
### (Against Brahmasandra, and Williams)

126.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

127.    Plaintiff HandyLab entered in valid and enforceable contracts with Brahmasandra, namely, the At-Will Employment Agreement and NDA.

128.    Plaintiff HandyLab entered in a valid and enforceable contract with Williams, namely, the At-Will Employment Agreement.

129.    At no time was Brahmasandra's performance under the At-Will Employment Agreement or NDA excused, aside from the limited waiver of the non-compete provisions.  For example, Brahmasandra acknowledged in the At-Will Employment Agreement and NDA that the restrictions on disclosure and use of confidential information and material shall continue to apply after his employment terminated with HandyLab.

130.    At no time was Williams's performance under the At-Will Employment Agreement excused.  For example, Williams acknowledged in the At-Will Employment Agreement that the restrictions on disclosure and use of confidential information and material shall continue to apply after his employment terminated with HandyLab.

131.    Brahmasandra breached the At-Will Employment Agreement and NDA, including by disclosing confidential HandyLab documents and information to NeuMoDx and/or other third-

parties in connection with his employment as the President and Chief Operating Officer of NeuMoDx, using confidential HandyLab documents and information and material in connection with his employment as the President and Chief Operating Officer of NeuMoDx, and failing to surrender confidential HandyLab documents and information and material to HandyLab upon the termination of his employment.  Brahmasandra also breached the Amendment to the Employment Agreement by failing to perform his obligations under paragraph "2." of the letter agreement, including by failing to provide "additional information about the Proposed Business" and that such Proposed Business was misappropriated from Plaintiffs.

132.    Williams breached the At-Will Employment Agreement, including by disclosing confidential HandyLab documents and information and material to NeuMoDx and/or other third-parties in connection with his employment as the CEO of NeuMoDx, using confidential HandyLab documents and information and material in connection with his employment as the CEO of NeuMoDx, and failing to surrender confidential HandyLab documents and information and material to HandyLab upon the termination of his employment.

133.    As a direct and proximate result of Brahmasandra's and Williams's breach of their At-Will Employment Agreements, Plaintiffs have been harmed in an amount to be proven at trial.

### EIGHTH COUNTERCLAIM-IN-REPLY
**BREACH OF FIDUCIARY DUTIES**
**(Against Brahmasandra and Williams)**

134.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

135.    Brahmasandra and Williams owed a fiduciary duty and duty of loyalty to HandyLab as directors, nondirector officers, and/or key managerial personnel of HandyLab.  In addition, Brahmasandra and Williams owed a fiduciary duty and duty of loyalty to HandyLab as its agents who were provided with HandyLab's confidential and proprietary information and material.

136.     Brahmasandra breached his duties to HandyLab by improperly using, disclosing, and retaining for the purpose of disclosing HandyLab's confidential and proprietary information and material with or to competitors outside HandyLab or BD.  Brahmasandra also breached his duties to HandyLab by improperly retaining, disclosing, and using HandyLab's confidential and proprietary information and material—which was founded on information and material acquired during his fiduciary relationship with HandyLab—at NeuMoDx.

137.     Williams breached his duties to HandyLab by improperly retaining, disclosing, and using HandyLab's confidential and proprietary information and material —which was founded on information acquired during his fiduciary relationship—at NeuMoDx.

138.     Brahmasandra's and Williams's breaches were a direct and proximate cause of damages suffered by Plaintiffs, in an amount to be determined at trial.

## NINTH COUNTERCLAIM-IN-REPLY
### FRAUD IN THE INDUCEMENT
### (Against Brahmasandra)

139.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

140.     On or around December 2011, at the time Brahmasandra requested that Plaintiffs amend his At-Will Employment Agreement to waive the non-compete provision, Brahmasandra by words or conduct represented or misled Plaintiffs to believe that he had thus far not breached any of the provisions of the At-Will Employment Agreement and had been an employee in good-standing.  For example, Brahmasandra stated in a December 8, 2011 email to an executive at BD that he had joined a company called Life Magnetics but that he had cautiously "stayed out of any discussions with [Williams] regarding this type of a system – out of consideration for the non-compete I signed with BD as party of my employment agreement."  Brahmasandra thus represented by words or conduct that he had not breached any provision of the employment

49

agreement, including the confidentiality provisions and the non-compete provision that he was asking Plaintiffs to voluntarily waive.   Brahmasandra also represented that Williams and Molecular Systems Corp. had "ideas" but "really no technology yet to implement anything" and therefore would "not result in the development of any competing products for at least 3-4 years from when we do start to work on the product."  Brahmasandra also represented that Williams and Molecular Systems Corp. had "ideas" but "really no technology yet to implement anything" and therefore would "not result in the development of any competing products for at least 3-4 years from when we do start to work on the product."  Brahmasandra by words or conduct represented or misled Plaintiffs to believe that Molecular Systems Corp. would start from "really no technology"—and not, for example, a head-start based on hundreds of Plaintiffs' confidential, proprietary, and Trade Secret documents and information—that Brahmasandra wished to explore the "the development" of a new idea or new technology (when instead he planned to co-opt Plaintiffs' development) and that Brahmasandra was going to develop "new technology" (when instead he planned to co-opt Plaintiffs' technologies).

141.   Brahmasandra's representations were material and knowingly or recklessly false. In fact, Brahmasandra was not in good-standing because he had already breached the At-Will Employment Agreement, including by disclosing Plaintiffs' confidential information to third-parties during his employment with HandyLab, by retaining Plaintiffs' confidential information after his employment with HandyLab, and by already planning and developing nucleic acid testing systems, including with Jeff Williams with whom he had not "stayed out of any discussions" but rather exchanged detailed correspondence about product specifications and development, and including with Michelle Mastronardi ███████████████████████████ █ prior to the waiver request being granted.  Moreover, Brahmasandra intended to use and

disclose Plaintiffs' confidential, proprietary, and Trade Secret information at Molecular System Corp./NeuMoDx or with Molecular Systems Corp./NeuMoDx employees.

142.   Brahmasandra intended to deceive and defraud Plaintiffs into granting a waiver of his non-compete.  Plaintiffs relied upon Brahmasandra's material misrepresentations, but for which Plaintiffs would not have agreed to amend Brahmasandra's At-Will Employment Agreement to grant the waiver of Brahmasandra's non-compete.

143.   As a direct and proximate result of Brahmasandra's fraud in the inducement of the amendment to his At-Will Employment Agreement, Plaintiffs have been harmed competitively and harmed in an amount to be proven at trial.

### TENTH COUNTERCLAIM-IN-REPLY
### SILENT FRAUD
### (Against Brahmasandra)

144.   Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

145.   On or around December 2011, at the time Brahmasandra requested that Plaintiffs amend his At-Will Employment Agreement to waive the non-compete provision, he suppressed the material facts that (1) he had already breached the At-Will Employment Agreement, including by disclosing Plaintiffs' confidential information to third-parties during his employment with HandyLab, by retaining Plaintiffs' confidential information after his employment with HandyLab; and by already planning and developing nucleic acid testing systems, including with Jeff Williams with whom he had not "stayed out of any discussions" but rather exchanged detailed correspondence about product specifications and development, and including with Michelle Mastronardi ███████████████████████████████ prior to the waiver request being granted; and (2) he intended to use and disclose Plaintiffs' confidential, proprietary,

and Trade Secret information at Molecular System Corp./NeuMoDx or with Molecular Systems Corp./NeuMoDx employees.

146.    Brahmasandra's suppression of those material facts was knowing or reckless. Moreover, Brahmasandra had a legal or equitable duty to disclose those facts to Plaintiffs during the negotiation of any amendment to his At-Will Employment Agreement with HandyLab, based on his former roles as director, officer, and/or key managerial personnel of HandyLab; as a former agent of HandyLab provided with HandyLab's confidential and proprietary information, and based on his duties to disclose material new information relating to his prior representations and warranties.

147.    Brahmasandra intended to deceive and defraud Plaintiffs into granting a waiver of his non-compete.  Plaintiffs relied upon Brahmasandra's suppression of those material facts; had Plaintiffs known those facts, they would not have agreed to amend Brahmasandra's At-Will Employment Agreement to grant the waiver of Brahmasandra's non-compete.

148.    As a direct and proximate result of Brahmasandra's suppression of material facts in negotiating the amendment to his At-Will Employment Agreement, Plaintiffs have been harmed competitively and harmed in an amount to be proven at trial.

### ELEVENTH COUNTERCLAIM-IN-REPLY
### TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against NeuMoDx)

149.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

150.    Plaintiff HandyLab entered in a valid and enforceable contract with Brahmasandra, namely, the At-Will Employment Agreement.

151.    Plaintiff HandyLab entered in a valid and enforceable contract with Williams, namely, the At-Will Employment Agreement.

██████  ████████  ─ ████████████████

152.    At all times, NeuMoDx was aware of HandyLab's At-Will Employment Agreement with Brahmasandra, and HandyLab's At-Will Employment Agreement with Williams.

153.    NeuMoDx intentionally and improperly interfered with Brahmasandra's and Williams's performance of their obligations under the At-Will Employment Agreements—including under the provisions thereof relating to the disclosure, use, and surrender of confidential information.

154.    NeuMoDx's interference caused Brahmasandra and Williams to breach their obligations under the At-Will Employment Agreements, including under the provisions thereof relating to the disclosure, use, and surrender of confidential information.

155.    At no time was NeuMoDx's interference excused or justified.  For instance, both Brahmasandra's and Williams's At-Will Employment Agreements stated that the restrictions on disclosure and use of confidential information shall continue to apply after the employment terminates with HandyLab.

156.    As a direct and proximate result of NeuMoDx's tortious interference with Brahmasandra's and Williams's At-Will Employment Agreements, Plaintiffs have been harmed in an amount to be proven at trial.

### TWELFTH COUNTERCLAIM-IN-REPLY
### BREACH OF QIAGEN-HANDYLAB AGREEMENT
### (Against Qiagen and NeuMoDx)

157.    Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

158.    Under NeuMoDx's and Qiagen's theories of the case, Plaintiff HandyLab entered in a valid and enforceable contract with Qiagen, namely the Qiagen-HandyLab Agreement entered on May 21, 2008 and amended on July 1, 2009.

159.     Even under NeuMoDx's and Qiagen's theories of the case, at no time was Qiagen's performance under the Qiagen-HandyLab Agreement excused.

160.     Under NeuMoDx's and Qiagen's theories of the case, at least Qiagen—as well as NeuMoDx if, as NeuMoDx contends, NeuMoDx and any of the Asserted Patents were somehow licensed under the Agreement—have materially breached the Qiagen-HandyLab Agreement in numerous ways, including for the reasons stated in Plaintiffs' January 7, 2021 Letter to Qiagen (D.I. 191 at Ex. A), for example, failing to give HandyLab the required notice of infringement or threatened infringement of HandyLab patents as required by Section 7.1 of the Qiagen-HandyLab Agreement.   Qiagen failed to provide HandyLab with notice of infringement even though Qiagen had knowledge of such infringement at least as of December 2018.  As another example, Qiagen and NeuMoDx materially breached the agreement by challenging the validity of HandyLab's patents before the United States Patent Trial and Appeal Board, contrary to Sections 4.5 and 14 of the Qiagen-HandyLab Agreement.  Qiagen's and NeuMoDx's material failures, neglect, refusals and/or breaches are not curable, and were not cured.

161.     As a direct and proximate result of Qiagen's and NeuMoDx's material breach of the Qiagen-HandyLab Agreement, Plaintiffs have been harmed in an amount to be proven at trial

## RESERVATION OF RIGHTS

162.     The above affirmative defenses and counterclaims are based upon incomplete information because Plaintiffs' discovery and investigation of the claims, counterclaims and defenses in this action are continuing.  Therefore, Plaintiffs reserve the right to supplement and/or amend such defenses and/or counterclaims if and when further information becomes available.

## PRAYER FOR RELIEF FOR COUNTERCLAIMS-IN-REPLY

WHEREFORE, Plaintiffs pray for the following relief, declaration and judgment:

a.    Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

b.    An injunction against Defendants enjoining them from disclosing or using Plaintiffs' confidential or proprietary information, directing them to return all of Plaintiffs' confidential or proprietary information, and enjoining the sale of any of Defendants' products that incorporates or was otherwise derived from Plaintiffs' confidential information;

c.    An order compelling Defendants to have an independent forensic expert review Defendants' computer systems, including any and all e-mail or cloud storage accounts, and identify and delete any of Plaintiffs' confidential or proprietary information;

d.    That Defendants be directed to file with the Court and serve upon Plaintiffs' counsel within thirty (30) days of entry of such order and/or injunction a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with Sections b-c above;

e.    Preliminary and permanent injunctive relief enjoining Defendants, their officers, agents, servants, and employees, and those persons in active concert or participation with any of them, from manufacturing, using, offering for sale, selling in the United States, or importing into the United States, the Accused Products, and any other product derived from, relating to, and/or the fruit of the misappropriation of Plaintiffs' Trade Secrets or confidential proprietary information and materials;

f.    Possession of confidential, proprietary, trade secret information, material, and intellectual property derived from and/or the fruit of Defendants' misappropriation of Plaintiffs' trade secret, confidential, and proprietary information or material;

g.    Other temporary, preliminary, and/or permanent injunctive relief;

██████  █████████  ─ ████████████████████████

h.　　Damages in an amount to be further proven at trial, including actual loss, and reasonable royalties;

i.　　Punitive damages;

j.　　Exemplary damages for willful and malicious misappropriation of Plaintiffs' Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(C) and 6 Del. C. § 2003(b).

k.　　Prejudgment and post-judgment interest;

l.　　Restitution;

m.　　Disgorgement;

n.　　Plaintiffs' lost profits from any lost sales or revenue;

o.　　A declaration that Brahmasandra's Amendment to Employment Agreement (waiver of non-compete) is void, invalid, or voidable by Plaintiffs;

p.　　A declaration that the Qiagen-HandyLab Agreement is void, invalid, or voidable by Plaintiffs;

q.　　Attorneys' fees and costs in the suit herein, to the extent permitted by law;

r.　　Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

██████ ██████████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

OF COUNSEL:

Amy K. Wigmore
Heather M. Petruzzi
David P. Yin
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000

Omar A. Khan
Barish Ozdamar
Laura Macro
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

April 15, 2021

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com
amoshos@morrisnichols.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 24, 2021, upon the following in the manner indicated:

Brian E. Farnan, Esquire                                    *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendants*

James K. Cleland, Esquire                                   *VIA ELECTRONIC MAIL*
Michael Spink, Esquire
Keith Weiss, Esquire
DICKINSON WRIGHT PLLC
350 South Main Street, Suite 300
Ann Arbor, MI  48104
*Attorneys for Defendants*

Alan G. Carlson, Esquire                                    *VIA ELECTRONIC MAIL*
J. Derek Vandenburgh, Esquire
Gary J. Speier, Esquire
Jonathan D. Carpenter, Esquire
Peter M. Kohlhepp, Esquire
Samuel T. Lockner, Esquire
Alexandra J. Olson, Esquire
CARLSON, CASPERS, VANDENBURGH &
   LINDQUIST, P.A.
225 South 6th Street, Suite 4200
Minneapolis, MN  55402
*Attorneys for Defendants*


                                        */s/ Michael J. Flynn*
                                        _____
                                        Michael J. Flynn (#5333)